# 24-1643

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆

ST. JOSEPH'S HOSPITAL HEALTH CENTER,

*Plaintiff-Counter-Defendant-Appellee,*

—v.—

AMERICAN ANESTHESIOLOGY OF SYRACUSE, P.C.,
AMERICAN ANESTHESIOLOGY, INC., NMSC II, LLC,
NORTH AMERICAN PARTNERS IN ANESTHESIA, LLP,

*Defendants-Counter-Claimants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

WILLIAM MAYER KATZ, JR.
DINA MCKENNEY
HOLLAND & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700

SCOTT O'CONNELL
HOLLAND & KNIGHT LLP
10 Saint James Avenue
Boston, Massachusetts 02116
(617) 523-2700

*Attorneys for Defendants-Counter-
Claimants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendants-Counter-Plaintiffs-Appellants American Anesthesiology of Syracuse, P.C. (the "Group"), American Anesthesiology, Inc., NMSC II, LLC, and North American Partners in Anesthesia, LLP (collectively, "NAPA") state that NMSC II, LLC is the parent company of American Anesthesiology, Inc. and NAPA Management Services Corporation is the parent company of NMSC II, LLC.

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 2

STATEMENT OF THE ISSUES ................................................................ 3

STATEMENT OF THE CASE ................................................................... 4

    A.    Factual Background ................................................................ 4

    B.    Procedural History ............................................................... 12

SUMMARY OF THE ARGUMENT ....................................................... 14

STANDARD OF REVIEW ..................................................................... 18

ARGUMENT .......................................................................................... 18

  I.    THE DISTRICT COURT ERRED IN DETERMINING THAT THERE IS NO LIKELIHOOD OF SUCCESS ON THE MERITS. ....................... 19

    A.    The heightened standard for injunctive relief does not apply. ........ 19

    B.    St. Joseph's breached the Agreement. ............................................. 21

    C.    The Non-Solicitation Clause is enforceable. ................................... 22

    D.    St. Joseph's remaining challenges to NAPA's breach-of-contract claim fail. ............................................................................ 38

  II.    THE DISTRICT COURT ERRED IN DETERMINING THAT THERE WAS NO IRREPARABLE INJURY ....................................................... 43

    A.    NAPA established that it would suffer irreparable injury in the form of lost customer relationships and opportunity costs. ............ 44

    B.    NAPA established that it would suffer irreparable injury due to the loss of its trained clinicians. ...................................................... 48

    C.    NAPA established that it would suffer irreparable injury in the form of reputational harm. ................................................................ 51

  III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTERESTS TIP IN NAPA'S FAVOR. ............................................................................... 53

  IV.    THE DISTRICT COURT ERRED IN REFUSING TO CONDUCT AN EVIDENTIARY HEARING. ................................................................... 54

CONCLUSION ....................................................................................... 56

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*159 MP Corp. v. Redbridge Bedford, LLC,*
  33 N.Y.3d 353 (N.Y. 2019) ................................................ 54

*Adecco USA, Inc. v. Staffworks, Inc.,*
  2020 WL 7028872 (N.D.N.Y. Sept. 15, 2020) ............................................. 28, 31

*Adecco USA, Inc. v. Staffworks, Inc.,*
  2021 WL 2593304 (N.D.N.Y. June 23, 2021) ................................................ 22

*Admarketplace Inc. v. Salzman,*
  2014 WL 1278504 (N.Y. Sup. Ct. Mar. 28, 2014) ............................................ 28

*Amaker v. Fischer,*
  453 F. App'x 59 (2d Cir. 2011) ................................................ 18

*Arista Dev., LLC v. Clearmind Holdings, LLC,*
  172 N.Y.S.3d 271 (4th Dep't 2022) ................................................ 43

*Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983) ................................................ 39

*BDO Seidman v. Hirshberg,*
  93 N.Y.2d 382 (N.Y. 1999) ................................................ 32, 36

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
  784 F.3d 887 (2d Cir. 2015) ................................................ 19

*Briggs v. Bremby,*
  792 F.3d 239 (2d Cir. 2015) ................................................ 18

*Bronx Household of Faith v. Bd. of Educ.,*
  331 F.3d 342 (2d Cir. 2003) ................................................ 18

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
  996 F.2d 537 (2d Cir. 1993) ................................................ 41

iii

*Cenveo Corp. v. Diversapack LLC*,
　2009 WL 3169484 (S.D.N.Y. Oct. 1, 2009) ........................................ 37

*Commodity Futures Trading Comm'n v. Incomco, Inc.*,
　649 F.2d 128 (2d Cir. 1981)..................................................... 17, 53, 55

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.*,
　37 F. Supp. 2d 192 (E.D.N.Y. 1999) ...................................... 22, 25, 54

*Design Strategy Corp. v. Knack Sys., LLC*,
　2007 WL 4562926 (S.D.N.Y. Dec. 18, 2007) .................................... 26

*Express Freight Sys., Inc. v. YMB Enters., Inc.*,
　623 F. Supp. 3d 39 (E.D.N.Y. 2022) ...................................... 28, 31, 36

*Fido's Fences v. Canine Fence Co.*,
　672 F. Supp. 2d 303 (E.D.N.Y. Nov. 30, 2009) ............................... 39

*Finger v. Pearson PLC*,
　2019 WL 10632904,n.2 (S.D.N.Y. Sept. 16, 2019)........................... 35

*Forts v. Ward*,
　566 F.2d 849 (2d Cir. 1977)............................................. 17, 18, 31, 55

*Genesee Valley Tr. Co. v. Waterford Grp., LLC*,
　14 N.Y.S.3d 605 (4th Dep't 2015)........................................ 15, 22, 32

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
　878 F.3d 524 (6th Cir. 2017)....................................................... 51

*Locke v. Tom James Co.*,
　2013 WL 1340841 (S.D.N.Y. Mar. 25, 2013) ................................... 37

*Lucescu v. Zafirovski*,
　2018 WL 1773134,n.3 (S.D.N.Y. Apr. 11, 2018) .............................. 36

*Marsh USA Inc. v. Karasaki*,
　2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008)............................... *passim*

*MasterCard Int'l Inc. v. Nike, Inc.*,
    164 F. Supp. 3d 592 (S.D.N.Y. 2016).......................................22-23, 25

*Mathias v. Jacobs*,
    167 F. Supp. 2d 606 (S.D.N.Y. 2001)............................................. *passim*

*Mercer Health & Benefits LLC v. DiGregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y. 2018)..................................................... 22

*Millennial Plastic Surgery PLLC v. James*,
    2021 WL 5988322 (S.D.N.Y. Dec. 16, 2021) ....................................... 47

*N. Collier Fire Control & Rescue Dist. Firefighter*
*Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).................................... 35

*Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*,
    2008 WL 207843 (E.D.N.Y. Jan. 24, 2008) ........................... 33, 50, 51

*Natsource LLC v. Paribello*,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001)................................44, 45-46, 48

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,*
*LLP*, 322 F.3d 147 (2d Cir. 2003)). ...................................................... 21

*Ogden v. Little Caesar Enters.*,
    393 F. Supp. 3d 622 (E.D. Mich. 2019).............................................. 40

*Omni Consulting Group, Inc. v. Marina Consulting, Inc.*,
    2007 WL 2693813 (W.D.N.Y. Sept. 12, 2007) ..................23-24, 25, 28

*Omni Consulting Grp., Inc. v. Pilgrim's Pride Corp.*,
    488 F. App'x 478 (2d Cir. 2012) ........................................... 15, 24, 38

*Oneida Nation of N.Y. v. Cuomo*,
    645 F.3d 154 (2d Cir. 2011).................................................................. 18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)................................................................... 40

*Reed Elsevier Inc. v. Transunion Holding Co.*,
  2014 WL 97317 (S.D.N.Y. Jan. 19, 2014) .................................................. 23, 37

*Register.com, Inc. v. Verio, Inc.*,
  126 F. Supp. 2d 238 (S.D.N.Y. 2000) ........................................................ 46-47

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ........................................................................ 51

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) .................................................................................. 39

*Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ...................................................................... 52

*Silipos, Inc. v. Bickel*,
  2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) .............................................. 37

*Specialty Minerals, Inc. v. Pluess-Staufer AG*,
  395 F. Supp. 2d 109 (S.D.N.Y. 2005) ........................................................ 43

*Spherenomics Glob. Contact Ctrs. v. vCustomer Corp.*,
  427 F. Supp. 2d 236 (E.D.N.Y. 2006) ...................................................... 26, 28

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (2d Cir. 1999) ................................................................. *passim*

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ...................................................................... 41

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) .......................................................................... 20

*Tri-Star Lighting Corp. v. Goldstein*,
  58 N.Y.S.3d 448 (2d Dep't 2017) .............................................................. 19

*Trixler Brokerage Co. v. Ralston Purina Co.*,
  505 F.2d 1045 (9th Cir. 1974) .................................................................. 39

*United Pool Distrib., Inc. v. Custom Courier Sols., Inc.*,
  2024 WL 3163432 (W.D.N.Y. June 25, 2024) .................................................. 26

*Veramark Techs., Inc. v. Bouk*,
  10 F. Supp. 3d 395 (W.D.N.Y. 2014) ........................................................... 47-48

*Willis of N.Y., Inc. v. DeFelice*,
  750 N.Y.S.2d 39 (1st Dep't 2002) ................................................................ 22

*Wolff v. Rare Medium, Inc.*,
  171 F. Supp. 2d 354 (S.D.N.Y. 2001) ........................................................... 42

*Wrap-N-Pack, Inc. v. Eisenberg*,
  2007 WL 952069 (E.D.N.Y. Mar. 29, 2007) ................................................ 37

**Statutes**

28 U.S.C. § 1292(a)(1) ...................................................................................... 2

28 U.S.C. § 1331 ................................................................................................ 2

28 U.S.C. § 1367 ................................................................................................ 2

## INTRODUCTION

This is an appeal from the denial of motion for a preliminary injunction to enforce a reciprocal non-solicitation provision (the "Non-Solicitation Clause") in an agreement under which the Group provided anesthesiology services to patients at St. Joseph's Hospital Health Center ("St. Joseph's"). In direct contravention of the Non-Solicitation Clause, St. Joseph's raided NAPA's anesthesiologists and certified registered nurse anesthetists ("CRNAs") by recruiting them and offering them employment. St. Joseph's did not dispute that its flagrant actions breached the Non-Solicitation Clause, but instead challenged the Non-Solicitation Clause as unenforceable.

In denying NAPA's request for a preliminary injunction to prevent St. Joseph's from raiding NAPA's trained clinicians, the district court took an overly narrow view of the enforceability of restrictive covenants in ordinary commercial contracts, which are analyzed under a "simple rule of reason" standard. Under the proper standard, NAPA established that it was likely to succeed on the merits of its breach-of-contract claim because the Non-Solicitation Clause protects multiple legitimate business interests, including (1) the hiring, retention, and training of NAPA's clinicians, (2) the goodwill NAPA's clinicians have with St. Joseph's healthcare providers, and (3) the goodwill from NAPA's investments in the Group.

1

The district court also erred in rejecting the multiple forms of irreparable injury facing NAPA, including lost customer relationships and opportunity costs, the loss of its trained clinicians, and reputational harm. And NAPA firmly established the final two requirements for injunctive relief—i.e., that the balance of hardships and the public interest both favor NAPA. Accordingly, the Court should reverse and remand with instructions to grant the preliminary injunction.

Alternatively, the district court erred in refusing to hold an evidentiary hearing on NAPA's motion because the facts—and the inferences to be drawn from them—were in dispute. Therefore, if the Court does not remand with instructions to enter NAPA's requested injunction, it should remand with instructions that the district court hold an evidentiary hearing on NAPA's motion.

## JURISDICTIONAL STATEMENT

The District Court for the Northern District of New York had jurisdiction over Plaintiff-Counter-Defendant-Appellee St. Joseph's Hospital Health Center's ("St. Joseph") Sherman Act claims under 28 U.S.C. § 1331 and over St. Joseph's and NAPA's state law claims under 28 U.S.C. § 1367.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1) because this is an appeal from an interlocutory order granting, continuing, modifying, refusing or dissolving an injunction, or refusing to dissolve or modify an injunction. This appeal is timely. The Court denied NAPA's request for a

preliminary injunction on May 16, 2024, and NAPA timely filed its notice of appeal on June 14, 2024.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in denying NAPA's motion for a preliminary injunction, which includes the following sub-issues:

      a.    Whether the district court erred in determining there was no likelihood of success on the merits;

      b.    Whether the district court erred in determining there was no irreparable injury;

      c.    Whether NAPA established that the balance of hardships and equities favor NAPA; and

      d.    Whether the district court erred in denying NAPA's request for an injunction without conducting an evidentiary hearing.

## STATEMENT OF THE CASE

**A.**   **Factual Background**

1.   The Agreement and the Non-Solicitation Clause

At issue in this appeal is the Administrative and Clinical Services Agreement, which has an effective date of December 31, 2018, and was amended multiple times (the "Agreement").  (J.A. 90 (Santos Decl.) ¶ 4, J.A. 96–167.)  The purpose of the Agreement was to provide an exclusive arrangement under which the Group would provide anesthesiology services for St. Joseph's patients.  (J.A. 96 (Agreement) § I.) The Agreement contains the Non-Solicitation Clause, which runs in favor of both the Group and St. Joseph's and reads as follows:

> Employee Inducement.  During the term of this Agreement and for two (2) years from the date of termination of this Agreement, either Party will not directly or indirectly, whether as an individual, advisor, employee, agent, or otherwise take any action to induce any employee to cease his or her employment with the other Party.

(J.A. 111 (Agreement) § XIII.D, J.A. 134 (First Amendment) ¶ 11.D.)

2.   NAPA's Legitimate Business Interests

The Non-Solicitation Clause protects NAPA's legitimate business interests, including hiring, retaining, and training highly-skilled clinicians and protecting the goodwill that NAPA has developed from its relationships and investments.

      a.    *NAPA's Interest in Hiring, Retaining, and Training Qualified Clinicians.*

In its Complaint, St. Joseph's acknowledged the unique skillsets of NAPA's anesthesiologists and CRNAs (J.A. 24–25 (Compl.) ¶¶ 24–25), highlighted their "critical roles in the care of patients" (J.A. 25 (Compl.) ¶¶ 26-27), and conceded both the significant shortage of qualified anesthesia providers and the difficulty in recruiting and retaining them (J.A. 26 (Compl.) ¶ 30.) NAPA expends considerable effort in identifying, hiring, and retaining qualified anesthesiologists and CRNAs. (J.A. 268 (Gifford Decl.) ¶¶ 6–8, J.A. 271–72 (Second Santos Decl.) ¶ 6.)

Further, NAPA trains its chief clinicians on best practices, including operating room efficiency, inclusion, problem resolution, and culture building. (J.A. 338–39 (Ekbatani Decl) ¶ 9) NAPA also builds its talent base by using unique and propriety talent acquisition and onboarding processes. (*Id.*) These processes allow NAPA to hire and retain excellent clinicians. (*Id.*) NAPA's extensive training and talent acquisition and retention processes establish the foundation for a cohesive anesthesia department focused on teamwork, efficiency, problem solving, and quality of care. (*Id.*) NAPA's investments make its clinicians uniquely valuable and desirable by hospitals like St. Joseph's. (*Id.*) Because of the unique and special value of NAPA's services, it is important for NAPA to have non-solicitation provisions with hospitals like St. Joseph's. (*Id.*) Without these contractual protections, hospitals can raid NAPA's clinicians and take all the value created by and belonging to NAPA. (*Id.*)

5

NAPA also provides its clinicians with access to a proprietary clinical outcome database, which captures all of the material information about every procedure performed by NAPA's affiliated anesthesia practices. (J.A. 339 (Ekbatani Decl.) ¶ 10.) This database, along with regular meetings to address quality assurance and other issues, provide the clinicians with real-time, data-driven analysis and best practices, which the clinicians use to improve outcomes for all procedures. (*Id.*) NAPA's clinicians also have access to Anesthesia Risk Alerts, which are proprietary to NAPA and its affiliates and provide NAPA's clinicians with novel mitigation strategies to better manage high-risk clinical scenarios. (J.A. 339 (Ekbatani Decl.) ¶ 11.)[1]

All of the training and information described above make NAPA's clinicians specially equipped and trained to provide safe, quality, and special clinical care with exceptional outcomes. (J.A. 339–40 (Ekbatani Decl.) ¶ 12.) NAPA's continuing training and education also make its clinicians unique and provide additional value to the medical community. (*Id.*) The Non-Solicitation Clause with St. Joseph's is designed and intended to protect NAPA's investment in the clinicians' training and knowledge base. (*Id.*)

---

[1] NAPA's Anesthesia Risk Alerts program has received the John M. Eisenberg Patient Safety and Quality Award in the National Level Innovation in Patient Safety and Quality category, which is presented by Joint Commission, the nation's largest healthcare accreditor, and the National Quality Forum, the nation's resource for healthcare quality measurement and improvement. (J.A. 339 (Ekbatani Decl.) ¶ 11.)

### b.　NAPA's Goodwill from Relationships

NAPA's goodwill with its customers arises from the relationship that NAPA's clinicians have with the physicians and other professionals who perform surgeries and other procedures at St. Joseph's. (J.A. 338–39 (Ekbatani Decl.) ¶ 9.) The physicians and other professionals are NAPA's "customers," and the relationships that NAPA has developed with these medical professionals are part of NAPA's goodwill. In this regard, NAPA trains its chiefs on best practices for operating room efficiency, inclusion, problem resolution, and culture building. (*Id.*)

In fact, St. Joseph's has admitted in several ways that NAPA has developed significant goodwill with the physicians and other professionals practicing at St. Joseph's. According to St. Joseph's, it is important for anesthesia clinicians—like those provided by NAPA—to have "ongoing relationships with the surgeons and other physicians who perform the procedures that require anesthesia" because "physicians would prefer to use hospital-based anesthesiologists they know and trust rather than to work extensively with locum tenens physicians."[2] (J.A. 28 (Compl.) ¶ 34.) St. Joseph's also acknowledged that physicians have "preferred anesthesiologists with whom they have developed long, successful working

---

[2] Locum tenens physicians are temporary anesthesia providers. (J.A. 28 (Compl.) ¶ 33.)

relationships." (J.A. 49 (Compl.) ¶ 112.) NAPA's clinicians meet all of these criteria that St. Joseph's has alleged to be important in the Complaint.[3]

St. Joseph's has admitted that "[m]ost of NAPA's providers at St. Joseph's have worked at [its] hospital for many years, and have established close working relationships with St. Joseph's surgeons, cardiologists, OB/GYNs and other physicians." (J.A. 243 (Himes Decl.) ¶ 7.) As St. Joseph's acknowledges, "having a stable relationship with a core group of local anesthesia providers who know the surgeons, other proceduralists and nursing teams highly enhances the safe care of patients." (J.A. 241 (Himes Decl.) ¶ 3; *accord* J.A. 220 (Tocco-Bradley Decl.) ¶ 4.) This is exactly what NAPA provided under the Agreement.

St. Joseph's has "spoken with many surgeons on [its] medical staff who are understandably concerned that [NAPA's] anesthesia providers remain at St. Joseph's." (J.A. 228 (Price Decl.) ¶ 13.) This is another reflection of the goodwill that NAPA has developed with the surgeons on St. Joseph's medical staff.

In fact, NAPA's goodwill with St. Joseph's medical staff is so significant, "[i]f Saint Joseph's faced the need to replace [NAPA's] physicians with other anesthesiologists, [it] would expect significant disruptions" and "that many of [St. Joseph's] orthopedic surgeons would likely shift patients to other area hospitals."

---

[3] Because NAPA provided all of the anesthesiologists and CRNAs at St. Joseph's hospital, St. Joseph's statements refers to NAPA's clinicians and their relationships with the physicians and others practicing at St. Joseph's.

(J.A. 232 (Werbeck Decl.) ¶ 8.)  The same is true for St. Joseph's patients and other physicians: "If patients are unable to obtain full coverage for anesthesia services at St. Joseph's many patients and their physicians will instead take those cases to other hospitals within the Syracuse area for services that require anesthesia."  (J.A. 241 (Himes Decl.) ¶ 2.)

> c.  *NAPA's Goodwill from Investments in the Group.*

NAPA has made significant financial investments to acquire the Group. Through its affiliate, NAPA Management Services Corporation ("NMSC"), NAPA provides a full range of management services and operations support to its medical practice affiliates, like the Group.  (J.A. 336 (Ekbatani Decl.) ¶ 2.)  From time to time, NMSC or its affiliates acquire and partner with anesthesia practices to provide, in part, a mechanism for local anesthesia practitioners to sell their interests and/or financial investments in their anesthesia practices, yet continue working as clinicians, while delegating the day-to-day business operations of the practices to NMSC.  (J.A. 337 (Ekbatani Decl.) ¶ 6.)  When an NMSC affiliate acquires or merges with a local practice, in addition to acquiring the exclusive anesthesia contract that practice has with the hospital, it acquires the goodwill of the practice. (*Id.*)

To protect its investment, the NMSC affiliate will maintain a non-solicitation

agreement with the hospital where the Group practices. (*Id.*) This non-solicitation provision is intended to prevent the hospital from taking and capitalizing on the goodwill acquired by the NMSC affiliate. (*Id.*)

The Group's prior shareholders went through a similar process with another national anesthesia practice management company, American Anesthesiology, Inc. ("AAI"). (J.A. 338 (Ekbatani Decl.) ¶ 7.) On June 10, 2013, the eleven shareholders of the Group sold their interests to affiliates of AAI for $18 million. (*Id.*) As part of that transaction, the shareholders entered a non-compete agreement "to protect the goodwill of the Company." (*Id.*) The shareholders also agreed to a non-solicitation agreement recognizing that "a strong relationship and connection exists between Buyer" and "the hospitals and healthcare facilities at which their respective providers provide professional services." (*Id.*)

On May 6, 2020, an NMSC affiliate acquired all of the outstanding stock in AAI—which managed several anesthesia practices, including the Group—for a $50 million cash payment at closing, the retention by seller of approximately $110 million of accounts receivable, and additional payments contingent on certain other financial performance criteria. (*Id.*) Additionally, NMSC and its affiliates provided the Group with working capital to fund its operations after the acquisition. (*Id.*) The Agreement (including its Non-Solicitation Clause), the employment agreements

with the providers (including their noncompete provisions), and the Group's goodwill were all part of the acquisition. (*Id.*)

In sum, the Non-Solicitation Clause and the noncompete provisions in the clinicians' agreements are essential to protect NAPA's investment and the goodwill acquired from the Group. (*Id.*) Those contractual provisions prevent St. Joseph's or the clinicians from taking NAPA's goodwill or investment. (*Id.*)

3.   St. Joseph's Blatant Violation the Non-Solicitation Clause

On December 29, 2023, St. Joseph's provided the Group with a notice that it would not be renewing the Agreement, which would therefore terminate on July 1, 2024. *See* (J.A. 90 (Santos Decl.) ¶ 6, J.A. 173–74.) Because the Non-Solicitation Clause lasts for two years following termination, it precludes St. Joseph's from directly or indirectly taking any action to induce any employee of NAPA to cease employment with NAPA until June 30, 2026. (J.A. 111 (Agreement) § XIII.D, J.A. 134 (First Amendment) ¶ 11.D.)

Beginning in February 2024, St. Joseph's began offering NAPA's clinicians employment, in direct contravention of the Non-Solicitation Clause. This breach of the Agreement was not unintentional happenstance: it was part of a deliberate and thought-out plan to raid the Group's clinicians in contravention of the Non-Solicitation Clause. On February 26, 2024, St. Joseph's announced to the whole medical staff that it would be extending offers of employment to the providers in the

11

Group. (J.A. 91 (Santos Decl.) ¶ 9, J.A. 176–77.) St. Joseph then sent individual offers of employment to the Group's clinicians, which included employment terms, proposed employment agreements, and a summary of benefits. (J.A. 91 (Santos Decl.) ¶ 10, J.A. 533–35.) That same day, St. Joseph's filed its Complaint in this lawsuit challenging the Non-Solicitation Clause, in which it admits that it is actively "offering employment to [NAPA's] anesthesiologists and CRNAs, effective on expiration of the Agreement on July 1, 2024." (J.A. 38 (Compl.) ¶ 72.)

Upon learning of St. Joseph's announcement and offer letters, NAPA sent the Group a cease and desist letter, which demanded that St. Joseph's immediately refrain from any further actions to induce any NAPA clinician to cease or terminate his or her employment with NAPA. (J.A. 91 (Santos Dec.) ¶ 12; J.A. 180–81.) St. Joseph's responded, claiming that the Non-Solicitation Clause was "void and unenforceable." (J.A. 91 (Santos Dec.) ¶ 13; J.A. 183–84.)

### B.    Procedural History

St. Joseph's initiated this lawsuit against NAPA seeking (*inter alia*) to challenge the Non-Solicitation Clause as unenforceable under New York and federal antitrust law and to obtain a declaratory judgment that the Non-Solicitation clause is unenforceable. (J.A. 18–61). NAPA filed counterclaims against St. Joseph's, which included (as relevant here) a claim for breach of contract for St. Joseph's breach of the Non-Solicitation Clause. (J.A. 80–88, J.A. 450–67.) In connection with its

breach-of-contract claim, NAPA moved for a temporary restraining order and preliminary injunction to prevent St. Joseph's from (1) taking any action, directly or indirectly, to induce NAPA's anesthesiologists and CRNAs to cease their employment with NAPA and (2) taking any further action with respect to any offer of employment that St. Joseph's had extended to any NAPA anesthesia clinician. (NAPA's Mot. Prelim. Inj., ECF No. 23.)

The district court denied NAPA's request for a TRO and set an evidentiary hearing to consider NAPA's request for a preliminary injunction. (J.A. 11, Mem. Order Den. TRO, ECF No. 39.) St. Joseph's maintained that an evidentiary hearing was not necessary and sought to place limits on NAPA's ability to present evidence at that hearing. (J.A. 324–25.) In response, NAPA explained that there were disputed factual issues that were material to the request for injunctive relief on which the district court would need to make credibility determinations and factual findings. (J.A. 326–27.) NAPA explained that it intended to call five witnesses at the hearing—two from St. Joseph's and three from NAPA. (J.A. 326.)

The district court then cancelled the evidentiary hearing, determining that an evidentiary hearing was not necessary because the relevant facts were not in dispute. (J.A. 330). NAPA objected to the lack of an evidentiary hearing. (J.A. 331–35.) In its objection, NAPA set forth exactly what evidence it sought to present at the

hearing, including evidence relevant to irreparable harm and whether it had a legitimate business interest sufficient to support the Non-Solicitation Clause. (*Id.*)

On May 16, 2024, the district court entered its Memorandum Decision and Order, which denied NAPA's request for a preliminary injunction. (Special App. 1–23 ("Memorandum Decision and Order").) NAPA timely filed its Notice of Appeal on June 14, 2024. (J.A. 530–31.)

## SUMMARY OF THE ARGUMENT

The district court erred in denying NAPA's request for a preliminary injunction for multiple reasons.

*First*, the district court erred in determining that NAPA failed to establish a likelihood of success on the merits of its breach-of-contract claim. It is undisputed that St. Joseph's flagrantly breached the Non-Solicitation Clause by raiding and poaching NAPA's clinicians. And the Non-Solicitation Clause is enforceable because it protects multiple legitimate business interests. For example, NAPA has a legitimate business interest in (1) hiring, retaining, and training its clinicians, (2) protecting its goodwill developed with the healthcare providers at St. Joseph's, and (3) protecting its goodwill developed from its investments in the Group.

In rejecting these legitimate business interests, the district court took an overly narrow approach to the enforceability of restrictive covenants in ordinary commercial contracts, which are subject to "a simple rule of reason" test. *Mathias*

*v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001). For example, the district court imposed requirements for the existence of a legitimate business interest that are absent from the case law—such as the protection of confidential information and that NAPA's clinicians generate business from St. Joseph's providers. Further, even if these were required, the district court ignored (or improperly weighed) evidence in the record of confidential information and business generation. Finally, the district court relied on cases addressing restrictive covenants in employment contracts to restrict the permissible categories of legitimate business interests that can justify a restrictive covenants. But "[r]estrictive covenants in employment contracts … are subject to more exacting scrutiny than are those in … ordinary commercial contracts." *Mathias*, 167 F. Supp. 2d at 611. And "[a] covenant not to solicit employees is inherently more reasonable and less restrictive than a covenant not to compete." *Genesee Valley Tr. Co. v. Waterford Grp., LLC*, 14 N.Y.S.3d 605, 609 (4th Dep't 2015) (cleaned up). Indeed, in affirming the enforceability of a non-solicitation clause in an ordinary commercial contract, this Court has recognized these crucial distinctions: "We conclude that the district court did not err in enforcing [a non-solicitation provision] as it was not a restrictive covenant preventing an employee from pursuing his livelihood but an anti-raiding provision in a commercial agreement between two sophisticated parties." *Omni Consulting Grp., Inc. v. Pilgrim's Pride Corp.*, 488 F. App'x 478, 480 (2d Cir. 2012).

15

Additionally, St. Joseph's additional challenge to the Non-Solicitation Clause, which were not addressed by the district court, are meritless. By arguing that the Non-Solicitation Clause is an antitrust violation, St. Joseph's ignored that non-solicitation clauses are permissible when ancillary to a legitimate business purpose and that it lacked antitrust standing to assert its antitrust challenge. Nor did St. Joseph's establish that its egregious breach was excused by prior material breach or unclean hands.

*Second*, the district court erred in determining that NAPA had not established an irreparable injury. NAPA established multiple, independent forms of irreparable injury sufficient for injunctive relief. NAPA would suffer irreparable harm from (1) lost customer relationships and opportunity costs, (2) the loss of its trained clinicians, and (3) reputation harm—each of which are difficult or impossible to calculate with damages. The district court committed multiple errors in rejecting NAPA's irreparable harm. For example, the district court's refusal to credit irreparable harm from the loss of goodwill between NAPA's clinicians and other physicians at St. Joseph's was based on its erroneous rejection of this loss of goodwill as a legitimate business interest. And there is no requirement that goodwill (the loss of which courts consider to be irreparable) include business generation. Further, the district court ignored evidence in the record that St. Joseph's conduct is causing reputational harm to NAPA.

16

*Third*, NAPA established that the balance of hardships and public interests weigh in its favor.  Because the district court denied NAPA's injunction request based on its erroneous determination that NAPA has not established a likelihood of success and irreparable injury, it did not address these two requirements.  But NAPA easily met them, and this Court should vacate the Memorandum Decision and Order and remand with instructions to enter NAPA's requested injunction.

*Fourth*, although the evidence submitted by NAPA required the entry of an injunction for the previous reasons, if this Court disagrees, a remand is still required because the district court erred in refusing to conduct an evidentiary hearing.  Throughout its Memorandum Decision and Order, the district court weighed facts and drew inferences from facts.  But this Court has noted that "[i]t is settled law in this Circuit that motions for preliminary injunctions should not be decided on the basis of affidavits when disputed issues of fact exist."  *Commodity Futures Trading Comm'n v. Incomco, Inc.*, 649 F.2d 128, 131 (2d Cir. 1981).  Furthermore, "even if the basic facts [are] conceded," where "the inferences to be drawn from them are in dispute," the district court must hold an evidentiary hearing if practicable.  *Forts v. Ward*, 566 F.2d 849, 854 (2d Cir. 1977).  Accordingly, this Court should vacate the Memorandum Decision and Order and remand with instructions to conduct an evidentiary hearing.

## STANDARD OF REVIEW

The Second Circuit reviews the denial of a motion for preliminary injunction for an abuse of discretion. *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). "Such an abuse occurs when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348 (2d Cir. 2003). Additionally, where allegations of error in the denial of a preliminary injunction involve questions of law, this Court's review is de novo. *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015).

This Court reviews the trial court's decision not to have an evidentiary hearing for an abuse of discretion. *Amaker v. Fischer*, 453 F. App'x 59, 64 (2d Cir. 2011). A court abuses its discretion in refusing to have an evidentiary hearing where the injunction request depends on the resolution of disputed facts. *Forts*, 566 F.2d at 854 ("Thus, even if the basic facts were conceded, the inferences to be drawn from them are in dispute. Consequently, an evidentiary hearing should have been provided if practicable." (citation omitted)).

## ARGUMENT

To obtain an injunction, a party must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury absent an injunction; (3) the balance of hardships tips in the party's favor; and (4) the public interest would not

be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). Because NAPA established each of these elements, the Court erred in denying its request for a preliminary injunction.

## I. THE DISTRICT COURT ERRED IN DETERMINING THAT THERE IS NO LIKELIHOOD OF SUCCESS ON THE MERITS.

NAPA is likely to succeed on the merits of its breach-of-contract claim against St. Joseph's. To establish breach of contract under New York law, the plaintiff must show "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Tri-Star Lighting Corp. v. Goldstein*, 58 N.Y.S.3d 448, 453 (2d Dep't 2017). There is no dispute that St. Joseph's breached the Agreement, the Agreement is enforceable, and St. Joseph's various challenges to NAPA's breach-of-contract claim are meritless. Accordingly, the district court abused its discretion in determining that NAPA was not likely to succeed on the merits of its breach-of-contract claim.

### A. The heightened standard for injunctive relief does not apply.

As a preliminary matter, the heightened standard urged by St. Joseph's in the district court—a "substantial" likelihood of success on the merits—does not apply. (ECF No. 32 at 15–16.) The higher likelihood-of-success standard applies where, *inter alia*, the "injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on

the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995). This Court has noted the potential for misinterpretation of the "substantially all the relief sought" and confirmed that the situations where such a heightened standard would apply are narrow:

> A heightened standard can thus be justified when the issuance of an injunction will ***render a trial on the merits largely or partly meaningless***, either because of temporal concerns, say, a case involving the live televising of an event scheduled for the day on which preliminary relief is granted, or because of the nature of the subject of the litigation, say, a case involving the disclosure of confidential information.

*Id.* at 35 (emphasis added).

Applying this test here, this is not a situation where an injunction would render a trial on the merits meaningless. Indeed, any preliminary injunction could be undone. If, at trial, the district court determined that the Non-Solicitation Clause were unenforceable, it could dissolve the injunction, and St. Joseph's could then hire NAPA's clinicians. This case is therefore unlike the type of "live television event" or "disclosure of confidential information" that this Court intended to require a heightened standard. Regardless, NAPA meets the heightened "substantial likelihood of success" standard. Accordingly, the district court should have granted an injunction under either standard.

## B. St. Joseph's breached the Agreement.

St. Joseph's breached the Non-Solicitation Clause by raiding and poaching NAPA's clinicians. On February 26, 2024, St. Joseph's announced to its medical staff that it would be extending offers of employment to NAPA's anesthesiologists and CRNAs. (J.A. 91 (Santos Decl.) ¶ 9, J.A. 176–77.) That same day, St. Joseph's emailed individual offers of employment to NAPA's anesthesiologists and CRNAs that annexed St. Joseph's compensation policy, benefits guide, professional expense reimbursement policy, paid time off policy, and proposed employment agreement. (J.A. 91 (Santos Decl.) ¶ 10, J.A. 533–35.) Indeed, in its Complaint, St. Joseph's admitted that it was actively "offering employment to [NAPA's] anesthesiologists and CRNAs." (J.A. 38 (Compl.) ¶ 72).[4] St. Joseph's therefore took action "to induce any employee to cease his or her employment" with NAPA in direct contravention of the Non-Solicitation Clause. (J.A. 111 (Agreement) § XIII.D, J.A. 134 (First Amendment) ¶ 11.D.)

In the trial court, St. Joseph's did not dispute that its conduct breached the Non-Solicitation Clause. (*See* J.A. 185–214, 303–14.) Accordingly, there is no dispute that NAPA established that it was likely to succeed on the "breach" element of its breach-of-contract claim.

---

[4] The allegations in St. Joseph's complaint are "judicial admissions" that bind it "throughout the course of the proceeding." *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)).

### C.     The Non-Solicitation Clause is enforceable.

The Non-Solicitation Clause is valid and enforceable under New York law. In reviewing restrictive covenants in ordinary commercial contracts—such as the Agreement—courts apply "a simple rule of reason" test, which balances the "competing public policies in favor of robust competition and freedom to contract." *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (quoting *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999)).  In applying the "rule of reason" test, "[c]ourts typically consider the legitimate business interests protected by the covenant, the reasonableness of the covenant, and the degree of hardship imposed upon the party against whom the covenant is enforced." *Id.* (citing *DAR*, 37 F. Supp. 2d at 198–200).  Notably, "[a] covenant not to solicit employees is inherently more reasonable and less restrictive than a covenant not to compete."  *Genesee Valley Tr. Co. v. Waterford Grp., LLC*, 14 N.Y.S.3d 605, 609 (4th Dep't 2015) (cleaned up).

In the trial court, St. Joseph did not challenge the reasonableness of the Non-Solicitation Clause's two-year duration or geographic scope.[5]  (*See* J.A. 185–214,

---

[5] Nor could it.  The time limitation of two years is reasonable, especially where the services being provided by the employees are unique. *See, e.g.*, *Willis of N.Y., Inc. v. DeFelice*, 750 N.Y.S.2d 39, 41-42 (1st Dep't 2002).  Additionally, "New York courts have upheld as reasonable one year and two year non-solicitation provisions."  *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) (collecting cases); *see also Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744, 2021 WL 2593304, at *8 (N.D.N.Y. June 23, 2021). The duality of the time

303–14.) Instead, St. Joseph's argued that the Non-Solicitation Clause is not enforceable because it does not protect a legitimate business interest. That argument fails, however, because the Non-Solicitation Clause protects multiple business interests and the district court erred in concluding otherwise.

      1.    <u>The Non-Solicitation Clause protects NAPA's interest in hiring, retaining, and training clinicians.</u>

          *a.*    *NAPA has a legitimate business interest in hiring, retaining, and training its clinicians.*

NAPA has a legitimate business interest in preventing the unfair conversion and poaching of its trained and in-place workforce. This legitimate business interest is supported by the case law. For example, in *Omni Consulting Group, Inc. v. Marina Consulting, Inc.*, the Western District of New York considered the

---

restriction further demonstrates its reasonableness. *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 349 (S.D.N.Y. 2018) (nonmovant had its own non-solicitation agreements that applied for two years after employee left company).

And the lack of an express geographic limitation favors St. Joseph's because NAPA, which has a nationwide presence through its affiliates, is precluded from employing St. Joseph's employees on a much wider geographic scale than the narrower one imposed on St. Joseph's, which operates in and around Syracuse. New York courts have upheld nationwide restrictive covenants, including national non-recruitment provisions. *See, e.g.*, *MasterCard*, 164 F. Supp. 3d at 601 (upholding two-year national nonrecruitment provision where the company conducted worldwide business to a global customer base); *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13–civ.–8739, 2014 WL 97317, at *7 (S.D.N.Y. Jan. 19, 2014) (upholding restrictive covenant that lacked geographic scope, stating "where an employer's business is conducted worldwide to a global customer base, the lack of a geographic restriction is necessary" (internal quotations and citations omitted)).

enforceability of a non-solicitation provision in a contract between a consulting company, Omni, and its client, under which the client "agree[d] not to hire, offer employment to, or otherwise utilize the services of personnel supplied by [the consulting company]." No. 01-CV-511A, 2007 WL 2693813, at *2 (W.D.N.Y. Sept. 12, 2007). Like here, the client attempted to poach an employee in violation of the non-solicitation provision, prompting Omni to assert a breach-of-contract claim. *Id.* at *3. In finding the non-solicitation provision enforceable, the district court stated:

> That Omni has a legitimate business interest favoring enforcement of [the non-solicitation provision] ***is readily apparent***. Omni is in the business of providing consulting personnel to its clients. Omni's services include locating and training (if necessary) and matching personnel to meet the needs of its clients. ***If Pilgrim, or any of Omni's other clients, were free to directly hire the personnel provided by Omni, and thus bypass paying Omni a fee for locating and placing the personnel, Omni would not be able to maintain its business.***

*Id.* at *5 (emphasis added).

On appeal, this Court affirmed the enforceability of the non-solicitation clause. In doing so, this Court distinguished between "a restrictive covenant preventing an employee from pursuing his livelihood," and "an anti-raiding provision in a commercial agreement between two sophisticated parties." *Omni Consulting Grp., Inc. v. Pilgrim's Pride Corp.*, 488 F. App'x 478, 480 (2d Cir. 2012). That is the precise scenario before this Court. Two sophisticated parties entered into a commercial contract under which St. Joseph's and NAPA agreed not

to raid each other's employees. The legitimate business interest is "readily apparent." *Omni*, 2007 WL 2693813, at *5. Because the Non-Solicitation provision serves a legitimate business interest, it is enforceable under this Court's opinion in *Omni*.

Other cases confirm the enforceability of the Non-Solicitation Clause. In *DAR*, the parties entered into an agreement with a non-solicitation clause that prevented the plaintiff from hiring the defendant's employees for two years following the agreement's termination. 37 F. Supp. 2d at 195. In rejecting the plaintiff's challenge to the non-solicitation provision, the Eastern District of New York concluded that the defendant had an interest in its "know-how, client base, pool of temporary employees, and goodwill that warrants some protection through restrictive covenants." *Id.* at 199.

The Southern District of New York has likewise recognized that restrictive covenants which prevent competitors from poaching employees further a company's legitimate business interests. *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 602 (S.D.N.Y. 2016) ("Plaintiff's assertion that the Non-Recruitment Provision is designed to prevent competitors from poaching employees from MasterCard's highly developed IS department as well as protect against the misappropriation of MasterCard's proprietary IS network coincides with the legitimate interests recognized by courts in New York."); *Marsh USA Inc. v. Karasaki*, No. 08-civ-

25

4195, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008) (loss of employees would deprive the employer of, *inter alia*, "its investment in training and developing those employees"); *cf. Spherenomics Glob. Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 249 (E.D.N.Y. 2006) (finding a legitimate business interest in preventing defendant from pursuing business opportunities with a client to whom the plaintiff had introduced it). In this regard, "[l]egitimate business interests include 'prevention of unfair competition.'" *Design Strategy Corp. v. Knack Sys., LLC*, No. 07-civ.-0395, 2007 WL 4562926, at *3 (S.D.N.Y. Dec. 18, 2007) (citing cases) *United Pool Distrib., Inc. v. Custom Courier Sols., Inc.*, No. 22-CV-06314, 2024 WL 3163432, at *3 (W.D.N.Y. June 25, 2024) ("Plaintiff has a legitimate business interest in preventing unfair competition.").

Consistent with these principles, the Non-Solicitation Clause protects a legitimate business interest in preventing St. Joseph's unfair poaching of NAPA's clinicians. In the district court, NAPA established that it expends considerable effort in identifying, hiring, and retaining qualified clinicians. (J.A. 268 (Gifford Decl.) ¶¶ 6–8, J.A. 271–72 (Second Santos Decl.) ¶ 6). St. Joseph's itself has acknowledged the unique skillsets of anesthesiologists and CRNAs, highlighted their "critical roles in the care of patients," and bemoaned the significant shortage of anesthesia providers and the difficulty in recruiting and retaining qualified providers. (J.A. 24–26 (Compl.) ¶¶ 24–27, 30.) St. Joseph's Senior Vice President of Hospital

26

Operations testified via declaration that "after discussions with recruiters and area anesthesia groups, and after consultations with our parent … [St. Joseph's] concluded that [it] would be **unable to recruit sufficient anesthesia providers to replace the group**." (J.A. 322–23 (Second Price Decl.) ¶ 3 (emphasis added).) Accordingly, the value in identifying, hiring, and retaining clinicians cannot be understated.

> b. *The district court abused its discretion in rejecting NAPA's legitimate business interest in hiring, retaining, and training its clinicians.*

In its Memorandum Decision and Order denying the request for preliminary injunctive relief, the district court did not address NAPA's legitimate business interest in hiring, retaining, and training clinicians. (Special App. 1–23.) Instead, the district court merely stated that the additional facts adduced since its TRO decision did "not alter the outcome of [its] analysis." (Special App. 11.) When denying NAPA's request for a TRO, the district court had rejected the interest, stating that "there is no confidential or otherwise private business information or client information at issue" and that "there is no evidence in the record on which the Court could conclude that NAPA has significantly invested in training its clinicians." (ECF No. 39 at 15–16 n.15.) The district court's findings on this issue were erroneous for multiple reasons.

27

*First*, the district court's focus on confidential information or private business information was erroneous because the existence of confidential information or private business information is not required for a non-solicitation provision to be enforceable. New York courts have noted "that there is scant case law on the enforceability of non-recruitment clauses." *Admarketplace Inc. v. Salzman*, No. 651390/2013, 2014 WL 1278504, at *4 (N.Y. Sup. Ct. Mar. 28, 2014) (collecting cases); *see Spherenomics*, 427 F. Supp. 2d at 249 (noting that non-solicitation provisions in commercial contracts "fall[] in a considerably less common … category of cases"). There is no hard-and-fast rule for enforceability of the type of restrictive covenant at issue here. Rather, courts apply a "simple rule of reason" test that will depend on the unique circumstances of each case. *See Mathias*, 167 F. Supp. 2d at 611.

Accordingly, courts have issued injunctive relief or enforced non-solicitation clauses without a showing of trade secret or confidential information. For example, in *Omni*—which was affirmed by this Court—the court determined that the legitimate business interest was preventing the poaching of employees that the company had located and (if necessary) trained. 2007 WL 2693813, at *5; *see Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744, 2020 WL 7028872, at *10 (N.D.N.Y. Sept. 15, 2020) (issuing injunctive relief to enforce non-solicitation clause); *Express Freight Sys., Inc. v. YMB Enters., Inc.*, 623 F. Supp. 3d 39, 51, 56

28

(E.D.N.Y. 2022) (granting summary judgment to enforce non-solicitation clause). And another federal court has recognized that "the absence of [misappropriation of trade secrets or confidential information] does not preclude the plaintiff from independently showing irreparable harm" and obtaining injunctive relief. *Marsh USA*, 2008 WL 4778239 at \*14 n.8. Further, this Court has recognized that injunctive relief is available to enforce a non-compete—even though competition does not involve disclosure of confidential information—where the employee's services are "special, unique or extraordinary." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 72 (2d Cir. 1999).[6]

*Second*, the evidence showed that NAPA's clinicians obtained its confidential and private information. NAPA provides its clinicians with access to a proprietary clinical outcome database, which captures all of the material information about every procedure performed by NAPA's affiliated anesthesia practices across the United States. (J.A. 339 (Ekbatani Decl.) ¶ 10.) This database, along with regular meetings to address quality assurance and other issues, provide the clinicians with real-time, data-driven analysis and best practices, which the clinicians use to improve outcomes for all procedures. (*Id.*) NAPA's clinicians also have access to Anesthesia

---

[6] *See, e.g.*, J.A. 338–40 (Ekbatani Decl.) ¶¶ 9–12 (discussing the training and information provided to NAPA's clinicians that make them "specially equipped and trained to provide safe, quality, and special clinical care with exceptional outcomes").

Risk Alerts, which are proprietary to NAPA and its affiliates and provide NAPA's clinicians with novel mitigation strategies to better manage high-risk clinical scenarios. (J.A. 339 (Ekbatani Decl.) ¶ 11.) Although this evidence was in the record and uncontroverted, the Memorandum Decision and Order ignored it.

*Third*, the district court also ignored evidence in the record that NAPA has significantly invested in training its clinicians. The evidence established that NAPA trains its chief clinicians on best practices, including operating room efficiency, inclusion, problem resolution, and culture building, and builds its talent base by using unique and propriety talent acquisition and onboarding processes. (J.A. 338–39 (Ekbatani Decl.) ¶ 9.) NAPA's extensive chief training and talent acquisition and retention processes establish the foundation for a cohesive anesthesia department focused on teamwork, efficiency, problem solving, and quality of care. (*Id.*) NAPA's investments make its clinicians uniquely valuable and desirable by hospitals like St. Joseph's. (*Id.*)

All of the training and information described above make NAPA's clinicians specially equipped and trained to provide safe, quality, and special clinical care with exceptional outcomes. (J.A. 339–40 (Ekbatani Decl.) ¶ 12.) NAPA's continuing training and education also make its clinicians unique and provide additional value to the medical community. (*Id.*) The Non-Solicitation Clause with St. Joseph's is

also designed and intended to protect NAPA's investment in the clinicians' training and knowledge base. (*Id.*) The district court erred in ignoring this evidence.

*Fourth*, to the extent the district court weighed facts or made credibility determinations about the clinicians' training or access to NAPA's proprietary information, the district court was required to hold an evidentiary hearing and erred in refusing to do so. *See Forts v. Ward*, 566 F.2d 849, 854 (2d Cir. 1977); *infra* Section IV.

2. The Non-Solicitation Clause protects NAPA's interest in the goodwill its clinicians have developed with other physicians practicing at St. Joseph's.

   a. *NAPA has a legitimate interest in the goodwill its clinicians have developed with other physicians at St. Joseph's.*

NAPA also has a legitimate business interest in the goodwill that its clinicians have developed with NAPA's customers—i.e., the other physicians and healthcare providers working at St. Joseph's. Courts have repeatedly determined that a business's desire to protect its goodwill constitutes a legitimate business interest. *See Adecco USA*, 2020 WL 7028872, at *7 ("The desire of a business to protect its **goodwill that it has fostered with customers constitutes a legitimate business interest**." (emphasis added) (internal quotations omitted); *Express Freight*, 623 F. Supp. 3d at 51 ("While a restrictive covenant may not merely insulate a party from competition, **protectible business interests under the 'rule of reason' test include**

the prevention of unfair competition and ***the protection of a party's*** rights in its trademarks or ***goodwill***." (emphases added) (cleaned up)).

As the Court of Appeals of New York has determined, an employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392 (N.Y. 1999); *see Genesee Valley Tr. Co. v. Waterford Grp., LLC*, 14 N.Y.S.3d 605, 609 (4th Dep't 2015) ("[A]n employer has a legitimate interest in preventing an employee from leaving to work for a competitor if the employee has cultivated personal relationships with clients through the use of the employer's resources." (citing cases)).

Here, the relevant customer relationships are those between NAPA's clinicians and the physicians and other professionals that perform surgeries and procedures at St. Joseph's. (J.A. 338–39 (Ekbatani Decl.) ¶ 9 (discussing the meaningful and trusting relationships that anesthesia clinicians develop with the surgeons, proceduralists, and perioperative nurses at the hospital).) St. Joseph's concedes that "long, successful working relationships" have developed between NAPA's clinicians and the physicians practicing at St. Joseph's and that the physicians have "preferred anesthesiologists with whom" they like to work. (J.A. 49 (Compl.) ¶ 112; *accord* J.A. 243 (Himes Decl.) ¶ 7, J.A. 338–39 (Ekbatani Decl.)

¶ 9.) Thus, there is no doubt NAPA has developed significant goodwill from the relationships that it has with other individuals practicing at St. Joseph's.

> b. *The district court abused its discretion in rejecting NAPA's legitimate business interest in the goodwill between its clinicians and the other providers at St. Joseph's.*

The district court's rejection of a legitimate business interest in the goodwill between NAPA's clinicians and the other providers practicing at St. Joseph's was erroneous for two reasons.

*First*, the district court's conclusion that NAPA's clinicians do not generate any business from surgeons and other providers at the Hospital is legally irrelevant. There is no requirement that the clinicians generate business for there to be a legitimate interest. "[Goodwill] typically includes not only the likelihood that customers will return to the old place of business, ***but the competitive advantage of an established business***. … In other words, goodwill constitutes the intangible qualities of a business that attracts customers." *Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562, 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (emphasis added).

NAPA's clinicians generate this type of goodwill. St. Joseph's even acknowledged that physicians have "preferred anesthesiologists with whom they have developed long, successful working relationships." (J.A. 49 (Compl.) ¶ 112.) St. Joseph's has admitted that "[m]ost of NAPA's providers at St. Joseph's have

worked at [its] hospital for many years, and have established close working relationships with St. Joseph's surgeons, cardiologists, OB/GYNs and other physicians." (J.A. 243 (Himes Decl.) ¶ 7.) As St. Joseph's acknowledges, "having a stable relationship with a core group of local anesthesia providers who know the surgeons, other proceduralists and nursing teams highly enhances the safe care of patients." (J.A. 241 (Himes Decl.) ¶ 3; *accord* J.A. 220 (Tocco-Bradley Decl.) ¶ 4.) And St. Joseph's has "spoken with many surgeons on [its] medical staff who are understandably concerned that [NAPA's] anesthesia providers remain at St. Joseph's" (J.A. 228 (Price Decl.) ¶ 13), which is yet another reflection of the goodwill that NAPA has developed with the surgeons on St. Joseph's medical staff.

In fact, NAPA's goodwill with St. Joseph's medical staff is so significant, "[i]f Saint Joseph's faced the need to replace [NAPA's] physicians with other anesthesiologists, [it] would expect significant disruptions" and "that many of [St. Joseph's] orthopedic surgeons would likely shift patients to other area hospitals." (J.A. 232 (Werbeck Decl.) ¶ 8.) The same is true for St. Joseph's patients and other physicians: "If patients are unable to obtain full coverage for anesthesia services at St. Joseph's many patients and their physicians will instead take those cases to other hospitals within the Syracuse area for services that require anesthesia." (J.A. 241 (Himes Decl.) ¶ 2.)

34

*Second*, the district court was incorrect to suggests that surgeons and other providers are not NAPA's customers because they do not receive anesthesia services from NAPA. (Special App. 20.) The services provided by NAPA's clinicians absolutely benefit surgeons and other providers. NAPA's clinicians provide anesthesia services that are used during the surgeries and procedures that surgeons and other providers perform. St. Joseph's own witness explained in her declaration "[a]nesthesia services are critical to a hospital's provision of surgical services." (J.A. 241 (Himes Decl.) ¶ 2.) Indeed, if patients are not able to obtain full coverage for anesthesia services at St. Joseph's, "many patients *and their physicians* will instead take those cases to other hospitals." (*Id.*) These physicians clearly benefit from the services that NAPA's clinicians provides.

### 3. The Non-Solicitation Clause protects NAPA's goodwill from its investments in the Group.

The Non-Solicitation also protects NAPA's goodwill from its investments in the Group. In this regard, "[g]oodwill 'is an intangible asset generated by the acquisition of a business for a price greater than the value of the business's net identifiable assets (e.g., cash, investments, buildings, equipment, inventory, accounts receivable, and certain identifiable intangible assets).'" *Finger v. Pearson PLC*, No. 17-civ.-1422, 2019 WL 10632904, at *2 n.2 (S.D.N.Y. Sept. 16, 2019) (quoting *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15-CV-6034, 2016 WL

5794774, at *2 (S.D.N.Y. Sept. 30, 2016)); *see Lucescu v. Zafirovski*, No. 09-CV-4691, 2018 WL 1773134, at *1 n.3 (S.D.N.Y. Apr. 11, 2018) ("In broad terms, goodwill is a measurement of the value of a company's intangible assets over and above the fair market value of identifiable assets and liabilities.").

Here, the evidence established that NAPA made a significant investment to acquire the Group for the purposes of providing high-quality anesthesia practitioners to the healthcare market, including St. Joseph's. As explained by Dr. Ekbatani, NAPA acquired the Group's already developed goodwill when it bought the Group in 2020. (J.A. 338 (Ekbatani Decl.) ¶ 8 ("The St. Joseph's Agreement with the Non-Solicitation Clause, the employment agreements with the providers, which contain noncompete provisions, and the goodwill of the practice were part of the acquisition.")). The Non-Solicitation Clause serves NAPA's interests in protecting the goodwill that it acquired with the Group. (J.A. 337 (Ekbatani Decl.) ¶ 6.) The clause further protects the goodwill that NAPA has developed since acquiring the Group, including by "building its business, and … continuing [the] development of the practice." (J.A. 264 (Lee Decl.) ¶ 7.) This was a sufficient legitimate business interest to enforce the Non-Solicitation Clause and issue injunctive relief. *See Express Freight Sys., Inc.*, 623 F. Supp. 3d at 50–51 (granting summary judgment to enforce non-solicitation clause); *BDO Seidman*, 93 N.Y.2d at 392 (enforcing non-compete agreement).

36

The district court erred in rejecting this legitimate business interest from NAPA's investment in buying the Group because it took an overly narrow approach to restrictive covenants. It noted that "for an interest to be protectable by a restrictive covenant, it must fall into a category enumerated by *BDO Seideman*." (Special App. 22 n.17.) But the case it cites for that proposition—*Reed Elsevier*—supported this proposition by relying only on cases addressing restrictive covenants in *employment* contracts. *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13–civ.–8739, 2014 WL 97317, at \*12 (S.D.N.Y. Jan. 19, 2014) (citing *Locke v. Tom James Co*., No. 11-civ.-2961, 2013 WL 1340841, at \*7 (S.D.N.Y. Mar. 25, 2013) (non-competition provision in employment contract); *Cenveo Corp. v. Diversapack LLC*, No. 09-civ.-7544, 2009 WL 3169484, at \*7 (S.D.N.Y. Oct. 1, 2009) (anti-raiding provision in an employment agreement); *Silipos, Inc. v. Bickel*, No. 1:06-CV-02205, 2006 WL 2265055, at \*1 (S.D.N.Y. Aug. 8, 2006) (non-competition and non-solicitation provisions in an employment agreement); *Wrap-N-Pack, Inc. v. Eisenberg*, No. 04-CV-4887, 2007 WL 952069, at \*8 (E.D.N.Y. Mar. 29, 2007) (non-competition provision in an employment agreement)).

But the Non-Solicitation Clause is not in an employment contract—it is in an ordinary commercial contract between sophisticated parties. And "[r]estrictive covenants in employment contracts … are subject to more exacting scrutiny than are those in … ordinary commercial contracts." *Mathias*, 167 F. Supp. 2d at 611.

Indeed, in affirming the enforceability of a non-solicitation clause in an ordinary commercial contract, this Court has recognized this very distinction: "We conclude that the district court did not err in enforcing [a non-solicitation provision] as it was not a restrictive covenant preventing an employee from pursuing his livelihood but an anti-raiding provision in a commercial agreement between two sophisticated parties." *Omni Consulting*, 488 F. App'x at 480.

Accordingly, to the extent *Reed Elsevier* is inconsistent with the principles that apply to ordinary commercial contracts, the district court erred in relying on it to apply a more exacting scrutiny than it should have applied.

### D. St. Joseph's remaining challenges to NAPA's breach-of-contract claim fail.

In the district court, St. Joseph's offered various arguments to rebut NAPA's breach-of-contract claim. Although the district court did not reach any of these arguments, each would have failed for the reasons given below.

#### 1.     The Non-Solicitation Clause is not an antitrust violation.

This Court can quickly reject St. Joseph's meritless antitrust arguments. (*See* J.A. 205–08.) At the outset, St. Joseph's arguments in the district court invited that court to do what no other federal court has done: find that a non-solicitation clause between businesses that is ancillary to a legitimate business interest violates the Sherman Act or the Donnelly Act.

This Court should decline St. Joseph's invitation to make new law. Courts routinely find that non-solicitation and non-compete agreements are permissible when they are ancillary to a legitimate business purpose. *See, e.g.*, *Fido's Fences v. Canine Fence Co.*, 672 F. Supp. 2d 303, 312 (E.D.N.Y. Nov. 30, 2009) (dismissing antitrust claims and noting that "[to] the extent that [a non-compete clause] protects a legitimate business interest, and is reasonable in both time and geographic scope, it will be upheld" (internal quotations omitted)); *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045, 1051 (9th Cir. 1974) (where noncompete provision was reasonable in scope and duration and served a legitimate business purpose, it was not in restraint of trade). Here, the Non-Solicitation Clause is part of a broader commercial agreement between sophisticated parties and was reaffirmed several times by multiple amendments. (J.A. 264 (Lee Decl.) ¶ 6.)

St. Joseph's antitrust arguments also failed because it did not identify any antitrust injury that would entitle it to assert Sherman Act claims. *See Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). Antitrust injury ensures that St. Joseph's claims are focused on alleged harm to competition (i.e., the competitive process), rather than harm to competitors (i.e., St. Joseph's). *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979). Here, St. Joseph's cannot establish antitrust injury for several reasons.

*First*, St. Joseph's allegations are not the type of injury that the antitrust laws are meant to protect. Rather than focus on alleged harm to consumer welfare as a whole, St. Joseph's allegations focus on harm only to St. Joseph's; namely, its finances. Even if the Non-Solicitation Clause makes it "difficult" for St. Joseph's to recruit clinicians, that does not create an adverse effect on competition market-wide. Competition always creates winners and losers, and St. Joseph's has alleged nothing more than harm to itself. There are simply no specific facts or evidence supporting St. Joseph's conclusory allegations about prices or output in the alleged relevant market. The antitrust argument fails.

*Second*, St. Joseph's ignored the Non-Solicitation Clause's benefits and did not even attempt to show that they were outweighed by any alleged anticompetitive effects. *Ogden v. Little Caesar Enters.*, 393 F. Supp. 3d 622, 637 (E.D. Mich. 2019). As explained above, the Non-Solicitation Clause furthers several legitimate businesses purposes. *See supra* Section I.C.

*Third*, even if St. Joseph's had identified an antitrust injury (and it did not), it also failed to identify an anticompetitive effect in a relevant market. This, too, is fatal to St. Joseph's antitrust arguments because Sections 1 and 2 of the Sherman Act require St. Joseph's to define a relevant market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). St. Joseph's was therefore required to identify the relevant market, including the geographic market and a

relevant product market, and the "alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal citations omitted). To define a relevant market, St. Joseph's was required to submit reliable data that would, among other things, establish market shares for relevant market participants. *See, e.g.*, *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546–47 (2d Cir. 1993). St. Joseph's did none of these things, which confirms that the Non-Solicitation Clause does not violate the antitrust laws.

> ### 2.   St. Joseph's breach of the Non-Solicitation Clause is not excused.

The Court can also quickly dispose of St. Joseph's argument in the trial court that its breach of the Non-Solicitation Clause was excused. (J.A. 205.) St. Joseph's contention that NAPA's purported breach of certain staffing obligations in the Agreement somehow excused St. Joseph's breach of the Non-Solicitation Clause is wrong as a matter of fact and law. In the district court, St. Joseph's attempted to muddy the waters by listing alleged grievances with NAPA's performance of the Agreement over the years, even though St. Joseph's amended and reaffirmed the Agreement multiple times since it was originally signed. (J.A. 194–99, 213–14.) None of the grievances raised by St. Joseph's constitute legal justification for its

breach of the Non-Solicitation Clause.

In arguing its breach was excused, St. Joseph's alleged that NAPA breached the "staffing responsibilities" in the Agreement. (J.A. 205) But St. Joseph's failed to identify any specific provision in the Agreement that NAPA purportedly breached. *See Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) ("[A] plaintiff must identify what provisions of the contract were breached as a result of the acts at issue."). Regardless, at no time has NAPA failed to provide necessary staffing for any procedure at St. Joseph's. Nor did St. Joseph's ever notify NAPA that NAPA was allegedly in breach of any staffing obligation under the Agreement. (J.A. 270–71 (Second Santos Decl.) at ¶ 3, J.A. 264–65 (Lee Decl.) ¶¶ 9–11.)

Likewise, St. Joseph's contention that NAPA failed to provide staffing for the 13th and 14th surgical suites is misleading. (J.A. 270–71 (Second Santos Decl.) ¶ 3.) St. Joseph's told NAPA that *St. Joseph's* had insufficient staff to operate a 13th and 14th operating room. (*Id.*) Accordingly, any suggestion by St. Joseph's that NAPA was responsible for the staffing shortages for surgeries is simply false. (*Id.*)

3.  The doctrine of unclean hands does not apply.

St. Joseph's unclean hands argument also fails. In the district court, St. Joseph's maintained that NAPA had "unclean hands" because it had attempted to enforce the Non-Solicitation Clause. (J.A. 213–14.) But enforcing valid contractual

rights does not constitute unclean hands. *See Arista Dev., LLC v. Clearmind Holdings, LLC*, 172 N.Y.S.3d 271, 276 (4th Dep't 2022) ("[T]here is nothing immoral or unconscionable about plaintiff's decision to seek the unpaid rent that defendant was contractually obligated to pay."); *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) ("The Second Circuit has repeatedly emphasized the narrowness of the [unclean-hands] doctrine's application."). As explained *supra*, the Non-Solicitation Clause is enforceable. Accordingly, there is nothing inequitable about enforcing a commercial contract to which St. Joseph's agreed, and St. Joseph's unclean hands defense fails.

## II. THE DISTRICT COURT ERRED IN DETERMINING THAT THERE WAS NO IRREPARABLE INJURY

NAPA established that it would be irreparably harmed absent injunctive relief. As this Court has previously noted, an injunction should be granted where necessary to protect a party "against injuries that would otherwise be irremediable." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999). Here, NAPA's irreparable harm arises from (1) lost customer relationships (including lost opportunity costs at other facilities or a forced breach of contract at those other facilities for lack of available clinicians), (2) loss of trained clinicians, and (3) reputational harm—all of which are difficult, if not impossible, to calculate with money damages. The district court erred in determining that NAPA had not established irreparable injury.

43

A.    **NAPA established that it would suffer irreparable injury in the form of lost customer relationships and opportunity costs.**

      1.   <u>NAPA will suffer irreparable harm from lost customer relationships and opportunity costs.</u>

In the district court, NAPA established irreparable injury from the loss of customer relationships and the lost opportunity costs at other facilities or a forced breach of contract at other facilities due to the lack of available clinicians.  New York law recognizes lost customer relationships and opportunity costs as irreparable harm in the context of a non-solicitation agreement.  "The loss of training and *interference with already established relationships* that would occur should [former employee] recruit other employees within the year *are unquantifiable assets*." *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (emphases added) (granting preliminary injunction to enforce non-solicitation clause).  Indeed, "*[i]t is well established in this Circuit that the loss of client relationships* and customer goodwill that results from the breach of a non-compete clause *generally constitutes irreparable harm*."  *Marsh USA Inc. v. Karasaki*, No. 08-civ.-4195, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008) (emphases added) (granting preliminary injunction to enforce non-solicitation clause).  This is especially true where "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title*, 173 F.3d at 69

(affirming permanent injunction and enforcing non-compete agreement).

The uncontroverted evidence—including St. Joseph's own admissions—established that NAPA's clinicians have unique, special, and established relationships with the physicians and other professionals performing surgeries and procedures at St. Joseph's. This fact is underscored by St. Joseph's singular focus on hiring them. To that end, St. Joseph's acknowledges that the physicians and other professionals who perform surgeries and procedures at its hospital "prefer to use hospital-based anesthesiologists"—like those provided by NAPA—whom "they know and trust rather than to work extensively with [temporary] locum tenens physicians." (J.A. 28 (Compl.) ¶ 34.) This is because the physicians and other professionals have "preferred anesthesiologists with whom they have developed long, successful working relationships." (J.A. 49 (Compl.) ¶ 112; *accord* J.A. 243 (Himes Decl.) ¶ 7.)

In sum, NAPA's clinicians have unique, long-term relationships with the physicians and other professionals performing surgeries and other procedures at St. Joseph's. St. Joseph's unlawful raiding and poaching of NAPA's clinicians has resulted and will continue to result in irreparable harm, as recognized by this Court: "[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title*, 173 F.3d at 65; *accord Natsource*,

45

151 F. Supp. 2d at 469 ("The loss of training and interference with already established relationships that would occur should [former employees] recruit other employees within the year are unquantifiable assets."); *Marsh USA*, 2008 WL 4778239 at *14 ("The total monetary value of Marsh's loss of client[s] would be very difficult, if not impossible, to calculate with any exactitude.").

Additionally, given NAPA's work at Crouse Hospital and other facilities in the same area as St. Joseph's, there are significant opportunity costs that cannot be measured in money damages if the Court declines to issue injunctive relief (e.g., expansion of surgical and procedural capabilities in a labor-short anesthesia market). (J.A. 271 (Second Santos Decl.) ¶ 5.) Because it was not possible to predict the amount of business that would stay at St. Joseph's or leave with NAPA, the irreparable harm element was satisfied.

2.  The district court erred in rejecting NAPA's irreparable harm from lost customer relationships and goodwill.

The district court erred in determining that NAPA had not established irreparable harm from the loss of goodwill from its customer relationships. (Special App. 12) In so deciding, the district court determined that NAPA failed to establish that clinicians "produce an indeterminate amount of business in years to come." (*Id.*) This was erroneous for three reasons.

*First*, the inability to calculate the precise amount of monetary loss is the very reason courts find irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp.

46

2d 238, 248 (S.D.N.Y. 2000) (finding irreparable harm where "[n]either this Court nor the parties … could calculate with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of Register.com's relationships with customers and co-brand partners."), *aff'd as modified*, 356 F.3d 393 (2d Cir. 2004); *Millennial Plastic Surgery PLLC v. James*, No. 21-civ.-9590, 2021 WL 5988322, at *2 (S.D.N.Y. Dec. 16, 2021) ("In certain situations where ***it is impossible to estimate*** the amount of monetary loss resulting from the injury, courts in this Circuit have generally recognized that damage to business reputation and loss of clients may constitute irreparable harm." (emphasis added)). NAPA should not be faulted for failing to prove the unprovable. Regardless, the evidence established that "[o]nce the Group starts to break apart, it will be very difficult to put it back together and to calculate the losses resulting from St. Joseph's actions. The disintegration of the practice and the inability to generate the current revenue will cause irreparable harm." (J.A. 92 (Santos Decl.) ¶ 18.)

*Second*, the district court's refusal to credit the lost customer relationships as irreparable harm was based on its rejection of a legitimate business interest in the goodwill between NAPA's clinicians and the other providers at St. Joseph's. (Special App. 12 ("NAPA fails to demonstrate that this is the type of goodwill sufficient to establish irreparable harm.").) But as already explained, *supra*, the district court erred in disregarding this legitimate business interest. *See Veramark*

47

*Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 401 (W.D.N.Y. 2014) ("[I]n the context of an application for a preliminary injunction on a restrictive covenant, the evaluations of irreparable harm and likelihood of success are intertwined.").

*Third*, even if NAPA were required to present evidence of the amount of business generated by its clinicians, the district court erred in refusing to conduct an evidentiary hearing. At the evidentiary hearing, NAPA planned to present evidence about its clinicians' relationships with other providers at St. Joseph's, the clinicians' ability to generate business, the lost opportunity costs at other facilities, and the risk of a forced breach of contract at other facilities due to the lack of available clinicians. This was an abuse of discretion. *See infra* Section IV.

**B. NAPA established that it would suffer irreparable injury due to the loss of its trained clinicians.**

The loss of NAPA's trained clinicians that would occur absent an injunction also constitutes irreparable harm. New York law recognizes the loss of trained employees as a type of irreparable harm in the context of a non-solicitation agreement: "The ***loss of training*** and interference with already established relationships that would occur should [former employee] recruit other employees within the year are ***unquantifiable assets***." *Natsource LLC*, 151 F. Supp. 2d at 469 (emphases added); *accord Marsh USA*, 2008 WL 4778239 at *14 ("The departure of Marsh employees deprives Marsh not only of ***its investment in training and developing those employees***, but also, for those who were brokerage professionals,

of those employees' clients who follow the employees because of the relationships developed with them at Marsh's expense." (emphasis added)).

As explained by Dr. Ekbatani, NAPA provides unique and proprietary training and information to clinicians—including via a NAPA-developed clinical outcome database and award-winning Anesthesia Risk Alerts. (J.A. 338–40 (Ekbatani Decl.) ¶¶ 9–12.) In particular, NAPA provides training on a variety of issues, including best practices for "operating room efficiency, inclusion, problem resolution, and culture building." (J.A. 338–39 (Ekbatani Decl.) ¶ 9.) NAPA also maintains, and trains its clinicians about how to use and input data into its "proprietary clinical outcome database, which captures all of the material information about every procedure performed by NAPA affiliated anesthesia practices." (J.A. 339 (Ekbatani Decl.) ¶ 10.) Along with team meetings and other training, the database "provide[s] the clinicians with real-time data driven analysis and best practices, which are used to improve outcomes for all procedures." (*Id.*) NAPA further develops and provides its clinicians with proprietary and award-winning Anesthesia Risk Alerts, which give them "novel mitigation strategies to better manage high-risk clinical scenarios." (J.A. 339 (Ekbatani Decl.) ¶ 11.)

All of this proprietary training and information from NAPA makes its clinicians unique and special under New York law because non-NAPA clinicians do not have access to NAPA's proprietary database and Anesthesia Risk Alerts. *See*

*Ticor Title*, 173 F.3d at 71 ("Hence, as noted earlier, in determining uniqueness the inquiry now focuses more on the employee's relationship to the employer's business than on the individual person of the employee."). Moreover, the well-accepted fact that there is a shortage of anesthesia clinicians across the country establishes and reflects that the clinicians are unique and provide specialized services—i.e., there are not a lot of them and not every physician can do what the rare anesthesia clinician can do—which is exactly why St. Joseph's desires to hire them away. Allowing St. Joseph's to raid and poach NAPA's clinicians in violation of the Non-Solicitation Clause results in irreparable harm because the "unique services" of NAPA's clinicians would then be "available to a competitor"—i.e., St. Joseph's. *Id.* at 70.

The district court erred in determining that NAPA had not established irreparable harm from the loss of its trained clinicians. (Special App. 13–14.) In so deciding, the district court reasoned that the training identified by NAPA differs from the training at issue in *Natsource* and *Marsh*, "which involved brokerage firms training their brokers with regard to the establishment, strengthening, and maintenance of business-generating client relationships." (Special App. 14.)

This was erroneous because the district court misinterpreted the case law as *requiring* a business-generating relationship between NAPA's clinicians and the other providers at St. Joseph's to establish irreparable injury. But goodwill does not require business generation. *Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No.

50

07-CV-1562, 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) ("[Goodwill] typically includes not only the likelihood that customers will return to the old place of business, **but the competitive advantage of an established business**. … In other words, goodwill constitutes the intangible qualities of a business that attracts customers." (emphasis added)). And as another circuit court has aptly noted, "[a]lthough lost profits alone are calculable and compensable through monetary damages, loss of goodwill is not." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017).

### C. NAPA established that it would suffer irreparable injury in the form of reputational harm.

NAPA also established a third form of irreparable injury—reputational harm. The Second Circuit has recognized that reputational harm is another type of irreparable injury. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("In our view, the district court did not abuse its discretion in finding that, unless specific relief were granted, Verio's actions would cause Register irreparable harm through ***loss of reputation***, good will, and business opportunities." (emphasis added)); *see Nat'l Elevator*, 2008 WL 207843, at *8 ("With that backdrop, one can easily conclude that H & B can and will cause irreparable, unquantifiable harm to National's customer relations and ***reputation in the industry*** if it is not enjoined." (emphasis added)).

As explained by Dr. Santos, St. Joseph's actions have been "distressing and

distracting to [NAPA's] clinicians," resulting in clinicians being "afraid and concerned about their future employment." (J.A. 91 (Santos Decl.) ¶ 14.) St. Joseph's actions have also hurt NAPA's reputation with potential recruits, causing them "to rethink their commitments to join the Group" and "adding to the stress on [NAPA's] current clinicians." (J.A. 92 (Santos Decl.) ¶ 17.) In sum, St. Joseph's conduct continued to harm NAPA's reputation—another type of irreparable harm recognized by governing New York law.

The district court erred in dismissing NAPA's reputational harm as "speculative, conclusory and unsupported by the facts in the record." (Special App. 11.) In concluding that Dr. Santos offered no testimony "about any actual or imminent reputational harm that has befallen NAPA," (*Id.*), the district court wholly ignored his testimony that "St. Joseph's actions have caused [clinicians NAPA has recruited to join the Group] to rethink their commitments to join the Group based on St. Joseph's improper actions." (J.A. 92 (Santos Decl.) ¶ 17.) This type of injury is irreparable. *See, e.g.*, *Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").

Moreover, in its order denying the TRO, the district court clearly weighed competing testimony, noting that Dr. Santos' testimony was "contradicted by declarations from doctors and administrators." But weighing of competing

affidavits is improper. *Commodity Futures Trading Comm'n v. Incomco, Inc.*, 649 F.2d 128, 131 (2d Cir. 1981) ("It is settled law in this Circuit that motions for preliminary injunctions should not be decided on the basis of affidavits when disputed issues of fact exist."); *see infra* Section IV. Thus, to the extent the district court determined Dr. Santos' testimony regarding reputational harm was contradicted, it was required to hold an evidentiary hearing and erred by failing to do so. The district court essentially forced NAPA to prosecute its request for injunctive relief with one hand tied behind its back, with St. Joseph's witnesses able to say whatever they pleased, without any risk of cross-examination or challenge.

## III.  THE BALANCE OF HARDSHIPS AND PUBLIC INTERESTS TIP IN NAPA'S FAVOR.

Because the district court denied NAPA's injunction request based on its (erroneous) determination that NAPA had not satisfied the "likelihood of success" and "irreparable injury" requirement, the district court did not address the balance of hardships and public interest factors. (Special App. 23.) NAPA easily established both.

As to the balance of the hardships, NAPA does not seek to prevent St. Joseph's from soliciting and hiring other anesthesiology professionals. NAPA only seeks to enjoin St. Joseph's from continuing to violate the Non-Solicitation Clause, by raiding and poaching its workforce, pending discovery and resolution of the legal issues in this case. Further, St. Joseph's could not argue that the Non-Solicitation

was harming it. Indeed, courts have rejected this type of argument where the party against whom injunctive relief was sought entered into the agreement "eyes wide open, specifically agreed to bear the risk of that hardship and was paid fairly to do so." *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 200 (E.D.N.Y. 1999) (noting that the company "received the benefit of the bargain" from the contract for ten years and cannot now seek to deprive plaintiff from the benefit of its bargain by directly competing with plaintiff, in violation of the restrictive covenant).

Moreover, as a matter of public policy in New York, freedom of contract is a "deeply rooted" public policy and a right of "constitutional dimension." *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359 (N.Y. 2019). St. Joseph's and NAPA are sophisticated parties that entered into an arm's length agreement to allow collaboration between them for years. St. Joseph's seeks to use the judicial system to openly breach its Agreement, redraft the Agreement, take advantage of NAPA's significant investments, and unfairly compete against NAPA. The district court should not have rewarded St. Joseph's behavior and, in the process, undermined New York contract law.

## IV. THE DISTRICT COURT ERRED IN REFUSING TO CONDUCT AN EVIDENTIARY HEARING.

For the reason explained *supra*, the evidence submitted by NAPA required the entry of an injunction, and the district court erred in denying NAPA's injunction request. In the alternative, for the reasons that follow, the district court erred in

refusing to conduct an evidentiary hearing on NAPA's motion for a preliminary injunction.

"It is settled law in this Circuit that motions for preliminary injunctions should not be decided on the basis of affidavits when disputed issues of fact exist." *Commodity Futures Trading*, 649 F.2d at 131. Furthermore, "even if the basic facts [are] conceded," where "the inferences to be drawn from them are in dispute," the district court must hold an evidentiary hearing if practicable. *Forts v. Ward*, 566 F.2d 849, 854 (2d Cir. 1977).

Applying this standard, the district court erred. At the hearing, NAPA was prepared to present evidence regarding the following facts:

- Whether St. Joseph had engaged in conduct that damaged NAPA's reputation with the physicians and others practicing at St. Joseph's specifically, and in the wider medical community generally, resulting in irreparable harm;

- Whether NAPA's clinicians had unique, long-term relationships with the physicians and other professionals performing surgeries and other procedures at St. Joseph's;

- Whether St. Joseph's active solicitation of NAPA's clinicians harmed NAPA's practice at St. Joseph's or the cohesion and teamwork developed among NAPA's clinicians, resulting in both irreparable harm and loss of goodwill;

- Whether the Non-Solicitation Clause in the Agreement protected NAPA's goodwill and the value created by NAPA;

- Whether St. Joseph's active solicitation of NAPA's clinicians harmed NAPA by causing recruited clinicians to no longer join NAPA, given the chaotic atmosphere created by St. Joseph's; and

- Whether St. Joseph's conduct established irreparable injury to NAPA from the lost opportunity costs at other facilities served by NAPA, or a forced breach of contract by NAPA at those other facilities, due to the lack of other available clinicians that NAPA could use at those facilities.

Nonetheless, throughout the Memorandum Decision and Order, the district court weighed facts and drew inferences from facts. This was erroneous. The district court's refusal to conduct an evidentiary hearing was an abuse of discretion warranting vacatur of the Memorandum Decision and Order and a remand with instructions for the district court to hold an evidentiary hearing.

## <u>CONCLUSION</u>

For the foregoing reasons, NAPA respectfully requests that the Court vacate the district court's Memorandum Decision and Order denying NAPA's request for a preliminary injunction and remand with instructions to enter NAPA's requested injunction.

In the alternative, NAPA respectfully request that the Court vacate and remand for further proceedings, including an evidentiary hearing on the motion for preliminary injunction.

Dated: August 23, 2024

Respectfully submitted,

HOLLAND & KNIGHT, LLP

/s/ *William M. Katz, Jr.*
William M. Katz, Jr.
Dina W. McKenney
HOLLAND & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
Telephone: (214) 969-1700
*william.katz@hklaw.com*
*dina.mckenney@hklaw.com*

W. Scott O'Connell, Esq.
HOLLAND & KNIGHT LLP
10 Saint James Avenue
Boston, Massachusetts 02116
Telephone: (617) 523-2700
*scott.oconnell@hklaw.com*

## <u>CERTIFICATION OF COMPLIANCE WITH RULE 32(a)</u>

I hereby certify, pursuant to the Federal Rule of Appellate Procedure 32(a)(7)(C), that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4) because this brief contains 12,353 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), and Local Rule 32.1(a), because this brief has been prepared in a proportionately spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: August 23, 2024

/s/ Dina W. McKenney
Dina W. McKenney
*Counsel for Defendants-Counter-Claimants-Appellants*

# SPECIAL APPENDIX

**TABLE OF CONTENTS**

PAGE

Memorandum Decision and Order of the Honorable
    Brenda K. Sannes, dated May 16, 2024 ......................... SPA1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ST. JOSEPH'S HOSPITAL HEALTH CENTER,

                             Plaintiff,                      5:24-cv-276 (BKS/ML)

v.

AMERICAN ANESTHESIOLOGY OF SYRACUSE,
P.C., AMERICAN ANESTHESIOLOGY, INC., NMSC II,
LLC, and NORTH AMERICAN PARTNERS IN
ANESTHESIA, L.L.P,

                             Defendants.

_____

AMERICAN ANESTHESIOLOGY OF SYRACUSE,
P.C., AMERICAN ANESTHESIOLOGY, INC., NMSC II,
LLC, and NORTH AMERICAN PARTNERS IN
ANESTHESIA, L.L.P,

                             Counter-Claimants,

v.

ST. JOSEPH'S HOSPITAL HEALTH CENTER,

                             Counter-Defendant.

_____

**Appearances:**

*For Plaintiff and Counter-Defendant:*
John F. Queenan
Rivkin Radler LLP
66 South Pearl Street, 11th Floor
Albany, New York 12207

David A. Ettinger
Benjamin VanderWerp
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226

*For Defendants and Counter-Claimants:*
Jon P. Devendorf
J.J. Pelligra
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

W. Scott O'Connell
Jennifer Lada
Marc L. Antonecchia
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

William M. Katz, Jr.
Holland & Knight LLP
One Arts Plaza
1722 Routh Street
Dallas, Texas 75201

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

Plaintiff St. Joseph's Hospital Health Center initiated this action on February 26, 2024,

against Defendants American Anesthesiology of Syracuse, P.C., American Anesthesiology of

Syracuse, Inc., NMSC II, LLC, and North American Partners in Anesthesiology, L.L.P, asserting

antitrust claims under the Sherman Act, 15 U.S.C. § 1 et seq., and New York law, N.Y. Gen.

Bus. Law § 340. (Dkt. No. 1.) Presently before the Court is American Anesthesiology of

Syracuse, P.C. and North American Partners in Anesthesia, L.L.P.'s motion for a preliminary

injunction. (Dkt. No. 22.) The motion is fully briefed. (Dkt. Nos. 23–25, 31–32, 38, 43–44, 51,

54–55.) For the following reasons, the motion for a preliminary injunction is denied.

II.     **BACKGROUND**

St. Joseph's filed the complaint on February 26, 2024. (Dkt. No. 1.) On March 7, 2024, Defendants answered the complaint and American Anesthesiology of Syracuse, P.C. and North American Partners in Anesthesia, L.L.P. (together, "NAPA") asserted a counterclaim for breach of contract. (Dkt. No. 20.)[1] The same day, NAPA moved by order to show cause for a temporary restraining order and preliminary injunction. (Dkt. Nos. 22–23.) NAPA submitted with its motion two declarations and supporting exhibits. (Dkt. Nos. 24–25.) The parties fully briefed the motion. (Dkt. Nos. 32, 38.) St. Joseph's submitted nine declarations in opposition, (Dkt. No. 32-2 to 32-10), and NAPA submitted three additional declarations in reply, (Dkt. Nos. 38-1 to 38-3).

The Court heard oral argument on the motion via telephonic conference on March 15, 2024. (Text Minute Entry dated Mar. 15, 2024.) On March 19, 2024, the Court denied NAPA's motion for a temporary restraining order and allowed the parties to file additional briefing for the Court's consideration in deciding NAPA's motion for a preliminary injunction. *See St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, No. 24-cv-276, 2024 WL 1181136, at *8, 2024 U.S. Dist. LEXIS 47891, at *19 (N.D.N.Y. Mar. 19, 2024). The parties filed supplemental briefs, (Dkt. Nos. 43–44), including two additional declarations filed by St. Joesph's, (Dkt. Nos. 43-2 to 43-3). The Court ordered the parties to appear for oral argument on the motion on April 15, 2024, but indicated that an evidentiary hearing was not necessary because "'the relevant facts . . . [were] not in dispute' on the record before the Court." (Dkt. No. 49 (quoting *Christian Fellowship Ctrs. of N.Y., Inc. v. Village of Canton*, 377 F. Supp. 3d 146, 155 (N.D.N.Y. 2019)).) NAPA filed an objection to the lack of an evidentiary hearing, (Dkt.

---

[1] St. Joseph's moved to dismiss NAPA's counterclaims, (Dkt. No. 45), and Defendants filed an amended answer and counterclaims, (Dkt. No. 53). St. Joseph's subsequently withdrew its motion to dismiss, (Dkt. No. 56), and filed a motion to dismiss the amended counterclaims, (Dkt. No. 57).

No. 50), and, on Sunday, April 14, 2024—the day before oral argument on the motion—filed a

motion for leave to file an additional declaration, (Dkt. No. 51). St. Joseph's opposed NAPA's

motion. (Dkt. No. 53.)

At the video conference hearing on April 15, 2024, the Court granted NAPA's motion

for leave to file an additional declaration but did not hear oral argument on NAPA's motion for a

preliminary injunction. (Text Minute Entry dated Apr. 15, 2024.) At the Court's direction, (*id.*),

the parties filed supplemental briefing addressing issues raised by the additional declaration,

(Dkt. Nos. 55, 56).

On May 1, 2024, the Court heard oral argument via video conference on NAPA's motion

for a preliminary injunction. (Text Minute Entry dated May 1, 2024.)

**III.   FACTS[2]**

**A.   Parties**

St. Joseph's operates a 431-bed hospital in Syracuse, New York, that offers "a variety of

inpatient and outpatient services, including cardiology, obstetrics, surgery, and Level II trauma

care." (Dkt. No. 32-3, ¶ 2; *see also* Dkt. No. 1, ¶¶ 8–9.)

North American Partners in Anesthesia, L.L.P. is an "anesthesia management company."

(Dkt. No. 24, ¶ 3.) A NAPA affiliate acquired all of the outstanding shares of American

Anesthesiology of Syracuse, among other entities, in 2020 "for a $50 million cash payment at

closing, the retention by seller of approximately $110 million of accounts receivable, and other

---

[2] The facts are taken from the affidavits and exhibits the parties submitted in connection with this motion. *See J.S.G. ex rel. J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits . . . given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003). The Court's recitation of facts is limited to those relevant to the disposition of NAPA's motion for a preliminary injunction.

additional payments contingent on certain other financial performance criteria," making American Anesthesiology of Syracuse an affiliate of North American Partners in Anesthesia. (Dkt. No. 51-1, at 3, ¶ 8; *see also id.* at 73.)[3] Both American Anesthesiology of Syracuse and North American Partners in Anesthesia are headquartered in Melville, New York. (Dkt. No. 20, at 20, ¶ 2–3.)

### B.   Underlying Agreement

St. Joseph's and American Anesthesiology of Syracuse entered into an Administrative and Clinical Services Agreement (the "Agreement"), effective December 31, 2018. (Dkt. No. 24, ¶ 4; Dkt. No. 24-1.) The Agreement "establishe[d] an exclusive services arrangement between [St. Joseph's] and [American Anesthesiology of Syracuse] for the provision of anesthesiology services for patients of [St. Joseph's]," including the provision of anesthesiologists and certified registered nurse anesthetists ("CRNAs" and, together with anesthesiologists, the "Clinicians"). Dkt. No. 24-1, at 2–3; Dkt. No. 24, ¶ 3.)

In general, "the patients the anesthesia providers see are provided by the hospital." (Dkt. No. 32-2, ¶ 10.) "Anesthesia providers do not advertise their providers' services to prospective patients and do not admit their own patients to the hospital." (*Id.*) The "[a]nesthesiologists at St. Joseph's do not have relationships with patients, but instead are assigned patients as needed in light of the procedures being performed by [St. Joseph's] surgeons, cardiologists, OB/GYNs and other physicians which require anesthesia." (Dkt. No. 32-4, ¶ 9.)

---

[3] Prior shareholders of American Anesthesiology of Syracuse, P.C. had previously "sold their interests to affiliates of American Anesthesiology, Inc. for $18 million" in 2013. (*Id.* at 3, ¶ 7; *see also id.* at 7–70.) That transaction included restrictive covenants "in order to protect the goodwill of the Company" and in light of the "strong relationship and connection . . . between Buyer or its affiliates and their respective current and prospective patients and customers . . . as well as the hospitals and healthcare facilities at which their respective providers provide professional services." (*Id.* at 38.)

The Agreement's original term expired on December 31, 2020, with an automatic renewal for a period of two years unless either party gave notice 180 days or more before the expiration of the Agreement. (Dkt. No. 24-1, at 14.) Via multiple amendments, the Agreement term was extended to July 1, 2024. (Dkt. No. 24, ¶ 4; Dkt. Nos. 24-2, 24-3, 24-4.) On March 1, 2021, by Assignment and Assumption Agreement, American Anesthesiology of Syracuse assigned the Agreement (among other service contracts) to North American Partners in Anesthesia. (Dkt. No. 24, ¶ 5; Dkt. No. 24-5.)

The Agreement includes a non-solicitation clause, section XIII.D (the "Non-Solicitation Clause"), that reads in pertinent part:

> Employee Inducement. During the Term of this Agreement and for two (2) years from the date of termination of this Agreement, either Party will not directly or indirectly, whether as an individual, advisor, employee, agent, or otherwise take any action to induce any employee to cease his or her employment with the other Party.

(Dkt. No. 24-2, at 5.)[4]

### C.    Relevant Conduct

On December 29, 2023, St. Joseph's informed NAPA that it would not renew the Agreement when the term ended on July 1, 2024. (Dkt. No. 32-3, ¶ 9.) During subsequent contract negotiations, NAPA representatives discussed the possibility of negotiating a buyout. (Dkt. No. 32-7, ¶¶ 6, 8.) Negotiations, however, were unsuccessful. (*Id.* ¶ 10.) St. Joseph's states that it is "imperative that [it] make arrangements to obtain anesthesia coverage in a short period of time, so that any physicians who are employed by St. Joseph's . . . can be properly

---

[4] The Non-Solicitation Clause was present in the Agreement as originally contemplated. (Dkt. No. 24-1, at 17.) It was amended effective December 31, 2020, but the operative language was not meaningfully altered. (Dkt. No. 24-2, at 5.)

credentialed and included in managed care contracts and approved by Medicare and Medicaid so that their services can be paid for." (Dkt. No. 32-7, ¶ 10.)

To that end, on February 26, 2024, St. Joseph's announced to its medical staff via email its intention to offer employment to "NAPA's anesthesia providers." (Dkt. No. 24-7.)[5] The same day, St. Joseph's sent offers of employment to "its anesthesia providers," (Dkt. No. 32-3, ¶ 10; Dkt. No. 32-7, ¶ 11; Dkt. No. 24-9),[6] and filed its complaint, (Dkt. No. 1). On March 1, 2024, NAPA sent St. Joseph's a cease-and-desist letter demanding that St. Joseph's refrain from inducing the Clinicians to terminate their contracts with NAPA. (Dkt. No. 25-1.) St. Joseph's responded by letter dated March 5, 2024. (Dkt. No. 25-2.)[7]

As of March 6, 2024, American Anesthesiology of Syracuse, P.C. "employ[ed] 16 anesthesiologists and 35 [CRNAs]." (Dkt. No. 24, ¶ 3.) "The composition of the anesthesia group at St. Joseph's has changed, and continues to change, on a year by year basis," and "[a]pproximately 38% of [St. Joseph's] anesthesia providers have received medical staff privileges to join the group since 2021." (Dkt. No. 43-2, ¶ 2.) About twenty of the Clinicians at St. Joseph's are "temporary 'locum tenens' providers." (*Id.* ¶ 6.)

The parties agreed during the May 1, 2024 hearing that a "significant" number of the NAPA Clinicians have entered into contracts with St. Joseph's and have given NAPA notice of termination of their agreements with NAPA.

---

[5] St. Joseph's acknowledged the Non-Solicitation Clause and other restrictive covenants in this email and indicated that it was "suing to have those [restrictive covenants] declared void and to obtain damages based on NAPA's past behavior." (*Id.*)

[6] The offers of employment also acknowledged existing restrictive covenants. (Dkt. No. 24-9, at 3.)

[7] St. Joseph's requested in this letter "an estimate of the cost" associated with "the benefit of funds [NAPA] has expended in clinical training of [the Clinicians]." (*Id.* at 2.)

IV.    DISCUSSION

A.    **Standard of Review**

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. In general, a party seeking a preliminary injunction must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the presence of sufficiently serious questions, that the balance of hardships tips decidedly in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS 5396, at *4 (N.D.N.Y. Jan. 11, 2019), and "[i]n the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied," *Rodriguez*, 175 F.3d at 234. "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

As to the next requirement, "[t]o establish a likelihood of success on the merits, a plaintiff must show that he is more likely than not to prevail on his claims, or, in other words, that the 'probability of prevailing is better than fifty percent.'" *Doe v. Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *20 (S.D.N.Y. Nov. 21, 2019) (quoting *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000)). However, a party may also prevail by showing "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Id.*, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *21 (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)). This allows a district court to grant injunctive relief "where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

Generally, preliminary injunctions are prohibitory or mandatory. *N. Am. Soccer League*, 883 F.3d at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is[] 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "A heightened 'substantial likelihood' standard may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial."

*Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

St. Joseph's does not contend that the injunctive relief NAPA seeks is mandatory rather than prohibitory.[8] Rather, St. Joseph's argues that "an injunction would provide NAPA with substantially all the relief it seeks, and that relief could not be undone." (Dkt. No. 32, at 16.) NAPA did not address this argument in any of its briefing but argued at the May 1, 2024 hearing that, while the relief sought may give NAPA all the relief it seeks, such relief can be undone. Given the dearth of argument and caselaw provided by either party as to this issue, it is not clear to the Court whether the "substantial likelihood of success" standard applies. However, given St. Joseph's representation—made in briefing, (Dkt. No. 32, at 14–16; Dkt. No. 32-7, ¶ 10), and at the March 15, 2024, and May 1, 2024 hearings—of the need to urgently negotiate employment contracts in order to have the Clinicians in place at the expiration of the Agreement in July 2024, it appears in this context that an injunctive order preventing St. Joseph's from timely executing such contracts could not easily be undone and that the "substantial likelihood of success" standard therefore applies. Even applying the less demanding "likelihood of success" standard, however, NAPA has failed to meet its burden on the record before the Court.

**B.    Analysis**

The Court assumes familiarity with the analysis in its prior decision denying NAPA's motion for a temporary restraining order. *See St. Joseph's*, 2024 WL 1181136, at *3–8, 2024 U.S. Dist. LEXIS 47891, at *7–18. Additional facts adduced since the Court's prior decision do

---

[8] Because the relief sought would appear to maintain the status quo—that is, the "the last actual, peaceable uncontested status which preceded the pending controversy"—the Court assumes the injunction is prohibitory. *See N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio*, 768 F.3d at 120).

not alter the outcome of that analysis. However, NAPA has introduced new arguments in its supplemental briefing, (Dkt. Nos. 44, 55), which the Court addresses below.

          **1.**       **Irreparable Harm**

NAPA now argues that it has suffered irreparable harm arising from (1) lost "goodwill" resulting from "customer" relationships, which NAPA characterizes as the relationships between the Clinicians and other providers at St. Joseph's; (2) loss of trained Clinicians; and (3) reputational harm. (Dkt. No. 44, at 8–9; Dkt. No. 55, at 5–10.) St. Joseph's argues that money damages are sufficient to remedy any injury to NAPA and that NAPA has not "provided any specifics whatsoever to indicate that it will lose *any* business as a result of the loss of" the Clinicians. (Dkt. No. 43, at 7–9; *see also* Dkt. No. 54, at 5.)

The Court notes that since its initial decision denying NAPA's motion for a temporary restraining order, NAPA has submitted one additional declaration. (Dkt. No. 51-1.) That declaration provides facts pertaining to NAPA's acquisition of American Anesthesiology of Syracuse, (*id.* ¶¶ 6–8), and NAPA's training, "proprietary clinical outcome database," and proprietary "Anesthesia Risk Alerts," (*id.* ¶¶ 9–12).

NAPA's argument that it faces irreparable reputational harm is speculative, conclusory, and unsupported by facts in the record. NAPA cites Dr. Kenneth Santos's assertion that St. Joseph's actions have been "distressing and distracting to NAPA's clinicians," resulting in clinicians being "afraid and concerned about their future employment." (Dkt. No. 24, ¶ 14.) But Dr. Santos's statement says nothing about any actual or imminent reputational harm that has befallen NAPA, and in any event, as the Court noted in its prior decision with respect to this assertion, Dr. Santos's vague, speculative, and conclusory concern, which was made in the context of concern about patient care, "provides an insufficient basis on which to establish irreparable harm." *See St. Joseph's*, 2024 WL 1181136, at \*4, 2024 U.S. Dist. LEXIS 47891, at

*10. NAPA's citation of Dr. Santos's other concern that "St. Joseph's actions have caused [newly recruited] clinicians to rethink their commitments to join the Group," (Dkt. No. 24, ¶ 17), is similarly vague and speculative, and it is therefore equally insufficient to support NAPA's argument.

Nor has NAPA demonstrated that the loss of what it characterizes as "goodwill" from "customer" relationships between the Clinicians and other providers at St. Joseph's constitutes irreparable harm. There is no dispute that the Clinicians and other providers at St. Joseph's generally have positive working relationships, (*see, e.g.,* Dkt. No. 32-6, ¶ 7), that are "meaningful and trusting," (Dkt. No. 51-1, ¶ 9). But NAPA fails to demonstrate that this is the type of goodwill sufficient to establish irreparable harm. These are not the type of relationships that "produce an indeterminate amount of business in years to come," *see Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999), such that the harm caused by the loss of the relationships is not compensable by money damages, *see Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001); *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195, 2008 WL 4778239, at *14, 2008 U.S. Dist. LEXIS 90986, at *40–41 (S.D.N.Y. Oct. 31, 2008). Indeed, there is no evidence in the record demonstrating that the Clinicians generate any business from patients in the sense contemplated by *Ticor*, *Natsource*, or *Marsh* because the Clinicians are assigned patients by the hospital, (Dkt. No. 32-2, ¶ 10; Dkt. No. 32-4, ¶ 9), and NAPA does not demonstrate that the relationships between the Clinicians and other providers at St. Joseph's otherwise generate business.[9]

---

[9] Even if the replacement of NAPA's Clinicians could, as one witness stated, lead to "significant disruption" at St. Joseph's and the possibility that cases could be shifted to other hospitals, (Dkt. No. 32-6, ¶ 7; *see also* Dkt. No. 32-4, at ¶ 8), this does not support a claim of irreparable harm by NAPA. There is no evidence that any such shifts would be the result of business-generating relationships between the Clinicians and other providers at St. Joseph's similar to the relationship between a salesperson or broker and a purchaser, *see Ticor*, 173 F.3d at 68–69; *Marsh*, 2008 WL 4778239, at *14, 2008 U.S. Dist. LEXIS 90986, at *40–41; *Natsource*, 151 F. Supp. 2d at 469. And the record is

NAPA argues in its briefing, (Dkt. No. 55, at 7, 11–12), and stated at the May 1, 2024 hearing that the relationships between the Clinicians' and St. Joesph's patients also provide a basis on which to grant injunctive relief. The record is clear, however—and NAPA does not dispute—that the Clinicians do not have their own patients, (Dkt. No. 32-2, ¶ 10; Dkt. No. 32-4, ¶ 9), and there is no evidence in the record to suggest the existence of any specific relationships between the Clinicians and patients.[10]

NAPA's argument that the loss of its trained Clinicians constitutes irreparable harm fares no better. While it is not disputed that a significant number of Clinicians have signed contracts with St. Joseph's, NAPA has not shown that money damages are insufficient to compensate NAPA for any loss of business due to the Clinicians' departures.

NAPA cites *Natsource* and *Marsh* for the general proposition that "New York law recognizes the loss of trained employees as a[] type of irreparable harm in the context of a non-solicitation agreement. (Dkt. No. 55, at 8.) The general proposition that the loss of trained employees may constitute irreparable harm is correct, but NAPA has failed to explain how the reasoning underpinning those decisions is applicable here.

In *Natsource*, which involved a plaintiff commodity brokerage firm that formerly employed the defendant employee, the record reflected that the employer "expend[ed] substantial

---

devoid of any facts demonstrating the existence of any specific relationship between a given Clinician and any provider at St. Joseph's.

[10] The only record evidence NAPA cites in support of its position is that "[i]f patients are unable to obtain full coverage for anesthesia services at St. Joseph's many patients and their physicians will instead take those cases to other hospitals within the Syracuse area for services that require anesthesia." (Dkt. No. 55, at 11 (quoting Dkt. No. 32-6, ¶ 2).) But that conclusion follows from the premise that "patients [would be] unable to obtain full coverage for anesthesia services at St. Joseph's," (Dkt. No. 32-6, ¶ 2), not from any relationships between the Clinicians and patients. Put differently, there is no evidence in the record that if patients at St. Joseph's are able to obtain anesthesia services at St. Joseph's—even if not from the Clinicians—they would nevertheless follow the Clinicians to other hospitals within the Syracuse area for services that require anesthesia. Thus, NAPA's argument as to the relationships between the Clinicians and patients is without merit.

resources to help its brokers develop customer relations," "introduced [its brokers] to established customers," "encouraged [its brokers] to strengthen these relationships," and "support[ed] the brokers by providing market intelligence and through relationships maintained on their desks." *See* 151 F. Supp. 2d at 469. Based on those facts, the court determined that "the loss of training and interference with already established relationships that would occur should [the defendant] recruit other employees . . . [we]re unquantifiable assets." *Id.* Similarly, relying on *Natsource*, the Court in *Marsh* found that "the departure of [the plaintiff insurance brokerage firm's] employees deprive[d] [the plaintiff] of not only its investment in training and developing those employees, but also, for those who were brokerage professionals, of those employees' clients who follow the employees because of the relationships developed with them at [the plaintiff's] expense." *See* 2008 WL 4778239, at *14, 2008 U.S. Dist. LEXIS 90986, at *43.

Here, however, the training cited by NAPA in support of its argument differs significantly. "NAPA trains its chiefs on best practices in terms of operating room efficiency, inclusion, problem resolution and culture building." (Dkt. No. 51-1, ¶ 9). The Clinicians have access to NAPA's "proprietary clinical outcome database" and proprietary "Anesthesia Risk Alerts," which "provide the clinicians with real-time data driven analysis and best practices" and "improve outcomes for all procedures." (*Id.* ¶¶ 10–11.) And there are "regular Chiefs meetings and quality assurance meetings." (*Id.* ¶ 10). But this is unlike the training relied upon in *Natsource* and *Marsh*, which involved brokerage firms training their brokers with regard to the establishment, strengthening, and maintenance of business-generating client relationships. *See Natsource,* 151 F. Supp. 2d at 469; *Marsh*, 2008 WL 4778239, at *14, 2008 U.S. Dist. LEXIS 90986, at *43. NAPA has established the existence of no such training here. And, as discussed in depth below with respect to NAPA's purported legitimate business interest, NAPA has

established no such relationship here, where the Clinicians lack analogous business-generating relationships with any other party, and it is therefore not clear that the training described by NAPA—that is, training on the general provision of care rather than training that enables employees to establish, strengthen, and maintain business-generating relationships—entitles them to a finding of irreparable harm. It is this distinction that appears to render money damages adequate to compensate NAPA for harm caused by departing Clinicians: as already noted, NAPA has not demonstrated that the Clinicians have business-generating client relationships that would "produce an indeterminate amount of business in years to come," *see Ticor*, 173 F.3d at 69, because the Clinicians do not have relationships with patients, (Dkt. No. 32-2, ¶ 10; Dkt. No. 32-4, ¶ 9), from whom compensation is derived.

In sum, NAPA has not, on the record before the Court, met its burden of demonstrating irreparable harm because NAPA "has not made a sufficient showing that an award of money damages would not be an adequate remedy." *Banner Indus. of N.E., Inc. v. Wicks*, No. 11-cv-1537, 2012 WL 13018976, at *6 (N.D.N.Y. May 8, 2012). "It is settled law that when an injury is compensable through money damages there is no irreparable harm." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). And "[l]oss of business due to a breach of a [restrictive covenant] is often a quantifiable injury which can be remedied at law." *Banner*, 2012 WL 13018976, at *6 (collecting cases). Rather, the harms NAPA alleges appear to amount to "[m]ere business disruptions," *see Harley Marine NY, Inc. v. Moore*, No. 23-cv-163, 2023 WL 3620720, at *6, 2023 U.S. Dist. LEXIS 92265, at *17 (N.D.N.Y. Mar. 24, 2023), that are compensable by money damages, *see Banner*, 2012 WL 13018976, at *6; *TGG Ultimate*

*Holdings, Inc. v. Hollett*, No. 16-cv-6289, 2016 WL 8794465, at *5, 2016 U.S. Dist. LEXIS

188014, at *12 (S.D.N.Y. Aug. 29, 2016).[11]

### 2.    Likelihood of Success or Sufficiently Serious Questions

NAPA argues that it is entitled to injunctive relief because enforcement of the Non-

Solicitation Clause supports NAPA's legitimate business interests. (Dkt. No. 44, at 5; Dkt. No.

55, at 10.) Specifically, NAPA now argues that the legitimate business interest at issue is the

protection of "goodwill resulting from NAPA's sizeable investment in assembling the highly

specialized workforce at issue," (Dkt. No. 44, at 5), which, NAPA clarifies, is "goodwill" that

has been developed through (1) "customer relationships . . . between NAPA's clinicians and the

physicians and other professionals performing surgeries and other procedures at St. Joseph's,"

(Dkt. No. 55, at 10–12); and (2) "investments in [American Anesthesiology of Syracuse] and its

clinicians," including investment in acquiring the practice and in subsequently "building its

business, and . . . continuing [the] development of the practice." (*id.* at 12 (second and third

alterations in original) (quoting Dkt. No. 38-1, ¶ 7)).[12] St. Joseph's argues that it has paid NAPA

for investments in recruitment, (Dkt. No. 43, at 4), that any relationships between the Clinicians

---

[11] NAPA's oblique references to other facilities, such as Crouse Hospital, (Dkt. No. 55, at 8), provide no support for NAPA's arguments because there is no evidence in the record demonstrating what impact other facilities have on NAPA, St. Joseph's, or the Clinicians other than the existence of "a contract to provide anesthesia services" between NAPA and Crouse, (Dkt. No. 38-3, ¶ 4). There is no evidence in the record that NAPA has, in fact, reassigned Clinicians to Crouse or that Crouse, or any other facility, has a need for the Clinicians such that the Clinicians could be reassigned.

[12] At the May 1, 2024 hearing, NAPA conceded that neither confidential customer information nor trade secrets are at issue. NAPA also stated at the hearing, however, that it has a legitimate interest in its "client base." But as discussed below, NAPA premises its purported legitimate business interest on the relationships between the Clinicians and other providers at St. Joseph's, and therefore, the Court sees no distinction between NAPA's argument, on the one hand, that "customer" goodwill—that is, the positive working relationships between the Clinicians and other providers at St. Joseph's—constitutes a legitimate business interest, and, on the other hand, that NAPA's "client" base—that is, the pool of other providers at St. Joseph's with whom the Clinicians work—does the same. Accordingly, the Court construes NAPA's arguments as relying on goodwill created by the relationships between the Clinicians and other providers at St. Joseph's.

For the reasons discussed above with respect to the purported irreparable harm, the relationships between the Clinicians and patients fails to provide a basis for a protectable legitimate business interest.

16

and other providers at St. Joseph's provide an insufficient basis on which to find the existence of a legitimate business interest, and that, in any case, there is insufficient evidence in the record to establish any such relationships, (Dkt. No. 54, at 6–9). At oral argument, St. Joseph's also argued that there is no basis for the proposition that an entity's general investment in an interest renders that interest protectable by a restrictive covenant.

As in its prior decision, *see St. Joseph's*, 2024 WL 1181136, at *6 & n.12, 2024 U.S. Dist. LEXIS 47891, at *14–15 & n.12, and as both NAPA and St. Joseph's do, (Dkt. No. 44, at 5, 7; Dkt. No. 54, at 6–12; Dkt. No. 55, at 10–12), the Court applies the standard set forth in *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999), to determine whether the Non-Solicitation Clause protects a legitimate business interest. The Court therefore considers whether the Non-Solicitation Clause prevents NAPA's "former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to [NAPA]'s competitive detriment." *See BDO Seidman*, 93 N.Y.2d at 389, 392.

As noted, NAPA indicates for the first time in its second supplemental reply brief that the goodwill on which it premises its argument is the goodwill purportedly created by the relationships between the Clinicians and other providers at St. Joseph's, such as surgeons whose procedures require the use of anesthesia. (Dkt. No. 55, at 6, 11–12 ("NAPA's clinicians have unique, special, and established relationships with the physicians and other professionals performing surgeries and procedures at St. Joseph's. . . . [T]hese are the relevant 'customer relationships' when considering whether to issue injunctive relief.").) NAPA relies principally on *Adecco USA, Inc. v. Staffworks, Inc.*, No. 20-cv-744, 2020 WL 7028872, 2020 U.S. Dist. LEXIS 226382 (N.D.N.Y. Sept. 15, 2020), and *Express Freight Systems Inc. v. YMB Enterprises Inc.*,

623 F. Supp. 3d 39, 51 (E.D.N.Y. 2022), in arguing that the goodwill resulting from these positive relationships between the Clinicians and other providers at St. Joseph's is a legitimate business interest entitling NAPA to enforcement of the Non-Solicitation Clause. (Dkt. No. 44, at 6–8; Dkt. No. 55, at 10–12.)

In *Adecco*, former employees of a staffing company were hired by a competing staffing agency. *See* 2020 WL 7028872, at *1–2, 2020 U.S. Dist. LEXIS 226382, at *2–4. At issue in that case was "goodwill with *current customers*," information about which the defendants had obtained from the plaintiff. *See* 2020 WL 7028872, at *7–8, 2020 U.S. Dist. LEXIS 226382, at *18–19 (emphasis added). Judge D'Agostino found that the plaintiff had "a legitimate business interest in protecting the *goodwill it has fostered with its customers* through the Former Employees" and that "[t]he protection of these relationships [wa]s especially [compelling] in light of the testimony of the Former Employees that the staffing industry is all about *relationships with clients*." *See id.*, 2020 WL 7028872, at *8, 2020 U.S. Dist. LEXIS 226382, at *19–20 (emphasis added).

Similarly, *Express Freight* involved protection of the relationship between the plaintiff transportation broker and a specific *customer*, information about which the defendant freight carrier had obtained from the plaintiff. *See* 623 F. Supp. 3d at 45–46, 51. The restrictive covenant at issue restrained the defendant "from 'directly or indirectly solicit[ing] or do[ing] business of a transportation or warehouse nature with *any of* [*the plaintiff's*] *customers* who [were] serviced by [the defendant] as a result of [the] agreement." *Id.* at 47 (fourth and sixth alterations in original) (emphasis added)). And because the defendant "likely gained access to clients and industry information through their work with [the plaintiff]," the Court enforced the

restrictive covenant to prevent the "unfair competition" that would result from the defendant "undercut[ting] [the plaintiff's] business with [the client.]" *Id.* at 51.[13]

Underlying these decisions is the rationale for enforcing restrictive covenants—namely, prevention of "unfair competition," *see BDO Seidman*, 93 N.Y.2d at 391; *Express Freight*, 623 F. Supp. 3d at 52; *Adecco*, 2020 WL 7028872, at *10, 2020 U.S. Dist. LEXIS 226382, at *26; *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13-cv-8739, 2014 WL 97317, at *6, 2014 U.S. Dist. LEXIS 2640, at *17 (S.D.N.Y. Jan. 9, 2014) (quoting *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982)), that could result where the goodwill developed through a "relationship with . . . customers is such that there is a substantial risk that the employee may be able to divert all or part of the business," *see Ticor*, 173 F.3d at 72. The potential for such an unfair competition is clear where the goodwill at issue involves a customer with whom the party seeking to enforce the restrictive covenant has a relationship, to whom a service is provided, and who is likely to rely on such goodwill in future commercial decisions. *See, e.g., BDO Seidman*, 93 N.Y.2d at 392 ("[The plaintiff's] legitimate interest here is protection against defendant's competitive use of client relationships which [the plaintiff] enabled [the defendant] to acquire through [the defendant's] performance of accounting services for the [the plaintiff's] clientele during the course of [the defendant's] employment."); *Express Freight*, 623 F. Supp. 3d at 51 ("[The] restrictive covenant was here intended to protect [the

---

[13] The other cases cited by NAPA, (Dkt. No. 44, at 7–8), in support of its goodwill argument similarly involve *customer* goodwill. *See Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017) ("[The plaintiff] offers an expert witness declaration to support its position that *client relationships* are important and unique in consulting, and that the loss of a consultant with strong *client relationships* can dramatically undercut a consultancy's business. Indeed, like many service-oriented businesses, [the plaintiff] depends on *client relationships* for its success." (emphasis added)); *Portware, LLC v. Barot*, 815 N.Y.S.2d 495, 2006 WL 516816, at *5, 2006 N.Y. Misc. LEXIS 376, at *12 (N.Y. Sup. Ct. 2006) (table opinion) ("[The plaintiff's] legitimate interest in enforcing the non-solicitation covenant is to protect against [the defendant's] competitive use of *customer relationships* that [the plaintiff] enabled him to acquire through his position as account manager [for] [the plaintiff]." (emphasis added) (citing *BDO Seidman*, 93 N.Y.2d at 391)).

plaintiff's] interest in preventing the carriers it hires . . . from simultaneously working directly

with [the plaintiff's] customers . . . [because the carriers] likely gained access to clients and

industry information through their work with [the plaintiff]." (citation and internal quotation

marks omitted)); *Adecco*, 2020 WL 7028872, at *7, 2020 U.S. Dist. LEXIS 226382, at *19 ("The

desire of a business to protect its goodwill that it has fostered with customers constitutes a

legitimate business interest. In many ways, the goodwill of a salesman's relationship with the

customer is to a degree an assent of the employer." (citations and internal quotation marks

omitted)); *Nat'l Elevator*, 2008 WL 207843, at *10 ("[The plaintiff] had a valid concern that it

needed to prevent [the defendant] from soliciting its three most important customers as a way of

protecting against the misuse of its information . . . .").[14]

      The protectable goodwill at issue in *Adecco*, *Express Freight*, and the other cases cited by

NAPA—that is, *customer* goodwill created by direct relationships between providers of a service

and recipients of that service—is distinct from the purported goodwill involved in the unusual

relationships put forth by NAPA, which involve, on the one hand, the Clinicians providing a

service to patients, and, on the other, surgeons or other proceduralists who are not the recipient

of that service (but are instead providing their own service), with whom the Clinicians have no

formal business relationship, and with whom NAPA has no relationship whatsoever. *Cf. Reed*

*Elsevier Inc.*, 2014 WL 97317, at *10, 2014 U.S. Dist. LEXIS 2640, at *28 (declining to find a

legitimate business interest where responsibilities arising from the relationships between

employees purportedly subject to a restrictive covenant and a client base "were primarily

---

[14] Goodwill "is not readily defined, but it has been described as the 'expectation that the old customers will resort to the old place,'" and it "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business." *Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-cv-1562, 2008 WL 207843, at *5, 2008 U.S. Dist. LEXIS 5389, at *16–17 (E.D.N.Y. Jan. 24, 2008) (quoting *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 901 (2d Cir. 1992)) (collecting cases). NAPA has nowhere argued how this definition of goodwill, or any other definition, applies in the present circumstances.

managerial and supervisory, rather than *client-focused responsibilities* that have been the basis for a finding of legitimate interest" (emphasis added)).[15]

The potential for unfair competition from the exploitation of goodwill is not clear here, notwithstanding NAPA's conclusory labelling of providers at St. Joseph's as "customers" and despite unsupported and conclusory statements in the record to that end, (*see, e.g.,* Dkt. No. 51-1, ¶ 6 ("In the context of anesthesia services, the goodwill is, among other things, created among and with surgeons and other proceduralists.")). NAPA has not provided a sufficient basis, relying either on relevant caselaw or on specific facts in the record, to conclude that it is likely to succeed in demonstrating that the relationships between the Clinicians and other providers at St. Joseph's are at risk of being unfairly exploited or how such exploitation would materialize. NAPA has not identified any case dealing with such an unusual relationship or pointed to facts in the record demonstrating, as NAPA suggests, that the Clinicians' "relationships with the physicians and others practicing at St. Joseph's are so significant that *they would follow NAPA's clinicians* to other facilities." (Dkt. No. 55, at 11 (emphasis added).)[16]

---

[15] In its most recent briefing, NAPA argues, in the context of the allegedly irreparable harm to NAPA and not in support of its argument that it is likely to succeed, that the Clinicians are "unique and special under New York law." (Dkt. No. 55, at 9; *see also* Dkt. No. 44, at 8.) But NAPA has cited no evidence in the record demonstrating that the Clinicians have "special talents" and are akin to an "individual performer [with] such ability and reputation that his or her place may not easily be filled," such as a musician, professional athlete, actor, or acrobat. *See Ticor*, 173 F.3d at 70; *see also Gujral v. Anesthesia Grp. of Albany, P.C.*, 201 N.Y.S.3d 920, 2023 WL 9285382, at *2, 2023 N.Y. Misc. LEXIS 23444, at *9 (N.Y. Sup. Ct. Dec. 20, 2023) (finding that "anesthesia services . . . are not unique" and their services are "routinely performed"). Nor has NAPA demonstrated that that the Clinicians are akin to "brokers, traders, or salespersons" who have "unique relationships with the customers with whom they deal." *See Reed Elsevier*, 2014 WL 97317, at *11, 2014 U.S. Dist. LEXIS 2640, at *30. Finally, NAPA cites no caselaw in support of its contention that either a nationwide shortage of anesthesiologists or "proprietary training and information from NAPA" entitles the Clinicians to "unique" status under New York law.

[16] As discussed with respect to the purported irreparable harm, while there is evidence suggesting that the Clinicians and other providers at St. Joseph's have positive working relationships, (*see, e.g.,* Dkt. No. 32-6, ¶ 7), the record evidence demonstrates that the possibility that St. Joseph's providers would shift patients to other hospitals results from the "significant disruption" of the immediate replacement of anesthesia providers, (*id.*; *see also* Dkt. No. 32-4, at ¶ 8). Again, NAPA does not demonstrate that such shifts would be the result of special relationships between the Clinicians and other providers at St. Joseph's, and the record contains no facts demonstrating the existence of any specific relationship between a given Clinician and any provider at St. Joseph's.

Nor has NAPA cited any relevant caselaw in support of its conclusion that purchasing "goodwill" as part of a commercial acquisition entitles an entity to enforcement of a restrictive covenant.[17] And the conclusory factual assertions NAPA cites, which contain no specific evidence of any investment in building or developing NAPA's practice other than the purchase price paid by NAPA in acquiring American Anesthesiology of Syracuse, are unavailing. (Dkt. No. 55, at 12 (citing Dkt. No. 38-1, ¶ 7; Dkt. No. 51-1, ¶¶ 6–8).)[18]

Therefore, at bottom, NAPA has not met its burden of demonstrating a likelihood of success or sufficiently serious questions going to the merits as to NAPA's breach of contract claim because it has not supported, with relevant caselaw or specific facts in the record, its contention that the purported goodwill either between the Clinicians and other providers at St. Joseph's or created by investment in and development of American Anesthesiology of Syracuse is a legitimate business interest entitled to protection by the Non-Solicitation Clause.

### 3.  Balance of Hardships and Public Interest

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co.*

---

[17] NAPA merely repeats citations of *Adecco*, *Express Freight*, and *BDO Seidman*, (Dkt. No. 55, at 12–13), none of which involved a merger or acquisition, let alone the express transfer of goodwill from one entity to another as part of such a transaction. NAPA cites no case for the proposition that a "significant investment"—here, approximately $50 million in 2020, (Dkt. No. 51-1, ¶ 8)—itself entitles NAPA to enforcement of the restrictive covenant at issue. Indeed, for an interest to be protectable by a restrictive covenant, it must fall into a category enumerated by *BDO Seidman*. *See Reed Elsevier*, 2014 U.S. Dist. LEXIS 2640, at *32–33 ("Federal courts applying New York law have consistently found th[e] list [of legitimate business interests in *BDO Seidman*] to be an exclusive one."). And as discussed above, NAPA has not met their burden of demonstrating that they are likely to succeed in establishing that the "goodwill" between the Clinicians and other providers at St. Joseph's qualifies as a legitimate business interest under *BDO Seidman*.

[18] NAPA does not address the undisputed fact that St. Joseph's paid NAPA for recruiting services. (Dkt. No. 32-5, ¶ 2(a); Dkt. No. 24-2, at 15; Dkt. No. 24-3, at 8.) Though NAPA argues that it is disputed whether "St. Joseph's has already paid for [recruitment, retention, and training]," (Dkt. No. 50, at 2), NAPA cites in support of that contention only the fact that St. Joseph's has not reimbursed the *Clinicians* for recruiting services, (Dkt. No. 38-3, ¶ 6). The relevant business relationship is between NAPA and St. Joseph's, not between St. Joseph's and the Clinicians. Thus, the fact that St. Joseph's has not paid the Clinicians directly for recruiting services is irrelevant to the issues before the Court.

*v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)). Furthermore, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger*, 607 F.3d at 80.

As in the Court's prior decision denying NAPA's motion for a temporary restraining order, NAPA's failure to demonstrate an irreparable injury and either a likelihood of success on the merits or sufficiently serious questions going to the merits is sufficient to deny injunctive relief. *See Salinger*, 607 F.3d at 75 n.5; *Faiveley*, 559 F.3d at 119. Accordingly, the Court need not consider the remaining balance of hardships and public interest factors. *Conn. State Police Union v. Rovella*, 36 F.4th 54, 68 (2d Cir. 2022) ("Because the District Court did not err in concluding that the [plaintiff] could not succeed on the merits of its claim, we need not address the remaining prongs of the preliminary injunction test, including whether the [plaintiff] demonstrated irreparable harm or whether an injunction would be in the public interest.").

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that NAPA's motion for a preliminary injunction, (Dkt. No. 22), is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>May 16, 2024</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

23