# 24-1643-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



ST. JOSEPH'S HOSPITAL HEALTH CENTER,

*Plaintiff-Counter-Defendant-Appellee,*

*v.*

AMERICAN ANESTHESIOLOGY OF SYRACUSE, P.C., AMERICAN ANESTHESIOLOGY, INC.,
NMSC II, LLC., NORTH AMERICAN PARTNERS IN ANESTHESIA, LLP,

*Defendant-Counter-Claimants-Appellants.*

---

*On Appeal from the United States District Court
for the Northern District of New York*

## AMENDED BRIEF FOR
## PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

John F. Queenan
RIVKIN RADLER LLP
66 South Pearl Street, 11th Floor
Albany, New York 12207
518-462-3000

David A. Ettinger
HONIGMAN LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226
313-465-7000

*Attorneys for Plaintiff-Counter-Defendant-Appellee*



## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), St. Joseph's Hospital Health Center is a New York not-for-profit corporation whose sole member is St. Joseph's Health, Inc., which is also a New York not-for-profit corporation. The sole member of St. Joseph's Health, Inc., is Trinity Health Corporation, which is an Indiana nonprofit corporation with corporate headquarters in Michigan. St. Joseph's Hospital Health Center is not a publicly traded company and no publicly held corporation owns 10% or more of stock in it.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .....................................................i

TABLE OF CONTENTS...................................................................... ii

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ...........................................................xi

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......................... xii

STATEMENT OF THE CASE...............................................................1

    A.    Factual Background....................................................................1

        1.    The Parties.....................................................................1

        2.    Anesthesiology Market and Competition ...................................2

        3.    Anesthesia at St. Joseph's ...................................................2

        4.    The Parties' Negotiations....................................................4

        5.    Absence of Justification for Restrictive Covenant ....................6

        6.    Post-Complaint Actions .....................................................7

    B.    Procedural History....................................................................7

SUMMARY OF THE ARGUMENT .....................................................10

STANDARD OF REVIEW ................................................................16

ARGUMENT ..............................................................................17

    A.    Legal Standard on Preliminary Injunction ..........................................17

    B.    The District Court Properly Found That There Was No Likelihood of Irreparable Harm ..........................................................19

        1.    Alleged "Opportunity Costs".....................................................21

2. Threatened Harm to Alleged "Customer Relationships"..........23

3. Alleged Loss of "Trained Clinicians".......................................28

4. Alleged "Reputational Harm"..................................................30

C. The District Court Did Not Abuse Its Discretion in Concluding that NAPA is Not Likely to Succeed on the Merits...........................33

1. The Nonsolicitation Clause is Unenforceable ..........................33

2. Any Breach by St. Joseph's is Excused Because NAPA Committed the First Material Breach .......................................49

3. The Non-Solicitation Clause as Utilized by NAPA Violates the Antitrust Laws ........................................50

D. The Balance of Harms and the Public Interest Weigh Heavily Against an Injunction ..........................................................54

E. An Injunction Would Harm the Public Interest .................................56

F. The District Court Properly Found No Material Facts in Dispute to Justify an Evidentiary Hearing.......................................57

CONCLUSION...................................................................................60

CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1) .................................61

58412754.1

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Abbassi v. INS*,
143 F.3d 513 (9th Cir. 1998) ...............................................................20

*Adecco USA, Inc. v. Staffworks, Inc.*,
No. 6:20-CV-744, 2020 WL 7028872 (N.D.N.Y. Sept. 15, 2020) ...................37

*American Anesthesiology of Syracuse, P.C. v. Genevieve
Dalton et al.*,
Index No. 006645 / 2024 (N.Y. Sup. Ct. June 27, 2024) ....................................7

*American Broadcasting Companies, Inc. v. Wolf*,
52 N.Y.2d 394 (1981) ...............................................................43

*American Institute of Chemical Engineers v. Reber-Fiel Co.*,
682 F. 2d 382 (2nd Cir. 1982) ...............................................................44

*Anderson v. Cameron*,
568 F. App'x 67 (2d Cir. 2014) ...............................................................56

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016) ...............................................................1

*Baker's Aid, Inc. v. Hussman Foodservice Co.*,
730 F. Supp. 1209 (E.D.N.Y. 1990) ...............................................................46

*Baker's Aid v. Hussman Foodserv. Co.*,
830 F.2d 13 (2d Cir. 1987) ...............................................................31

*BDO Seidman v. Hirschberg*,
93 N.Y.2d 382 (N.Y. 1999) ...............................................34, 36, 42, 43

*Bessemer Trust Co. v. Branin*,
16 N.Y.3d 549 (2011) ...............................................................36, 42

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*,
360 F.3d 125 (2d. Cir. 2004) ...............................................................16

iv

*Charette v. Town of Oyster Bay*,
    159 F.3d 749 (2d. Cir. 1998) ...............................................................57

*Christian Fellowship Ctrs. of N.Y., Inc. v. Village of Canton*,
    377 F. Supp. 3d 146 ............................................................................57

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985) ...............................................................19

*Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*,
    943 F.2d 220 (2d Cir. 1991) ...............................................................49

*Colony Grill Devl., LLC v. Colony Grill, Inc.*,
    2023 WL 6890675 (2d Cir. 2023) ......................................................16

*DAR & Associates, Inc. v. Uniforce Services, Inc.*,
    37 F. Supp. 2d 192 (E.D.N.Y. 1999) .......................................43, 44, 47

*Design Strategy Corp. v. Knack Systems, LLC*,
    2007 WL 4562926 (S.D.N.Y. Dec. 18, 2007) ....................................45

*Dexter 345 Inc. v. Cuomo*,
    663 F.3d 59 (2d Cir. 2011) .......................................................23, 31, 32

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
    356 F.3d 1256, 1260 (10th Cir. 2004) ...............................................19

*Express Freight Systems Inc.*,
    623 F. Supp. 3d 39 (E.D.N.Y. 2022) ..................................................46

*Fido's Fences v. Canine Fence Co*,
    672 F. Supp. 2d 303 (E.D.N.Y. Nov. 30, 2009) .................................52

*Finger v. Pearson PLC*,
    2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019) .................................37

*Follmer, Rudzewicz & Co. v. Kosco*,
    420 Mich. 394, 362 N.W.2d 676 (1984)............................................38

*Forest City Daly House, Inc. v. Town of N. Hempstead*,
    175 F.3d 144 (2d Cir. 1999) ...............................................................19

*Greenwich Mills Co. v. Barrie House Coffee Co.*,
    459 N.Y.S.2d 454 (N.Y. App. Div. 1983) ....................................................33, 34

*Grumman Corp. v. LTV Corp.*,
    665 F.2d 10 (2d Cir. 1981) ...................................................................56

*Gujral v. Anesthesia Group of Albany, P.C.*,
    201 N.Y.S.3d 920 (N.Y. Sup. Ct. Dec. 20, 2023) .............................................40

*Hasbrouck v. Texaco, Inc.*,
    842 F. 2d 1034 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990) .............................53

*In re Rationis Enters., Inc. of Panama*,
    261 F.3d 264 (2d Cir. 2001) .................................................................57

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
    812 F.2d 786 (2d Cir. 1987) ................................................................51

*Janese v. Fay*,
    692 F.3d 221 (2d Cir. 2012) .................................................................49

*Jayaraj v. Scappini*,
    66 F.3d 36 (2d. Cir. 1995) ...........................................................19, 20

*JBR. Inc. v. Keurig Green Mountain, Inc.*,
    618 F. App'x 31 (2d Cir. 2015).............................................................54

*JRH Tax, LLC v. Agnant*,
    62 F.4th 658 (2d. Cir. 2023) ...............................................................17

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
    917 F.2d 75 (2d Cir. 1990) .................................................................20

*K.M.B. Warehouse Distrib., Inc. v. Walker Mfg., Co.*,
    61 F.3d 123 (2d Cir. 1995) .................................................................51

*Knaust v. City of Kingston*,
    157 F.3d 86 (2d Cir. 1998) .................................................................55

*Lazer Inc. v. Kesselring*,
    13 Misc.3d 427, 823 N.Y.S.2d 834 (N.Y. Sup. Ct. 2005)..................................43

*Linden Care, LLC v. Express Scripts, Inc.*,
No. 1:15-CV-1335, 2015 WL 12734164
(N.D.N.Y. Dec. 7, 2015)........................................................................18

*Markets Group, Inc. v. Oliveira*,
No. 18-CV-2089, 2020 WL 820654 (S.D.N.Y. Feb. 3, 2020) ..............33, 34, 47

*Marsh USA Inc. v. Karasaki*,
No. 08-Civ.-4195 (JGK), 2008 WL 4778239
(S.D.N.Y. Oct. 31, 2008) ...............................................................*passim*

*MasterCard Int'l Inc. v. Nike, Inc.*,
164 F. Supp. 3d 592 (S.D.N.Y. 2016) ....................................34, 43, 45

*Mathias v. Jacobs,*
167 F. Supp. 2d, 606, 611 (S.D.N.Y. 2001) .....................................43

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)........................................................................17

*Mercer Health & Benefits LLC v. DiGregorio*,
307 F. Supp. 3d 326 (S.D.N.Y. 2018) ........................................34, 37

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,
854 F.3d 1236 (10th Cir. 2017) .........................................................19

*Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*,
2008 WL 207843 (E.D.N.Y. Jan. 24, 2008)......................................29

*Natsource LLC v. Paciello*,
151 F. Supp. 2d 465 (S.D.N.Y. 2001) ...........................................*passim*

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
442 F.3d 101 (2d Cir. 2006) .................................................................49

*New York ex rel. Schneiderman v. Actavis PLD*,
787 F.3d 638 (2d Cir. 2015) ...............................................................19

*Newburger, Loeb & Co., Inc. v. Gross*,
563 F.2d 1057 (2d Cir.1977) .............................................................50

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................20

vii

*Omni Consulting Group Inc. v. Marina Consulting Inc.*,
  2007 WL 2693813 (W.D.N.Y. Sept. 12, 2007) .....................................46, 47, 48

*Poller v. BioScrip, Inc.*,
  974 F. Supp. 2d 204 (S.D.N.Y. 2013) ...............................................................56

*Process Am., Inc. v. Cynergy Holdings, LLC*,
  839 F.3d 125 (2d Cir. 2016) ...............................................................................49

*Production Resource Group, LLC v. Oberman*,
  WL 22350939 (S.D.N.Y. Aug. 27, 2003).............................................................28

*Realcomp II, Ltd. v. F.T.C.*,
  635 F.3d 815 (6th Cir. 2011) ..............................................................................51

*Reed Elsevier Inc. v. Transunion Holding Co.*,
  No. 13 Civ. 8739(PKC), 2014 WL 97317
  (S.D.N.Y. Jan. 9, 2014)........................................................................................41

*Reed, Roberts Associates, Inc. v. Strauman*,
  40 N.Y.2d 303 (1976) ..........................................................................................43

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) ..................................................................................17

*SG Cowen Sec. Corp. v. Messih*,
  224 F.3d 79 (2d. Cir. 2000) .................................................................................16

*Spheronomics Global Contact Centers v. vCustomer Corp.*,
  427 F. Supp. 2d 236 (E.D.N.Y. 2006) .................................................................44

*Spinal Dimensions, Inc. v. Chepenuk*,
  847 N.Y.S.2d 905, 2007 WL 2296503
  (N.Y. Sup. Ct. Aug. 9, 2007) ...............................................................................38

*St. Luke's Hospital v. ProMedica Health Sys., Inc.*,
  8 F.4th 479, 489 (6th Cir. 2021) .........................................................................32

*Sussman v. Crawford*,
  488 F.3d 136 (2d Cir. 2007) ................................................................................17

*Ticor Title Ins. Co.; Chi. Title Ins. Co. v. Cohen*,
  173 F.3d 6 (2d Cir. 1999) ................................................................27, 28, 35, 40

58412754.1

*TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*,
  966 F.3d 46 (1st. Cir. 2020) ................................................................38

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ...............................................................53

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ...........................................18, 20, 23, 32

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998) .................................................................51

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d. Cir. 1995) ...............................................................54

*Trixler Brokerage Co. v. Ralston Purina Co.*,
  505 F.2d 1045 (9th Cir. 1974) ...........................................................52

*United States v. All Assets*,
  971 F. 2d 896 (2d Cir. 1992) .............................................................35

*United States v. Aluminum Co. of Am.*,
  377 U.S. 271 (1964)............................................................................54

*United States v. Archer*,
  977 F.3d 181 (2d Cir. 2020) ..............................................................17

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)............................................................................51

*United States v. E.l. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961)............................................................................55

*United States v. Forbes*,
  790 F.3d 403 (2d Cir. 2015) ..............................................................17

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)..............................................................51

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963)............................................................................54

ix

*USA Recycling, Inc. v. Town of Babylon*,
  66 F.3d 1272 (2d Cir. 1995) ...............................................................54

*Variscite NY Four, LLC v. New York State Cannabis Control Board*,
  No. 1:23-CV-1599, 2024 WL 406490 (N.D.N.Y. Feb. 2, 2024) .....................18

*Winston Franchise Corp. v. Williams*,
  1992 WL 7843 (S.D.N.Y. Jan. 10, 1992) ...........................................46

*Zervos v. Verizon, Inc.*,
  252 F.3d 163 (2d Cir. 2001) ............................................................16

**Statutes**

Sherman Act § 1 ...................................................................................50

Sherman Act § 2 ...................................................................................51

**Other Authorities**

*The NAPA Difference*, NAPA Anesthesia, (last visited Mar. 7, 2024) .....................1

*Who We Are*, NAPA Anesthesia, (last visited Mar. 7, 2024) ....................................1

x

## **JURISDICTIONAL STATEMENT**

Appellee St. Joseph's Hospital Health Center is satisfied with Appellants' Jurisdictional Statement.

58412754.1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether it was an abuse of discretion for the district court to reject NAPA's claims of irreparable harm, where such claims were speculative, conclusory and unsupported by facts in the record.

2. Whether it was an abuse of discretion for the district court to find that NAPA was not likely to succeed on the merits, where NAPA failed to demonstrate any legitimate business interest justifying enforcement of the nonsolicitation clause.

3. Whether it was an abuse of discretion for the district court to find, on a complete record, that there were no material disputes of fact warranting an evidentiary hearing.

4. Whether (though the district court did not reach these issues) the district court's denial of a preliminary injunction was justified where NAPA committed the first material breach of the parties' agreement and committed antitrust violations.

5. Whether (though the district court did not need to reach these issues) the district court's denial of a preliminary injunction was justified because NAPA failed to demonstrate that any remaining harm to NAPA outweighs a dramatic loss in activity in surgeries, cardiac procedures, deliveries of newborns and

other critical procedures that St. Joseph's would risk if an injunction were issued.

6.   Whether (though the district court did not need to reach these issues) the district court's denial of a preliminary injunction was justified because NAPA failed to demonstrate that the public interest favors an injunction.

58412754.1

## STATEMENT OF THE CASE

**A.    Factual Background**

**1.    The Parties**

St. Joseph's Hospital Health Center ("St. Joseph's") operates a non-profit hospital in Syracuse which offers a full range of inpatient and outpatient services, including cardiology, obstetrics, surgery and Level II trauma care. (J.A. 225 ¶2.) St. Joseph's has won numerous awards for its strong commitment to patient quality, safety and satisfaction, including in particular in surgery, heart care and obstetrics. (*Id.* ¶¶3-5.)

Appellants are national and local affiliate anesthesia providers, American Anesthesiology of Syracuse, P.C., American Anesthesiology, Inc., NMSC II, LLC and North American Partners in Anesthesia, L.L.P.'s ("NAPA"). NAPA employs 5,000 clinicians and provides services at 400 facilities nationwide in 22 states. *The NAPA Difference*, NAPA Anesthesia, (last visited Mar. 7, 2024). NAPA says that it serves over 2 million patients annually and has approximately $1.8 billion in annual revenues. *Id.* It is the largest anesthesia services provider in North America. *Who We Are*, NAPA Anesthesia, (last visited Mar. 7, 2024).[1]

---

[1] "[A court] may properly take judicial notice of [a] document" when the document is "publicly available and its accuracy cannot reasonably be questioned." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016).

58412754.1

### 2. Anesthesiology Market and Competition

Anesthesia providers play critical roles in the care of patients in every hospital, since anesthesia is required for all, or virtually all, surgeries and more invasive cardiac procedures, and for deliveries of newborns involving epidurals and cesarean sections, as well as all endoscopies, among other procedures. (J.A. 219-20 ¶3); (J.A. 229 ¶2). Since most of these procedures are the most profitable in the hospital, the revenues from these procedures are necessary for hospital systems to be able to afford to offer patients often unprofitable but necessary medical procedures. (J.A. 219-20 ¶3.)

In seeking the services of anesthesia providers, hospitals may consider both local and national groups. (J.A. 220 ¶4.) However, all of these groups depend on the supply of anesthesia providers in the local area in which the hospital is situated, because most anesthesia providers will not uproot their families and move long distances for employment, especially given the great demand for anesthesia providers. (*Id.*)

### 3. Anesthesia at St. Joseph's

NAPA and its predecessor were the exclusive provider of anesthesia care at St. Joseph's from December 31, 2018 to July 1, 2024. (J.A. 95, Administrative and Clinical Services Agreement ("Agreement"); J.A. 166) The parties' Agreement contains a nonsolicitation clause, which provides that during the term of the

Agreement, and for two years thereafter, neither party will "take any action to induce any employee to cease his or her employment with the other Party." (J.A. 134 §11.D.) NAPA also has noncompete agreements with the anesthesiologists and certified nurse anesthetists ("CRNAs") who work at St. Joseph's. (J.A. 63 ¶2.)

Over time, after its entry into the agreement with St. Joseph's, NAPA and its predecessor imposed unreasonable payment requirements on St. Joseph's. (J.A. 236 ¶2.) In the original year of the agreement between St. Joseph's and NAPA's predecessor, American Anesthesiology, the "subsidy" payment to NAPA was capped at approximately $4.4 million with a possible bonus. (*Id.*) In 2023, Defendants' subsidy payment to NAPA exceeded their budget by more than $10 million, equaling $16 million in total. (*Id.*)

The level of payment obtained by NAPA is well above the level that would be paid in a competitive market. For example, it is approximately twice the rate per anesthesia site in Albany, New York. (J.A. 237 ¶4.)

NAPA has not adequately staffed St. Joseph's units needing anesthesia care on a number of occasions, including from May to October 2022. (J.A. 232 ¶5.) The agreement between the parties defines such shortfalls over a consecutive 90-day period as a material breach. (J.A. 97-98 §II.F.)

NAPA employs virtually all the private anesthesiologists and CRNAs working at the two major community hospitals in Onondaga County, which includes

58412754.1

Syracuse. (J.A. 239 ¶6.) The third major hospital employs academic anesthesiologists who do not wish to provide anesthesia care at community hospitals where they cannot focus on academic medicine. (*Id.*) Other locations do not utilize sufficient numbers of anesthesia providers who are good substitutes for NAPA, because of their small size and/or distance from Syracuse. (*Id.*)

Because the extreme shortage of anesthesia providers makes it especially difficult for hospitals to recruit additional providers, there is no possibility that St. Joseph's could obtain anesthesia services from other sources at the volumes needed to completely replace the services rendered by NAPA's providers, especially given the need to recruit providers locally. (J.A. 241-43 ¶¶3-7); (J.A. 220 ¶6.) As a result, any effort to replace the NAPA anesthesia providers at St. Joseph's en masse would have made it impossible to fully care for patients in the hospital. (J.A. 243 ¶7.) This shortfall would both seriously harm patients needing care which requires anesthesia, and cost St. Joseph's critically needed funds. (J.A. 243 ¶8.)

### 4. The Parties' Negotiations

Because of NAPA's high prices and inadequate service, on December 29, 2023, St. Joseph's gave notice to NAPA that after its current contract expired effective July 1, 2024, it would not be renewing that contract. (J.A. 227 ¶9.) At the same time, St. Joseph's and its Florida affiliate hospital Holy Cross Hospital, Inc. ("Holy Cross") informed NAPA that they wished to either attempt to negotiate new

4

58412754.1

contracts that appropriately shared the risks of underpayment, inadequate staffing and excessive costs between the parties, or negotiate an agreement that would eliminate any barrier to efforts to seek to employ NAPA's providers. (*Id.*); (J.A. 247 ¶5.)

In response, after six weeks of negotiations in 2024, NAPA took the position that it was not interested in a new contract that would share these risks. (J.A. 247-49 ¶¶6, 10.) It stated that it was willing to negotiate a "buy out" of the noncompetes and nonsolicitation clause, but only at excessive terms, involving what would amount to a payment by St. Joseph's of approximately $20 million. (J.A. 248-49 ¶¶6, 8.) NAPA later agreed to reduce its buyout demand to a smaller, but still exorbitant number, to what it described as a "discount" to $12 million. (J.A. 249 ¶8.) But NAPA also demanded that along with these buyouts, that it be paid for a management services agreement at St. Joseph's, Holy Cross and their affiliate Samaritan Hospital in Troy, New York. (*Id.*).

NAPA justified its demand for these huge payments by citing the shortage of anesthesia providers. (J.A. 248 ¶7.) Mr. Cartagena, NAPA's CEO, made it very clear that his demands were also based upon the existence of the noncompetes and NAPA's willingness to enforce them. He referred to the anesthesia providers as NAPA's "assets." (*Id.*)

5

As a result, St. Joseph's had only two options – accede to NAPA's demands or seek to employ the providers directly. On February 26, St. Joseph's sent offers of employment to its anesthesia providers, effective July 1. (J.A. 249 ¶11); (J.A. 227 ¶10.) At the same time, it filed this lawsuit. (J.A. 249 ¶11.)

**5.     Absence of Justification for Restrictive Covenant**

The agreement between St. Joseph's and NAPA does not identify any information of NAPA that is claimed to be confidential. (*See generally* J.A. 113 §§XV.A.1-2.) NAPA has not claimed to St. Joseph's personnel that any of its information is confidential. (J.A. 232 ¶10.) The anesthesiologists and CRNAs all received specialized training before becoming employed by Defendants. (J.A. 233 ¶11.)

Patients do not choose their anesthesia providers. Nor are anesthesia providers chosen by the physicians performing procedures requiring anesthesia. The patients the anesthesiologists and CRNAs see are provided by the hospital. (J.A. 232 ¶¶9-10.) NAPA is the exclusive provider of anesthesia services at St. Joseph's pursuant to the contract between St. Joseph's and NAPA.  (J.A. 96 §I.; J.A. 221 ¶10.) NAPA does not advertise its providers' services to prospective patients. (J.A. 221 ¶10.)

NAPA has not rebutted any of these facts. In fact, NAPA conceded that neither confidential information nor trade secrets are at issue in this case. (S.P.A. 16

6

n.12.) NAPA also does not dispute that its anesthesia providers do not have their own patients. (S.P.A. 13.)

### 6. Post-Complaint Actions

After St. Joseph's made its offer, NAPA threatened providers that if they even talked to St. Joseph's, they would be fired. (J.A. 227-28 ¶12; *see also* J.A. 252 ¶4.) NAPA also told providers that if they contracted with St. Joseph's they would suffer a number of adverse consequences, including being sued by NAPA and losing their malpractice "tail" coverage. (J.A. 256 ¶3; J.A. 260 ¶4; J.A. 227-28 ¶12.) NAPA has now separately sued the 48 anesthesia providers who (as described in its Complaint) accepted St. Joseph's offers of employment and have gone to work for St. Joseph's. *See American Anesthesiology of Syracuse, P.C. v. Genevieve Dalton et al.*, Index No. 006645 / 2024 (N.Y. Sup. Ct. June 27, 2024).

Both St. Joseph's hospital personnel and the surgeons working at St. Joseph's believed that the quality of care provided by the anesthesia providers was not compromised in any way as a result of the parties' dispute. (J.A. 228 ¶13; J.A. 261 ¶5; J.A. 256-57 ¶4; J.A. 233 ¶11; J.A. 252-53 ¶5.)

### B. Procedural History

On February 26, 2024, St. Joseph's filed the underlying lawsuit to seek a determination that the noncompetes and nonsolicitation clause are unlawful and that

St. Joseph's could offer employment to the anesthesiologists and CRNAs working at its hospital. (J.A. 18.)

On March 7, 2024, NAPA sought a temporary restraining order and preliminary injunction enjoining St. Joseph's from "taking any action, directly or indirectly, to induce the NAPA Parties' anesthesiologists and CRNAs to cease their employment with the NAPA Parties," and "taking any further action with respect to any offer of employment that St. Joseph's extended on, around, or after February 26, 2024 to any NAPA Parties anesthesia clinician." (ECF No. 23, PageID.3.)

After a telephonic hearing on March 15, 2024 (J.A. 273), the district court denied NAPA's motion for a temporary restraining order and ordered supplemental briefing on the motion for a preliminary injunction. (ECF No. 39.)

In the interim, NAPA argued that it was entitled to an evidentiary hearing because "essential facts are disputed," although it did not identify them. (ECF 44, PageID.11.) The parties submitted letter briefing on the question of whether an evidentiary hearing was appropriate, (J.A. 324, 326, 328.) After considering the parties' letter briefs, on April 10, 2024, the district court determined that "an evidentiary hearing is not necessary to resolve the motion because 'the relevant facts… are not in dispute' on the record before the Court." (J.A. 330 (citation omitted).)

58412754.1

On April 15, 2024, the parties appeared for a hearing on NAPA's preliminary injunction motion. (J.A. 414.) There, rather than reach the merits of NAPA's motion, the district court and the parties discussed a new declaration that NAPA sought to file the night before. (*See generally id.*) Despite having previously provided NAPA with an opportunity to file three briefs and two rounds of evidence, the district court permitted NAPA to file the new declaration. (*Id.* at 13:10-13.) At the hearing, the district court asked NAPA whether its record would be complete with the addition of the new declaration, which NAPA confirmed. (J.A. 423 10:2-8.)

After additional briefing and a third hearing, the district court denied NAPA's request for a preliminary injunction on May 16, 2024. (S.P.A. 2.) The district court concluded that NAPA's claims of irreparable injury were "speculative, conclusory, and unsupported by facts in the record." (S.P.A. 11.) The district court also concluded that any claimed injury would, if proven, be compensable by money damages. (S.P.A. 12-13, 15.) With regard to NAPA's claims of "threatened loss of goodwill" from the relationships between NAPA's clinicians and St. Joseph's physicians and staff, the district court concluded that "these are not the type of relationships that 'produce an indeterminate amount of business in years to come,'" which is necessary to establish irreparable harm. (S.P.A. 12.) The district court also concluded that NAPA had proffered "no evidence" to support its alleged loss of "customer goodwill," and that the "training" it allegedly provided its Clinicians was

not like the training recognized as protectible under New York law, namely training directed toward "the establishment, strengthening, and maintenance of business-generating client relationships." (S.P.A. 12, 14 (citations omitted).)

The district court also found that NAPA was not likely to succeed on the merits of its claims. (S.P.A. 16.) The court addressed NAPA's new argument that the "customer relationships" NAPA alleges are between its anesthesia providers and St. Joseph's physicians. (S.P.A. 17.) The district court concluded that NAPA had failed to demonstrate, legal or factually, "that the relationships between the Clinicians and other providers at St. Joseph's are at risk of being unfairly exploited or how such exploitation would materialize." (S.P.A. 21.)

NAPA filed its Notice of Appeal on June 14, 2024, twenty-nine days after the district court order denying its preliminary injunction request. (J.A. 530-31.) NAPA did not seek an expedited appeal, but instead filed its appeal brief over two months later, on August 23, 2024, well after the July 1 date on which St. Joseph's offers of employment to the anesthesia providers took effect. (Dkt. 30.1.)

## SUMMARY OF THE ARGUMENT

The district court's decision to deny extraordinary preliminary injunctive relief in this case was well supported both legally and factually and did not remotely constitute an abuse of discretion.

58412754.1

First, it was not an abuse of discretion for the district court to conclude that NAPA had not satisfied its burden of showing an actual and imminent threat of irreparable injury:

1. NAPA failed to present evidence that *any* concrete injury would befall it if the anesthesia providers became employed by St. Joseph's. NAPA vaguely alluded to a lost "opportunity" to employ the providers elsewhere at the end of the St. Joseph's contract, but never explained where they would be employed, what the demand was for such anesthesia providers, or what losses NAPA would suffer as a result of the loss of these providers. Indeed, NAPA's brief vaguely refers to a loss of "options". But options, by their nature, involve possibilities, not actual and imminent injury.

2. NAPA's argument alleging threatened disruption of alleged physician relationships with the anesthesia providers was equally unsupported. NAPA did not show that, absent employment of the anesthesia providers by St. Joseph's, NAPA would have retained relationships with surgeons and other physicians that would result in the use of NAPA anesthesia providers to treat those physicians' patients. Since St. Joseph's had already ended its contract with NAPA, in order to succeed in this argument, NAPA would have to show that (a) it would have

11

moved its anesthesia providers to other locations, and (b) because of that fact, particular surgeons and other physicians working at St. Joseph's would switch their procedures to those locations in order to utilize NAPA anesthesiologists and CRNAs. But absolutely no evidence was provided that a single surgeon or other physician would take that step, or that even identified specific facilities at which the anesthesia providers would work. As a result, the claim of injury is entirely conjectural.

3. NAPA's claim of lost investments also does not provide evidence of an actual and imminent injury, much less an irreparable injury. NAPA does not provide any evidence that a lost investment would somehow cause it harm if its anesthesia providers went elsewhere. That would require that the providers would use any training invested in by NAPA to the detriment of NAPA. But no evidence whatsoever was offered by NAPA to show that that would be likely to occur.

4. Nor did NAPA show that any claimed injury was not recoverable in money damages. NAPA offered only a vague statement by a physician to support its conclusion. But that physician has no expertise in the estimation of damages.

12

The district court did not merely reject NAPA's theories. Its rulings were based on the fact that those nebulous theories were not supported by specific evidence. The district court's conclusion that NAPA did not provide adequate evidence in support of any of its claims of irreparable injury was certainly not clearly erroneous.

Second, the nonsolicitation clause on which NAPA rests its claims fails, even on the undisputed facts, to be justified by business interests that are necessary to support any restrictive covenant: NAPA admits (or fails to dispute) that the covenants do not protect any trade secrets or confidential information, and that the anesthesia providers who are the subjects of the covenants do not have their own patients, thereby precluding the primary justifications for restrictive covenants. Given these failures, NAPA resorted to a series of far-fetched and factually unsupported assertions to support its claim that its restrictive covenants are necessary to protect legitimate business interests:

1. NAPA claimed that its anesthesia providers have "relationships" with the surgeons and other physicians whose procedures require anesthesia, and that somehow this justifies the restrictive covenants. But NAPA's only evidence on this issue arises from a misquotation of St. Joseph's complaint and a statement by a NAPA official with no experience at St. Joseph's. NAPA presented no evidence that these relationships created

any likelihood that physicians and their patients would follow NAPA's anesthesia providers to a new facility after expiration of the St. Joseph's contract. Absent that, there was no risk of diversion of business from NAPA, and no legitimate interest requiring protection.

2. NAPA claimed that its providers are "unique", in the face of contrary precedent and even though there are thousands of anesthesia providers in the United States, working at every hospital. NAPA claimed that the restrictive covenants are justifiable because of its efforts to improve anesthesia quality but presented no evidence either that what it provides is different from what other anesthesia groups offer or that its quality software could be utilized to NAPA's disadvantage by anesthesia providers who go to work for St. Joseph's.

3. NAPA sought to protect its alleged investment in training, even though anesthesia providers receive exclusive training in medical school and residency, long before they are employed by NAPA, and New York law does not recognize an investment in training as a legitimate business interest justifying restrictive covenants.

4. NAPA claimed that it has invested in recruitment of physicians, but, again, such an investment is not recognized as a legitimate basis for a

14

restrictive covenant under New York law, and the parties' contract shows that St. Joseph's has already paid for recruitment efforts.

5. Finally, in the absence of any specifics, NAPA argues that it possesses some form of generic "goodwill" because of its investment in the anesthesia business that is protectable under New York law. But if that were all that is necessary to show legitimate business interests, all restrictive covenants would be enforceable, because all businesses make investments.

Additionally, though the district court did not reach these issues, its decision is also justified by (a) the fact that NAPA itself breached the contract between the parties, thereby excusing any alleged breach of the restrictive covenant and (b) the significant evidence that NAPA's enforcement of its restrictive covenant constituted a violation of the antitrust laws.

Additionally, though the district court did not need to reach these issues, denial of any injunction was strongly supported by the evidence of the balance of injuries here. Given the enormous harm to hospitals and patients that would arise if anesthesia services were not available, the harm from any injunction here would vastly exceed the harm to NAPA if there were no injunction.

Nor did the district court commit error by refusing an evidentiary hearing. While the parties certainly disputed each other's legal conclusions, there were no

58412754.1

disputes as to fact that were significant to the court's decision. NAPA's failure to present significant evidence in support of its contentions, even after having been provided numerous opportunities by the district court to do so, shows that there would be no purpose to be served by an evidentiary hearing.

## STANDARD OF REVIEW

This Court reviews a district court's decision concerning a motion for preliminary injunction or a temporary restraining order for an abuse of discretion. *See*, *e.g.*, *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 81 (2d. Cir. 2000). This standard is a "formidable hurdle to overcome". *Colony Grill Devl., LLC v. Colony Grill, Inc.*, 2023 WL 6890675, at *2 (2d Cir. 2023) (quoting *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 129 (2d. Cir. 2004).

As the Court explained in *Zervos v. Verizon, Inc.*, "the decision to grant or deny a preliminary injunction involves more than factual determinations . . . and legal conclusions . . . It involves an exercise of discretion." *Zervos v. Verizon, Inc.*, 252 F.3d 163, 170 (2d Cir. 2001). And "when a district court is vested with discretion as to a certain matter . . . the district court is empowered to make a decision—of *its* choosing—that falls within a permissible range of decisions." *Id.* at 169. "To have discretion is to have choice. To have choice is to be able to choose one course of action over one or more others with immunity from reversal by a higher court because of the course selected." *Id.* at 169 n.6 (quotations and citations omitted).

16

Thus, only when a court relies on an "error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding," or its decision "though not necessarily the product of legal error or a clearly erroneous factual finding— cannot be located within the range of permissible decisions," has it abused its discretion. *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (quoting *United States v. Forbes*, 790 F.3d 403, 406 (2d Cir. 2015); *see also JRH Tax, LLC v. Agnant*, 62 F.4th 658, 666 (2d. Cir. 2023).

## ARGUMENT

### A. Legal Standard on Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (emphasis in original) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). To obtain a preliminary injunction, the plaintiff must show (1) "a likelihood of success on the merits," (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction," (3) that "the balance of hardships tips in the plaintiff's favor," and (4) "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (internal quotation marks omitted). Courts alternatively may find that there is "a serious question going to the merits to make them a fair ground for trial, with a balance of

hardships tipping decidedly in the plaintiff's favor." *Variscite NY Four, LLC v. New York State Cannabis Control Board*, No. 1:23-CV-1599, 2024 WL 406490, at *10 (N.D.N.Y. Feb. 2, 2024).

The moving party must "meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) the injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Linden Care, LLC v. Express Scripts, Inc.*, No. 1:15-CV-1335, 2015 WL 12734164, at *11 (N.D.N.Y. Dec. 7, 2015) (Sannes, J.) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)).

On appeal, NAPA argues that the heightened standard does not apply here. In the district court, NAPA conceded that an injunction may give it all of the relief it seeks, but argued (as it does here) that such an injunction could be undone. (J.A. 490, 8:15-22.) But, of course, reversal of an injunction after trial, several years down the road, would not avoid the fact that in the interim, St. Joseph's would have been faced with a Hobson's choice: give in to NAPA's demands and pay exorbitant fees (or a massive buyout of the restrictive covenants), or face the impossible task of recruiting an entirely new group of anesthesia providers at the risk of having to provide substantially fewer services to its patients. (J.A. 232 ¶8; J.A. 243 ¶7-8.) A

preliminary injunction would have given NAPA precisely what it sought: St. Joseph's surrender.

In any event, the district court concluded that "[e]ven applying the less demanding 'likelihood of success' standard, . . . NAPA has failed to meet its burden on the record before the Court." (S.P.A. 10.)

## B.   The District Court Properly Found That There Was No Likelihood of Irreparable Harm

"Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that *cannot* be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLD*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly House, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). (Emphasis added). A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985); *see also N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017) (For this reason, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.") (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). Therefore, without a showing of probable irreparable harm, a motion for preliminary injunction necessarily fails. *Jayaraj v. Scappini*, 66 F.3d 36, 38-39 (2d. Cir. 1995).

Irreparable harm, moreover, "must be imminent or certain, not merely speculative." *Jayaraj*, 66 F.3d at 39 (quoting *Tom Doherty Ass'n, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995)).  A showing that the "possibility of irreparable injury" exists is insufficient. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998).

The district court properly found NAPA's claims of irreparable harm speculative, conclusory, and unsupported by any material facts, despite NAPA's multiple opportunities to submit evidence supporting its claims. The court's findings were certainly not clearly erroneous or an abuse of discretion. In its initial opinion denying NAPA's request for a temporary restraining order, the district court found that NAPA had "fail[ed] to demonstrate how the potential loss of clinicians to St. Joseph's is not compensable through money damages." (ECF 39, PageID.10.) "It is settled law that when an injury is compensable through money damages there is no irreparable harm." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

In the ensuing weeks, the district court gave NAPA numerous opportunities to supplement the record to overcome these deficiencies. (*See* ECF 39, PageID.18; 4/15/24 Hrg. Tr. at 13:10-13; 4/15/24 Text Minute Entry; ECF 55.) However, as the district court ultimately recognized, NAPA failed to support its claims of irreparable injury with any material evidence. (S.P.A. 12-16.)

58412754.1

NAPA alleges four sources of irreparable harm: (1) opportunity costs, (2) lost customer relationships, (3) loss of trained clinicians, and (4) reputational harm. But NAPA did not offer specific or competent evidence in support of any of these claims.

### 1.    Alleged "Opportunity Costs"

NAPA asserted that "there are significant opportunity costs" it would apparently suffer should an injunction not issue, but it provided only speculation, not evidence. (Dkt. 30.1, PageID.54.) NAPA claimed that it might have been able to reassign the clinicians to whom St. Joseph's offered employment to neighboring hospitals like Crouse Hospital. (ECF 30.1, PageID.54.) But NAPA did not allege— let alone demonstrate with competent evidence—that its clinicians practicing at St. Joseph's were necessary to meet NAPA's contractual obligations to Crouse Hospital, or that any other hospital would contract with NAPA and utilize the providers.

The only evidence NAPA mustered for this claim was a vague statement that "NAPA intends to reassign these clinicians to other nearby facilities after termination of the Agreement." (J.A. 271-72 ¶6.) But there is no evidence in the record that this would—or even could—actually happen. NAPA did not present evidence to show that there was any room for these providers at any facility which NAPA services or is about to serve. Nor does NAPA say how many of those

providers would actually end up at these "other facilities," if any. As the district court explained:

> NAPA's oblique references to other facilities, such as Crouse Hospital, provide no support for NAPA's arguments because there is no evidence in the record demonstrating what impact other facilities have on NAPA, St. Joseph's, or the Clinicians other than the existence of a "contract to provide anesthesia services" between NAPA and Crouse. There is no evidence in the record that NAPA has, in fact, reassigned Clinicians to Crouse or that Crouse, or any other facility, has a need for the Clinicians such that the Clinicians could be reassigned.

(S.P.A. 16.)

In fact, NAPA's evidence indicates that it received more than 300 inquiries from providers to work for it in Syracuse. (J.A. 268 ¶7.) If that evidence is credited at face value, then NAPA should have had no problems filling any needs at Crouse or any other facility, without reference to the anesthesia providers working at St. Joseph's.

Even if, hypothetically, NAPA could have shown that the loss of the anesthesia providers working at St. Joseph's would keep it from filling openings needed at Crouse or any other facility, that is not a cognizable harm for which NAPA could seek injunctive relief. That is because the alleged injury does not arise from any legitimate business interest. The injury, if any, arises from the fact that providers have chosen to no longer work for NAPA, and NAPA needs to hire others. But NAPA does not have a right to force doctors to work for it. If the effect of the

22

restrictive covenant is simply to restrict the providers' freedom of movement (without regard to any unfair competition to NAPA), that would be wholly improper.

Moreover, mere "opportunity costs"—particularly as alleged by NAPA—are not "actual and imminent" injuries that could support a preliminary injunction. "Opportunity costs", by their nature, are conjectural. An injury that is "remote and speculative" cannot be "actual and imminent" harm worthy of injunctive relief. *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 61 (2d Cir. 2011) (citing *Tom Doherty Assocs. V. Saban Entm't*, 60 F.3d 27, 37 (2d Cir. 1995)).

Finally, NAPA made no effort to support its claim that these supposed "opportunity costs" are not compensable with money damages. Instead, NAPA relies on vague and conclusory assertions in Dr. Santos' declaration. But his conclusory claim that it will be "very difficult . . . to calculate the losses" is entitled to no weight. (Dkt. 30.1, PageID.55.) The declarant (an anesthesiologist) is certainly not an expert on damages or finance. Therefore, his statement is not competent evidence.

In fact, it would be quite straightforward to calculate the losses from such a lost opportunity. What positions would be unfilled? How much did NAPA earn (or was it budgeted to earn) from such positions?

## 2. Threatened Harm to Alleged "Customer Relationships"

NAPA claims that without an injunction, it would lose the "goodwill" based on the "relationship" between NAPA's clinicians and "physicians and other

professionals performing surgeries and procedures at St. Joseph's." (Dkt. 30.1, PageID.53.) But the undisputed facts establish that St. Joseph's physicians do not choose which NAPA providers are assigned to a particular patient—the hospital does. (J.A. 232 ¶9 ("Anesthesiologists at St. Joseph's do not have relationships with patients, but instead are assigned patients as needed in light of the procedures being performed by our surgeons, cardiologists, ob/gyns and other physicians which require anesthesia."). The surgeons and other physicians also cannot choose whether or not to use NAPA's anesthesia providers. The parties' contract provides that NAPA is the exclusive provider of anesthesia services at St. Joseph's. (J.A. 96.) Moreover, as the district court recognized, "the record is devoid of any facts demonstrating the existence of any specific relationship between a given Clinician and any provider at St. Joseph's." (S.P.A. 12-13 n.9.)

NAPA did not submit a single piece of evidence that stated that anesthesiologist X had a relationship with surgeon Y such that surgeon Y used X for his cases, and that it was likely that he would continue to do so at another facility if X was transferred by NAPA to that facility after the St. Joesph's contract ended. NAPA has not even submitted a declaration that makes this assertion as a general matter. Thus, NAPA did not present any evidence that it risked the diversion of patients it would otherwise have received if its providers did not go to work for St. Joseph's after the Agreement expired. And, of course, without the diversion of

24

patients, there is no threat of injury. (S.P.A. 13 n.10 ("[T]here is no evidence in the record that if patients at St. Joseph's are able to obtain anesthesia services at St. Joseph's—even if not from the Clinicians—they would nevertheless follow the Clinicians to other hospitals within the Syracuse area for services that require anesthesia.").)

Indeed, since the loss of work at other facilities is, in NAPA's words, only an "opportunity cost," the most NAPA can argue (without specifics) is that it had an unspecified "opportunity" to take cases elsewhere if the anesthesia providers were in fact employed at another facility. And NAPA offered no evidence whatsoever that that would in fact occur.

NAPA relied on the declaration of Dr. Ekbatani in an attempt to explain the "goodwill" it would lose if an injunction does not issue. But Dr. Ekbatani offered nothing but conclusions and labels. He said nothing about NAPA or St. Joseph's specifically; rather his assertions were generalizations based on his medical experience. (*See, e.g.*, J.A. 338 ¶9 ("In my experience clinicians develop relationships with providers.").)

NAPA's only attempt to show that relationships between anesthesia providers and surgeons and other physicians drive patient choices is contained in its selective quotations (effectively misquotations) of St. Joseph's complaint and its

declarations.[2] But all that these statements say in substance is that if the NAPA providers were suddenly replaced "en masse" and St. Joseph's surgeons, cardiologists and ob/gyns "immediately" had to work with "other anesthesia providers with whom they were not familiar and the replacement anesthesia providers were not familiar with the hospital facilities," (J.A. 33 ¶55; J.A. 243 ¶7), this could cause significant "disruption" at St. Joseph's and even shifts in business, (J.A. 232 ¶8). That is because the (inevitable) use of temporary, "locum tenens" providers are "inherently less satisfactory than relationships with permanently employed anesthesia providers." (J.A. 28 ¶34.) These statements do not support a claim that anesthesia patients are likely to follow their surgeons to other facilities under normal circumstances, creating a risk of unfair competition. (S.P.A. 13 n.10 ("[T]hat conclusion follows from the premise that 'patients [would be] unable to obtain full coverage for anesthesia services at St. Joseph's,' not from any relationships between the Clinicians and patients.").)

The claim here is nothing like those recognized as constituting irreparable harm in the case law. *See, e.g.*, *Natsource LLC v. Paciello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (finding, based on the evidence, that if the noncompete and nonsoliciation clauses were not enforced, "these [identified] customers are likely to

---

[2] Notably, despite repeatedly relying on certain allegations in St. Joseph's complaint, in its Answer, NAPA denied them. (*See* J.A. 435 ¶¶34, 55.)

follow [the employee] because of their unique relationship."). The district court correctly recognized that although NAPA's clinicians and St. Joseph's physicians "generally have positive working relationships," NAPA failed to demonstrate that these relationships actually generate any business for NAPA. (S.P.A. 12.)

Nor has NAPA provided any competent evidence that if there were a threat of such injury, it was not compensable in money damages. NAPA admits that irreparable injury is present where "it is impossible to estimate the amount of monetary loss resulting from the injury." (Dkt. 30.1., PageID.55.) But NAPA has made no showing as to why any of the conjectural injury it claims is impossible to estimate. As described above, the conclusory statement in Dr. Santos' declaration to that effect is meaningless, since Dr. Santos has not indicated that he has any expertise in finance or in estimating damages. NAPA has provided anesthesia services at St. Joseph's pursuant to a discrete agreement with defined costs and revenues since 2018. To the extent it would be entitled to compensation for the loss of its "relationship" with St. Joseph's physicians and staff, NAPA has more than enough information from which to calculate monetary damages.

As the district court recognized, the case law finding irreparable injury involved very different facts. NAPA has not presented evidence of "the type of relationships that 'produce an indeterminate amount of business in years to come,' such that the harm caused by the loss of the relationships is not compensable by

27

money damages." (*Id.* (citing *Ticor Title Ins. Co.; Chi. Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *Natsource*, F. Supp. 2d at 469; *Marsh USA Inc. v. Karasaki*, No. 08-Civ.-4195 (JGK), 2008 WL 4778239 at *14 (S.D.N.Y. Oct. 31, 2008)).)

In fact, in *Marsh*, the court distinguished another case, *Production Resource Group, LLC v. Oberman*, WL 22350939 (S.D.N.Y. Aug. 27, 2003), because there was only "one finite contract at issue." *Marsh*, 2008 WL 4778239 at *14. But those are exactly the facts here.

### 3.    Alleged Loss of "Trained Clinicians"

NAPA also claims irreparable injury resulting from the threatened "loss of trained clinicians." (Dkt. 30.1, PageID.56.) But again, NAPA presented no evidence on this issue beyond the fact that it "trains its chiefs on best practices" and provides its anesthesiologists with access to a "NAPA-developed clinical outcome database and award-winning Anesthesia Risk Alerts." (*Id.* at PageID.57.) NAPA did not present any evidence linking this training in any way to any "actual and imminent" threatened loss.

NAPA asserts that the district court erred when it found that its "unique and proprietary" training did not provide its clinicians with the sort of skills that could be misappropriated by a competitor to generate business. But patients are the only party from whom compensation is derived and who would "produce an

indeterminate amount of business in years to come." (S.P.A. 15 (quoting *Ticor*, 173 F.3d at 69).) Any loss of clinicians with NAPA's alleged "training"—which is "training on the general provision of care rather than training that enables employees to establish, strengthen, and maintain business-generating relationships"—does not result in harm that warrants an injunction. (*Id.*)

Notably, NAPA effectively concedes this point with its citation to *National Elevator Cab* for the proposition that "goodwill constitutes the intangible qualities of a business *that attracts customers*." (Dkt. 30.1, PageID.41 (emphasis added) (quoting *Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008)).) In fact, *National Elevator Cab* makes clear that the relevant injury is "siphoning off plaintiff's carefully gleaned customers." *Nat'l Elevator Cab*, 2008 WL 207843, at *5. NAPA has presented no evidence to support the conclusion that such "siphoning off" would occur here due to the "training" it provides, or for any other reason.

Even if, as NAPA claims, other forms of training were cognizable, that still does not answer the question as to how the loss of trained providers would injure NAPA. NAPA did not provide any evidence that these providers could somehow take their training with them and use that to unfairly compete with NAPA. On this issue as well, NAPA offered labels without any specifics as to how injury might occur.

In any event, NAPA certainly ought to be able to quantify what its training efforts cost. If paid that amount, assuming it could show that those are cognizable damages, it would certainly be made whole. As the district court held, the loss of NAPA's "trained clinicians" is the sort of harm that "amounts to mere business disruptions, that are compensable by money damages." (S.P.A. 15 (citations and alterations omitted).)

### 4. Alleged "Reputational Harm"

NAPA's allegations of "reputational harm" are likewise speculative and unsupported by specific evidence. NAPA's only "evidence" supporting this claim is another vague statement in Dr. Santos' conclusory hearsay statements that "St. Joseph's actions" have been "distressing and distracting" and "have caused [clinicians NAPA has recruited to join the Group) to rethink their commitments to join the Group based on St. Joseph's improper actions." (Dkt. 30.1, PageID.59-60.) The Santos declaration does not explain how he concludes that these recruitment decisions were as a result of a harm to NAPA's "reputation," or in what way its reputation was damaged.

Similarly, Dr. Santos' statement on distractions to existing physicians certainly does not provide competent evidence of a harm to reputation. (J.A. 91-92 ¶14.) Indeed, it is not even clear from these statements whether these unnamed clinicians thought less of NAPA (necessary if NAPA's reputation was threatened)

30

or simply were concerned about the situation, assuming that any of that was true. It was certainly not clearly erroneous for the district court to disregard this statement as insufficient to support the claim of harmed reputation, much less actual and imminent irreparable injury.

The district court reasonably found these statements "speculative, conclusory, and unsupported by facts in the record." (S.P.A. 11-12.); *Baker's Aid v. Hussman Foodserv. Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("We are especially loath to find an abuse of discretion in the instant situation, given the district court's factual findings and plaintiff's failure to produce any evidence of irreparable harm, other than [a] conclusory statement.").

Nor was there any evidence that more providers would not join NAPA if the injunction were not granted, which is critical to proof of a threat of irreparable injury. *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d. Cir. 2011) (finding appellants' claim of irreparable harm based on reputational injury necessarily failed because any such injury occurred when the zoning law in question was enacted and, thus, "is not imminent injury that could be remedied by a preliminary injunction" (citation omitted)).

Finally, the loss of recruits should result in readily calculable money damages: How many positions (if any) went unfilled? How much had NAPA earned from

these positions? NAPA has not provided any evidence that the injury would be irreparable.

Contrary to NAPA's suggestions, loss of goodwill and reputational harm do not establish an automatic presumption of irreparable harm. Rather, "irreparable harm exists only where there is a threatened imminent loss that will be *very difficult* to quantify *at trial*." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc*, 60 F.3d 27, 37 (2d Cir. 1995) (emphasis added). Generally, no irreparable harm in the form of lost goodwill or reputation exists where they can be "fully compensable by monetary damages." *St. Luke's Hospital v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 489 (6th Cir. 2021); *see also Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (finding "long history of operations by both [a]ppellants ensures that they will be able to calculate money damages for any loss of goodwill they may have suffered."); *Tom Doherty Assocs., Inc.*, 60 F.3d at 38 (harm to goodwill not irreparable because "lost profits . . . could be compensated with money damages determined on the basis of past sales . . . and of current and expected future market conditions."). Moreover, where injuries such as "loss of patients or market share" can be assessed in monetary terms, "less tangible economic injuries—harm to reputation and goodwill—[] do not suffice" at the preliminary relief phase of a case to warrant such judicial intervention. *St. Luke's Hospital*, 8 F.4th at 489.

58412754.1

It was certainly within the discretion of the district court to decide that NAPA's conclusory assertions were insufficient to justify an order that would have prevented more than fifty anesthesia providers from accepting an offer of employment that they desired and that would risk a disruption of surgical and other procedures across St. Joseph's. The court could reasonably conclude that the mere use of labels like "reputation" and "goodwill" should not justify such draconian relief.

## C.  The District Court Did Not Abuse Its Discretion in Concluding that NAPA is Not Likely to Succeed on the Merits

### 1.  The Nonsolicitation Clause is Unenforceable

There was also a substantial basis for the district court's conclusion that NAPA is unlikely to succeed on the merits. As a general rule, "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition . . . ." *Markets Group, Inc. v. Oliveira*, No. 18-CV-2089, 2020 WL 820654, at *11 (S.D.N.Y. Feb. 3, 2020). Courts typically consider three factors to determine the enforceability of restrictive covenants: (1) whether the covenant protects a legitimate business interest; (2) the reasonableness of the covenant with respect to geographic scope and temporal duration; and (3) the degree of hardship imposed upon the party against whom the covenant is enforced. *Id.* (quoting

*Greenwich Mills Co. v. Barrie House Coffee Co.*, 459 N.Y.S.2d 454, 456 (N.Y. App. Div. 1983)).

Proof of the first element, a "legitimate business justification," is critical. "A nonsolicitation covenant will not be enforced absent trade secrets or other special circumstance." *Markets Group*, 2020 WL 820654, at *11 (quoting *Greenwich Mills Co.*, 459 N.Y.S. at 458). *See also BDO Seidman v. Hirschberg*, 93 N.Y.2d 382, 389 (N.Y. 1999) (limiting the "cognizable employer interests . . . to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary," or "[p]rotection of customer relationships the employee *acquired* in the course of employment"). Indeed, the cases that NAPA cites limit legitimate business interests to discrete situations in which the restrictive covenant is designed: "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information, or (3) in those cases were [sic] the employee's services to the employer are deemed special or unique." *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 602 (S.D.N.Y. 2016); *see also Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 349 (S.D.N.Y. 2018). NAPA has conceded that there are no trade secrets or confidential information that the physicians or CRNAs could misappropriate. (S.P.A. 16 n.12.)

### a. *NAPA failed to demonstrate a legitimate business interest in "customer goodwill"*

NAPA's failure to provide evidence of the threat of specific customer losses in the context of irreparable injury, *supra*, also dooms its argument on the existence of a legitimate business interest. Of course, even if NAPA's anesthesia providers have "relationships" with surgeons and other physicians, if those relationships do not decide how patients choose anesthesia providers, they do not address the concern legitimately addressed by noncompete and nonsolicitation clauses. That concern is to avoid "unfair competition" because "there is a substantial risk that the employee may be able to divert all or part of the business" that the employee possesses. *Ticor Title Insurance Co. v. Cohen*, 173 F.3d 63, 72 (2d Cir. 1999); *United States v. All Assets*, 971 F. 2d 896 (2d Cir. 1992) (goodwill is the "expectation that the old customers will resort to the old place"). *See also Natsource*, 151 F. Supp. 2d at 469 (if the noncompete and nonsolicitation clauses were not enforced "these customers are likely to follow him [the employee] because of their unique relationship"). NAPA's failure to explain how these vague relationships will result in unfair diversion of business if the restrictive covenants are not enforced is fatal to its argument.

As the district court concluded:

> NAPA has not provided a sufficient basis, relying either
> on relevant caselaw or on specific facts in the record, to
> conclude that it is likely to succeed in demonstrating that

> the relationships between the Clinicians and other
> providers at St. Joseph's are at risk of being unfairly
> exploited or how such exploitation would materialize.

(S.P.A. 21.)

NAPA apparently believes that all it needs to do is offer a conclusory assertion that it possesses "goodwill" or "relationships" to satisfy the requirement of a legitimate business interest. The district court properly found that it is not so simple. As NAPA's own cases recognize, it was necessary for NAPA to show that it needed to protect itself against unfair competition, by showing an actual likelihood that patients could be lost. But since NAPA's anesthesia providers do not have patients, and NAPA made no showing that their alleged relationships with physicians gains them patients, NAPA's use of buzzwords like "customer goodwill" is unavailing.

To try to escape this conundrum, NAPA insists that a legitimate interest in "goodwill" includes more than just "customer goodwill." It asserts a generic interest in "the competitive advantage of an established business." (Dkt. 30.1, PageID.41.) But the law does not permit every "established business" to enforce noncompetes. And NAPA's failure to explain how its restrictive covenant protects it from a diversion of business likewise fails to explain how it protects a "competitive advantage."

NAPA's vague assertions about "general" goodwill are clearly contrary to New York law. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392 (N.Y. 1999) ("The

58412754.1

employer has a legitimate interest in preventing former employees from exploiting or appropriating *the goodwill of a client or customer*, which had been created and maintained at the employer's expense, to the employer's competitive detriment." (emphasis added)); *Bessemer Trust Co. v. Branin*, 16 N.Y.3d 549, 557 (2011) (the sale of the goodwill of a business is "an attempt to transfer the loyalties of the business' *customers* from the seller, who cultivated and created them, to the new proprietor."); *Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744, 2020 WL 7028872, at *7 (N.D.N.Y. Sept. 15, 2020) (making clear that goodwill refers to "Adecco's goodwill with current customers")[3]. As the district court recognized, even NAPA's own cases repeatedly confirm that it is *customer* goodwill that is protectable. (S.P.A. 20 (emphasis in original).) The cases NAPA cites on customer goodwill in each and every case involves specific evidence indicating that customers would likely be lost. There is no such evidence here.

### b. *NAPA failed to demonstrate a legitimate business interest in "hiring, retaining, and training" clinicians*

NAPA's arguments on training and recruitment similarly fail to articulate a legitimate business interest justifying the restrictive covenant. NAPA has not claimed to have provided any significant specialized training to its anesthesiologists

---

[3] NAPA's citation of *Finger v. Pearson PLC*, 2019 WL 10632904, at *2 (S.D.N.Y. Sept. 16, 2019), a case involving securities violations, and not remotely addressing restrictive covenants, cannot salvage its argument.

and CRNAs, all of whom went to medical school, hospital residencies, CRNA programs, and other programs to learn their profession long before they were employed by NAPA. (J.A. 221 ¶11.)[4] In any event, investments in training are not recognized as a legal basis to justify a nonsolicitation clause. "It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee." *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 58 (1st. Cir. 2020) (quoting *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676, 681 n.4 (1984)). *See also Spinal Dimensions, Inc. v. Chepenuk*, 847 N.Y.S.2d 905, 2007 WL 2296503, at *5 n.2 (N.Y. Sup. Ct. Aug. 9, 2007).

As the district court recognized, the "training" that NAPA cites is completely unlike the sorts of training recognized as protectible in cases like *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465 (S.D.N.Y. 2001) and *Marsh USA Inc. v. Karasaki*,

---

[4] NAPA claims that "duality" (the fact that nonsolicitation clauses apply to NAPA as well as to St. Joseph's) somehow justifies its restrictive covenant. (Dkt. 30.1, PageID.30 n.5.) However, the case it cites, *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 349 (S.D.N.Y. 2018), simply referred to the use of noncompetes by the non-moving party as evidence that a particular duration of two years was reasonable. It did not rely on this fact to conclude a legitimate purpose was served by the restrictive covenant.

In any event, the Agreement provides a basis for a clear distinction between a restriction on St. Joseph's and one on NAPA. The Agreement specifically acknowledges that NAPA is receiving confidential information of St. Joseph's. (J.A. 113 §XV.A.1.). The Agreement is silent on any claim that NAPA possesses confidential information (because, of course, it does not).

58412754.1

No. 08-Civ.-4195 (JGK), 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008), relied upon by NAPA, "which involved brokerage firms training their brokers with regard to the establishment, strengthening, and maintenance of business-generating client relationships." (S.P.A. 14 (citing *Natsource*, 151 F.Supp. 2d at 469; *Marsh*, 2008 WL 4778239, at *14).) *See, e.g.*, *Marsh*, 2008 WL 4778239 at *14 (training "helps [employees] develop customer relationships"); *Natsource*, 151 F. Supp. 2d 465 ("Natsource expends substantial resources to help its brokers develop customer relations.")

For example, *Natsource* involved a commodity brokerage firm that had "expend[ed] substantial resources to help its brokers develop *customer relations*," "introduced [its brokers to *established customers*]," "encouraged [its brokers] to strengthen these relationships," and "support[ed] the brokers by providing market intelligence and through relationships maintained on their desks." *Natsource*, 151 F. Supp. 2d at 469 (emphasis added). The court found, based on the evidence, that if the noncompete and nonsolicitation clauses were not enforced, "these customers are likely to follow [the brokers] because of their unique relationship." *Id.*; *see also Marsh*, 2008 WL 4778239, at *14 ("The departure of Marsh employees deprives Marsh not only of its investment in training and developing those employees, but also, for those who were brokerage professionals, of those employees' clients who

39

follow the employees because of the relationships developed with them at Marsh's expense.").

NAPA suggests that because of its training, anesthesiologists and CRNAs are "special and unique." (*See* Dkt. 30.1, PageID.13, 37-38.) But to qualify as "special or unique," NAPA must demonstrate "[s]ervices that are not simply of value to the employer, but that may also truly be said to be special, unique or extraordinary[.]" *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999). While the NAPA anesthesiologists provide excellent care, NAPA has not presented evidence that they are unique or different from thousands of anesthesia providers across the United States. *Gujral v. Anesthesia Group of Albany, P.C.*, 201 N.Y.S.3d 920, at *4 (N.Y. Sup. Ct. Dec. 20, 2023) ("[A]nesthesia services . . . routinely performed at medical facilities by physicians" are not extraordinary or unique for purposes of the legitimate business interest analysis). The "special and unique" category has never been applied to a whole class of employees, as NAPA seeks to do here. *Cf. Ticor*, 173 F.3d at 70 (justification found "where the *individual performer* has such ability and reputation that his or her place may not easily be filled") (emphasis added).

Rather than make any particularized showing, NAPA rests solely on generalities about the clinicians' "unique skillsets," and their "unique and special value." (Dkt. 30.1, PageID.13, 37-38.) But these conclusory labels mean nothing. All anesthesia providers receive exclusive training, and there are hundreds of

continuing medical education programs applicable to anesthesiologists. (J.A. 221 ¶11.)

The fact that NAPA may claim special or unique *quality systems* is irrelevant, since that does not make its *providers* special or unique. Of course, allegedly unique training can be offered to new providers who can then replace the old ones. Moreover, NAPA did not offer any evidence that its quality services were in fact "special or unique," since NAPA did not offer any evidence about what other anesthesia groups provide related to quality.

NAPA also argues that it has spent (unspecified) time and expense on recruitment and will lose the value of those efforts if the nonsolicitation clause is not enforced. But NAPA has been compensated by St. Joseph's for these services. The fees paid to NAPA include an administrative fee. (J.A. 236 ¶2a.) The parties' agreement specifically states that this "[f]ixed administrative fee . . . covers services such as . . . recruitment . . . ." (J.A. 144 §II(A)(1).) This makes NAPA's argument completely untenable. It is not a legitimate business purpose to keep St. Joseph's from benefiting from recruitment efforts when St. Joseph's is paying for those efforts. It is not unfair competition by any stretch of the imagination for St. Joseph's to benefit from efforts for which it has reimbursed NAPA.[5]

---

[5] Dr. Santos' conclusory statements to the contrary (from someone who does not claim to have negotiated the contract or been involved in billing for services) is not competent evidence. (J.A. 271, Second Santos Decl. ¶6.)

58412754.1

The district court explained that "protection against a general risk of possible future employee attrition is not among the . . . legitimate interests recognized by New York courts to justify a restrictive covenant." (ECF 39, PageID15 (quoting *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13 Civ. 8739(PKC), 2014 WL 97317, at *12 (S.D.N.Y. Jan. 9, 2014)). In *Reed Elsevier*, the court rejected an argument that the risk of "employee attrition" is a legitimate interest supporting a non-solicitation provision, holding that the list of "four legitimate interests recognized by New York courts to justify a restrictive covenant [is] an exclusive one." *Id.* The four legitimate interests are: "(1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Id.* at *8. None of these exclusive legitimate interests contemplate NAPA's "interest" in "hiring, retaining, and training" its clinicians.

NAPA's argument that it has developed "goodwill" from the "investment" it has made in the anesthesiologists group is likewise insufficient. Protecting an investment in a business in general is not a cognizable business interest recognized under New York law. *See BDO Seidman*, 93 N.Y.2d at 392; *Bessemer Trust Co. v. Branin*, 16 N.Y.3d 549, 557 (2011). *See* (S.P.A. 22.) Indeed, NAPA's argument that it is entitled to a preliminary injunction to protect its investment in the practice, if

correct, would upend most noncompete law. According to NAPA's logic, any time a firm bought a business, it could prevent the employees from leaving. That is certainly not the law.

### c. *NAPA's "Ordinary Commercial Contract" Argument Does Not Change the Analysis*

NAPA attempts to salvage its position by arguing that the district court improperly assessed its claims as if they applied only to individual noncompete clauses, and not to commercial contracts between sophisticated parties. NAPA argues that the district court failed to apply a nebulous "simple rule of reason" test applicable to "commercial contracts." (Dkt. 30.1, PageID.35-37.) But the district court explicitly addressed this issue and determined, consistent with the case law, that "under the standard espoused by the cases NAPA cites for that proposition, the Court must still consider whether there are 'legitimate business interests protected by the covenant.'" (ECF 39, PageID.13 n. 12 (quoting *Mathias v. Jacobs*, 167 F. Supp. 2d, 606, 611 (S.D.N.Y. 2001); *DAR*, 37 F. Supp. 2d at 197).) And as the district court recognized, "multiple courts have applied the *BDO Seidman* factors in analyzing contractual provisions in similar contexts." (*Id.* (citing *Mastercard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 600 (S.D.N.Y.) (collecting cases and applying *BDO Seidman*)).)

New York courts have expressly held that nonsolicitation provisions are a "species . . . of a covenant not to compete" and are therefore "governed by the three-

part test of reasonableness articulated in *BDO Seidman*." *Lazer Inc. v. Kesselring*, 13 Misc.3d 427, 431, 823 N.Y.S.2d 834 (N.Y. Sup. Ct. 2005) (holding that a nonsolicitation agreement "necessarily also affects 'the general competitive mold of society,' and is in derogation of the concept, that 'our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas.'" (quoting *American Broadcasting Companies, Inc. v. Wolf*, 52 N.Y.2d 394 (1981); *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 307 (1976)).

Virtually all of NAPA's own cases addressing such contracts required a "legitimate business interest" to justify the covenants, and either approved or rejected them based on the presence or absence of confidential information or the risk of lost customers, factors analyzed by the district court:

- *DAR & Associates, Inc. v. Uniforce Services, Inc.*, 37 F. Supp. 2d 192 (E.D.N.Y. 1999) involved a noncompete pursuant to a licensing agreement, *not* a nonsolicitation clause. Nevertheless, the court analyzed the noncompete under the same framework cited by the district court. The *DAR* court cited *American Institute of Chemical Engineers v. Reber-Fiel Co.*, 682 F.2d 382, 387 (2nd Cir. 1982) to the effect that a restrictive covenant can be justified "[o]nly after determining that a restrictive covenant would serve to protect against 'unfair and illegal conduct' and

not merely to insulate the employer from competition…" *Id.* at 197-98 (citations and quotation omitted). The covenant was found to be justified in this case because of the use of a system "which consisted of confidential information…" *Id.* at 198.

- Similarly, in *Spheronomics Global Contact Centers v. vCustomer Corp.*, 427 F. Supp. 2d 236 (E.D.N.Y. 2006), the court assessed a nonsolicitation clause based on its protection against lost customers, finding that "the legitimate business interest to be preserved is the unfair competition that would result" from solicitation of "a client to whom Spheronomics had introduced it for the purpose of the joint pursuit." *Id*. at 249.

- In *Design Strategy Corp. v. Knack Systems, LLC*, 2007 WL 4562926 (S.D.N.Y. Dec. 18, 2007), the court assessed a noncompete clause between two businesses, stating that "[b]ecause covenants not to compete restrain trade, New York courts rigorously examine such covenants before enforcing them." *Id*. at *3. The court then examined whether there was a "legitimate business interest" protecting the covenant which would include "prevention of unfair competition." *Id*. The critical question, according to the court, was whether "Knack

45

exploited Design's relationship with L'Oreal to obtain its own business, but not otherwise." *Id*. Thus the case turned on whether the clause was necessary to avoid a poaching of customers.

- The court in *MasterCard* stated that restrictive covenants serve legitimate business interests only if they protect trade secrets, confidential information or special or unique services. *MasterCard*, 164 F. Supp. 3d. at 602. See discussion *supra*.

- *Marsh* critically involved protection of customer relationships "developed with [the employees] at Marsh's expense." *Marsh*, 2008 WL 4778239, at *14.

- The court found a legitimate business interest under a commercial contract in *Express Freight*, because parties to whom the restrictive covenant applied "likely gained access to clients… through their work with Express Freight." *Express Freight Systems Inc.*, 623 F. Supp. 3d 39, 51 (E.D.N.Y. 2022). The court found that this "would indeed amount to unfair competition." *Id.* at 52.

NAPA relies heavily on *Omni Consulting Group Inc. v. Marina Consulting Inc.*, 2007 WL 2693813 (W.D.N.Y. Sept. 12, 2007), *aff'd sub nom. Omni Consulting Group, Inc. v. Pilgrim's Pride Corp.*, 488 F. App'x 478 (Summary Order) (2d Cir.

July 17, 2012), an unreported federal district court decision affirmed by summary order, for the view (contrary to all the foregoing cases) that a nonsolicitation clause in a contract for services is inherently justified by a legitimate business interest. But the *Omni* decision did not rely on any New York appellate decision for its unusual conclusion, and the cases it does cite confirm that all restrictive covenants must be justified by a legitimate business interest related to trade secrets, confidential customer information, protection of a customer base, or unique and extraordinary employees. *See, e.g.*, *Baker's Aid, Inc. v. Hussman Foodservice Co.*, 730 F. Supp. 1209, 1214 (E.D.N.Y. 1990); *Winston Franchise Corp. v. Williams*, 1992 WL 7843, at *9-10 (S.D.N.Y. Jan. 10, 1992) (finding legitimate business interest in protecting confidential customer list); *DAR & Assoc., Inc. v. Uniforce Servs., Inc.*, 37 F.Supp. 2d 192, 198 (E.D.N.Y. 1999) (finding legitimate business interest in preventing a former licensee from using confidential information and customer goodwill obtained "while operating under the Uniforce trade name . . . to divert business away from Uniforce"). *Omni* is an outlier and does not reflect New York law.

This is not surprising, since the *Omni* decision makes no logical sense. The overriding principle under New York law is that restrictive covenants are strictly construed, because they limit competition. *Markets Group*, 2020 WL 820654, at *11 ("New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy

favoring robust and uninhibited competition . . . ."). Certainly (contrary to the *Omni* analysis), that is as true of a nonsolicitation clause as it is of an individual noncompete. In fact, the nonsolicitation clause here, since it affected scores of anesthesia providers, has the same impact as scores of noncompete clauses. Its effect on competition is far greater than, not less than, that of an individual noncompete clause.

Moreover, the *Omni* court relied upon the fact that the defendant there "does not argue that the enforcement of the provision would pose a hardship" to it, and found that because "the restriction in this case applied only to Pilgrim's ability to hire a single individual . . . [it] does not impact Pilgrim's ability to maintain its business." *Omni*, 2007 WL 2693813, at *5. The opposite is true here. St. Joseph's has explained why the nonsolicitation clause enabled NAPA to demand unreasonable terms from St. Joseph's, at the risk of totally disrupting patient care. The ability to do so is certainly not a "legitimate business interest."

Remarkably, NAPA then asserts that "the evidence showed that NAPA's clinicians obtained its confidential and private information." (Dkt. 30.1, PageID.37). But NAPA ignores the fact that it expressly disclaimed any assertion that it was protecting confidential information at one of the hearings before the district court:

> THE COURT: Just so that we narrow down what we're talking about, there's no argument that . . . the covenant is needed to protect trade secrets, that's correct?

58412754.1

MR. KATZ: That is correct.

THE COURT: And no argument that it's needed to protect confidential customer information.

MR. KATZ: That's correct.

(J.A. 511 29:3-13.) This is not surprising, since its agreement with St. Joesph mentioned only St. Joseph's confidential information, not NAPA's. NAPA apparently cannot get its own story straight.

### 2. Any Breach by St. Joseph's is Excused Because NAPA Committed the First Material Breach

While the district court did not need to reach this issue, there are several alternative grounds for affirmance of its decision on the merits. *Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 223 (2d Cir. 1991); *see, Janese v. Fay,* 692 F.3d 221, 225 (2d Cir. 2012) (holding that this Court can affirm the district court's order "on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely").

First, NAPA also cannot prevail on the merits because it materially breached the contract first. As a matter of law, a material breach excuses the other party from further performance. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016) (applying New York law); *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) (applying New York law).

The unrebutted evidence shows NAPA has failed to adequately staff the hospital. (J.A. 226 ¶7.) In fact, there have been significant periods (including at least

49

May, 2022, through October, 2022) during which NAPA provided adequate anesthesia staffing only for 11 operating rooms at St. Joseph's when there was a sufficient demand to operate 13 or 14 rooms. (J.A. 232 ¶5.) This has meant that many surgeries could not be performed at St. Joseph's. (*Id.*) NAPA's staffing failures constitute a material breach of the Agreement, which requires NAPA to schedule a sufficient number of providers to cover St. Joseph's surgical volume. (J.A. 97 §II.F.)

### 3. The Non-Solicitation Clause as Utilized by NAPA Violates the Antitrust Laws

Another alternative ground for affirmance arises because enforcement of the restrictive covenant would violate the antitrust laws. For this reason, as well, NAPA cannot prevail on the merits. NAPA seeks to use the covenants to maintain a virtual monopoly and demand exorbitant and increasing payments. As this Court explained in *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1082 (2d Cir.1977), "employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act." "When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired." *Id.* at 1082. In determining whether NAPA's enforcement of its noncompete and nonsolicitation clauses violate the antitrust laws, courts must consider: (1) whether the restrictive covenant "operates in circumstances where no valid business interest of the ex-employer is at stake," *or* (2) even if not overbroad per se, whether the restrictions are "so

58412754.1

burdensome that their anticompetitive purposes and effects outweigh their justifications." *Id.*

NAPA and its affiliates have an overwhelming share of nonacademic anesthesia providers in Onondaga County, and academic anesthesiologists are not alternatives to private practitioners. (J.A. 242 ¶6.) This gives NAPA a virtual monopoly, and explains why it has been able to dramatically increase the payments it demands from St. Joseph's, far above the rates charged in a comparable market such as Albany. *See, e.g.*, *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998). "Monopoly power," also referred to as market power, is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 791 n.3 (2d Cir. 1987)). Monopoly power may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market. *See K.M.B. Warehouse Distrib., Inc. v. Walker Mfg., Co.*, 61 F.3d 123, 129 (2d Cir. 1995). Both such sources of evidence are present here.

Because St. Joseph's has no real alternatives for anesthesia providers to fully staff its hospital except for the providers who were employed by NAPA and working at St. Joseph's, NAPA's noncompete and non-solicitation clauses effectively

eliminated any alternative sources of supply for St. Joseph's, and further cemented NAPA's monopoly. Statement of Facts, *supra*.

Thus, the restrictive covenant serves to maintain the monopoly power of NAPA and its affiliates. Section 2 of the Sherman Act is violated by conduct which "is reasonably capable of contributing significantly to a defendant's continued monopoly power." *Realcomp II, Ltd. v. F.T.C.,* 635 F.3d 815, 830 (6th Cir. 2011); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001).

In response, NAPA relies on cases which do not support its arguments. In *Fido's Fences v. Canine Fence Co*, 672 F. Supp. 2d 303, 313 (E.D.N.Y. Nov. 30, 2009), the antitrust claims were not dismissed based only on a "legitimate interest" analysis but because "the presence of this clause does nothing to further Fido's claim of market-wide antitrust injury."

NAPA also miscites *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045 (9th Cir. 1974). NAPA summarizes the case as saying "where noncompete provision was reasonable in scope and duration and served a legitimate business purpose, it was not in restraint of trade." (Dkt. 30.1, PageID.47.) But what the case actually says is that "the noncompete provision was reasonable in scope and duration and served a legitimate business purpose *not in restraint of trade*." *Trixler*, 505 F.2d at 1051. (Emphasis added). Thus, contrary to NAPA's argument, the court did not conclude there was no restraint of trade because of the presence of a legitimate

business purpose. It concluded that there was not a restraint of trade in addition to the finding of no legitimate business purpose. This is made clear by the court's statement that the proper standard was applied by the district court: "whether it is so inherently anticompetitive in purpose or effect or both as to constitute an unreasonable restraint of trade." *Trixler*, 505 F.2d at 1051.

NAPA's arguments on geographic markets do not change this conclusion. Under a normal antitrust analysis, NAPA's actions harm competition. NAPA does not dispute its dominant position in the provision of anesthesia services in Syracuse and Onondaga County. Precise market shares are not necessary when NAPA controls the only two significant non-academic hospitals in Onondaga County. (J.A. 242 ¶6.)

The geographic boundaries involved in an Onondaga County market are certainly not artificial. The unavailability of sufficient alternative sources of anesthesiologists outside of Onondaga County to replace NAPA (*id.*), (J.A. 220 ¶4), (J.A. 318-29 ¶¶3-5), means that those providers are not "reasonably interchangeable" substitutes for Onondaga County providers, *Todd v. Exxon Corp.*, 275 F.3d 191, 201, (2d Cir. 2001), and Onondaga County is therefore a relevant market.[6]

---

[6] Nor are anesthesia providers at ambulatory surgery centers a good substitute. (J.A. 221 ¶9.)

53

NAPA's argument that this case is about one competitor rather than overall competition ignores the fact that "[c]ompetition does not exist in a vacuum; it consists of rivalry among competitors. Clearly, injury to competitors may be probative of harm to competition." *Hasbrouck v. Texaco, Inc.*, 842 F. 2d 1034, 1040 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990). In an anesthesia market with very few competitors, and with one of them possessing monopoly power, the elimination of any actual or potential competitor has a very significant impact on competition. "[I]f concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 279 (1964) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365 n.42 (1963)).

## D.   The Balance of Harms and the Public Interest Weigh Heavily Against an Injunction

Because the district court concluded that NAPA failed to establish irreparable harm or the likelihood of success on the merits, the court was not obligated to make findings on the remaining preliminary injunction factors. *JBR. Inc.*, 618 F. App'x 31, 36 (2d Cir. 2015) ("Because irreparable harm is the '*sine qua non* for preliminary injunctive relief,' we conclude that [the] motion for a preliminary injunction fails at the irreparable harm stage, and we do not reach the other components of the preliminary injunction inquiry." (citing *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1295 (2d Cir. 1995))). Nevertheless, NAPA's arguments were also

inadequate on these remaining elements, and they provide an alternate basis for the district court's decision.

As this Court has ruled, the movant must show that "the balance of hardships tip[s] decidedly in the movant's favor." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967(2d. Cir. 1995). In fact, the opposite is true here. If St. Joseph's was not free to attempt to employ the anesthesia providers at its hospital, it would have been faced with the prospect of surrendering to NAPA or facing a dramatic loss in activity in surgeries, cardiac procedures, deliveries of newborns, and other procedures that are critical to the hospital's ongoing operations. (J.A. 241 ¶2.) In fiscal year (ending in June) 2023, St. Joseph's earned approximately $100 million in contribution margin from surgeries, heart procedures and other procedures requiring anesthesia care—*six times* what NAPA has been paid by St. Joseph's annually. (J.A. 237-38 ¶5.) That fact alone demonstrates that the harm from injunctive relief would have been far, far greater than anything that NAPA (which received $16 million) can claim. Statement of Facts, *supra.* Moreover, an injunction would have kept more than fifty anesthesia providers from continuing to work at the location they preferred, St. Joseph's. In contrast, and as described above, any threatened harm to NAPA is completely conjectural.

Significantly, as described above, the vast majority of the providers have already gone to work for St. Joseph's. At this point, NAPA could not possibly claim

any significant threatened injury, even if its arguments were otherwise tenable. *Knaust v. City of Kingston*, 157 F.3d 86, 87 (2d Cir. 1998) ("In general, an appeal from the denial of a preliminary injunction is mooted by the occurrence of the action sought to be enjoined.").

### E.    An Injunction Would Harm the Public Interest

The public interest favors free competition, not the restrictions imposed by the nonsolicitation clause. *United States v. E.l. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961) ("A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints."); *Grumman Corp. v. LTV Corp.*, 665 F.2d 10, 16 (2d Cir. 1981) (finding that "the threat to the public interest from the loss of competition is serious"). New York recognizes a "general public policy favoring robust and uninhibited competition[.]" *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 214 (S.D.N.Y. 2013). Moreover, the public interest certainly does not favor disruption of surgical care and the other procedures which require anesthesia at St. Joseph's.

Conversely, there is no evidence whatsoever that any disruptions in patient care would occur in the absence of an injunction. The evidence in the record from surgeons who directly observe quality of care, is drastically to the contrary. (J.A. 253 ¶¶2, 5.) In contrast, the Santos declaration to the contrary is conclusory hearsay.

(J.A. 91 ¶14 ("I have learned that St. Joseph's actions are distressing and distracting to the Group's clinicians.").)

### F. The District Court Properly Found No Material Facts in Dispute to Justify an Evidentiary Hearing

NAPA claims that an evidentiary hearing was required but has failed to identify any disputed relevant and material facts that would warrant it. When considering a motion for preliminary injunction, testimony is not required where no "essential" facts are in dispute. *Anderson v. Cameron*, 568 F. App'x 67, 68 (2d Cir. 2014) ("[T]here were no factual disputes, [and so] an evidentiary hearing was not necessary.) (quoting *In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 269 (2d Cir. 2001)); *see also Christian Fellowship Ctrs. of N.Y., Inc. v. Village of Canton*, 377 F. Supp. 3d 146, 155 (quoting Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d. Cir. 1998)). Moreover, as the district court rightly concluded, it is the "obligation [of] the moving party to put some facts in the record from which the court could determine" such a dispute exists. (J.A. 421-22 9:1-3.)

The district court gave NAPA multiple opportunities to supplement the record with any relevant, material facts that it could muster, which NAPA took advantage of by submitting additional declarations. (*Id.* at 8.) Upon reviewing the record evidence, the district court correctly determined that there are no relevant material facts disputed in the present matter and therefore, an evidentiary hearing was unnecessary. The district court was certainly correct. As described above, NAPA's

58412754.1

vague and conclusory declarations fail to meet its burden. And critical facts – the absence of trade secrets or relationships between anesthesia providers and their patients – are undisputed.

It is apparent from the argument in this case that NAPA sees an evidentiary hearing as an opportunity to present new evidence when it had every opportunity to present the evidence it needed by declaration. In fact, at the May 1, 2024, preliminary injunction hearing, NAPA's counsel stated that "we don't get an evidentiary hearing so I don't have five witnesses here . . . ." (J.A. 509 27:15-17.). In response, the district court stated:

> THE COURT: [A]n evidentiary hearing is not a time for you to come in and freshly make new argument. I've given you ample opportunity to put in affidavits in support of your arguments and to put in whatever information you wanted to put in to try to raise an issue of fact for an evidentiary hearing.

(J.A. 509-10 27:18-28:7.)

NAPA's appeal brief reflects a continued lack of understanding that NAPA had an obligation to first produce evidence by declaration, and that an evidentiary hearing was only necessary if, after the submission of such evidence, there were significant material disputes to be resolved. Thus, in its appeal brief, NAPA states that:

> At the evidentiary hearing, NAPA planned to present evidence about its clinicians' relationships with other providers at St. Joseph's, the clinicians' ability to generate

58

> business, the lost opportunity costs at other facilities, and
> the risk of a forced breach of contract at other facilities due
> to the lack of available clinicians.

(Dkt. 30.1, PageID.56.) But NAPA is not entitled to hold back evidence until an evidentiary hearing.

In its argument in its appeal brief for an evidentiary hearing, NAPA states that it "was prepared to present evidence regarding the following facts." (*Id.*, PageID.63.) But NAPA's obligation here is to show that it had *already* presented evidence sufficient to create significant and material *disputes* of fact that would require an evidentiary hearing to resolve. NAPA has utterly failed to do so.

## **CONCLUSION**

For the foregoing reasons, the district court's denial of NAPA's requests for

a temporary restraining order and preliminary injunction should be affirmed.

Dated: December 17, 2024

*s/John Queenan (w/permission)*
John Queenan (Bar Roll No.513003)
Rivkin Radler LLP
66 S. Pearl Street, 11th floor
Albany, NY 12207
(518) 641-7071 (p)
(518) 462-4199 (f)
john.queenan@rivkin.com

*s/David A. Ettinger*
David A. Ettinger (P26537) (*pro hac*)
Benjamin VanderWerp (P84614) (*pro hac*)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com
bvanderwerp@honigman.com

*Attorneys for Plaintiff/Counterclaim-Defendant*

58412754.1

### CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

I hereby certify, pursuant to Fed. R. Civ. P. 32(a)(7)(C), that:

1.      This brief complies with the type-volume limitations of Fed. R. Civ. P. 32(a)(7)(B) and Local Rule 32.1(a)(4). This brief contains 13,706 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and Local Rule 32.1(a). This brief has been prepared in proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

Dated: December 17, 2024

/s/ David A. Ettinger
David A. Ettinger

*Counsel for Plaintiff-Counter-Defendant-Appellee*

58412754.1